IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

WILLIAM PLAGENS,                    )
                                    )
            Plaintiff,              ) Case Nos. 1:20CV2744
                                    ) and 1:21CV238
      vs.                           )
                                    )
JENNIFER D. DECKARD, et al.,        )
                                    )
            Defendants.             )

- - - - -

TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

JUDGE J. PHILIP CALABRESE, JUDGE OF SAID COURT,

ON FRIDAY, JULY 23RD, 2021,

COMMENCING AT 9:00 O'CLOCK A.M.

- - - - -

Court Reporter:            GEORGE J. STAIDUHAR
                           801 W. SUPERIOR AVE.,
                           SUITE 7-184
                           CLEVELAND, OHIO 44113
                           (216) 357-7128

APPEARANCES:

On behalf of proposed lead Plaintiff Paul Antosca:

THORNTON LAW
BY:  GUILLAUME BUELL, ESQ.
     ANDREA M. LANDRY, ESQ. (by Zoom)
One Lincoln Street, 25th Floor
Boston, MA 02111


On behalf of proposed lead Plaintiff Sergio Baron:

GLANCY, PRONGAY & MURRAY
BY:  KEVIN F. RUF, ESQ.
1925 Century Park East, Suite 2100
Los Angeles, CA 90067


        and


LESLEY F. PORTNOY, ESQ.
info@portnoylaw.com
(310) 692-8883


On behalf of proposed lead Plaintiff
Thomas E. Phelps, M.D.:


THE ROSEN LAW FIRM, P.A.
BY:  PHILLIP KIM, ESQ.
     ERICA L. STONE, ESQ.
275 Madison Avenue, 40th Floor
New York, NY 10016

        and

LAW OFFICE OF DANIEL R. KARON, LLC
BY:  DANIEL R. KARON, ESQ.
Suite 200
700 St. Clair Avenue, W
Cleveland, OH 44113

APPEARANCES CONTINUED:


   On behalf of the Defendants:

       KIRKLAND & ELLIS - Chicago
       BY:  GABOR BALASSA, ESQ.
       300 North LaSalle Street
       Chicago, IL 60654


                   - - - - -

I N D E X

WITNESSES:                                    EXAMINATION

Paul Antosca

    by the Court                                  8

    by Mr. Kim                                     23

Sergio Baron

    by the Court                                  29

    by Mr. Buell                                  40

    by Mr. Ruff                                   47

Thomas E. Phelps, M.D.

    by the Court                                  50

    by Mr. Buell                                  62

    by Mr. Kim                                     68

P R O C E E D I N G S

THE COURT:  Please be seated.  All right. Good morning, everyone.  We are on the record today in two cases.

The first is William Plagens versus Jennifer Deckard and others in Case No. 1:20CV-2744, and the other is Sergio Baron versus Jennifer Deckard and others in Case No. 1:21CV-238.

Between the two cases, there are four motions to consolidate these related punitive securities class actions, select a lead plaintiff and appoint counsel.  Those are pending for the Court and the subject of the hearing this morning.

Before we go any further, will counsel please state their appearances for the record, starting with counsel for Mr. Antosca?

MR. BUELL:  Good morning, your Honor.

Guillaume Buell of the Thornton Law Firm from Boston Massachusetts, appearing for Antosca.  With me appearing remotely at his side is my law partner, Andrea Landry, who should be visible on my screen, your Honor, but if you do, then, I don't need to see Mr. Antosca.

And of course, with me is Mr. Antosca remotely.

THE COURT: All right. Thank you. And then counsel for Mr. Baron?

MR. RUF: Good morning, your Honor.

Kevin Ruf from Glancy, Prongay & Murray, and with me is Mr. Portnoy from the Portnoy Firm.

THE COURT: All right. Thank you. And then counsel for Dr. Phelps?

MR. KARRON: Good morning, your Honor.

Dan Karon, Karon, LLC, just down the street.

For the doctor with me today are Phil Kim and Erica Stone with the Rosen Firm in from New York.

THE COURT: Good morning. I'm sorry, and I didn't catch your name.

MS. STONE: Erica Stone from the Rosen Law Firm.

THE COURT: All right. Thank you.

MS. STONE: Dr. Phelps' counsel.

THE COURT: And counsel for Defendants?

MR. BALASSA: Good morning, your Honor.

Gabor Balassa, Kirkland & Ellis representing Defendants, observing here today.

THE COURT: All right. Thank you.

In connection with discharging the statutory directive under the Private Securities Litigation Reform Act of 1995 to appoint lead plaintiff, on May 25th of

this year, the Court scheduled this hearing and exercised its discretion by deciding to interview the candidates for appointment as lead plaintiff.

Upon conclusion of each interview, the Court will permit a limited amount of follow-up questions from counsel, and at the end of the interviews, the Court will hear short arguments from counsel as well.

Finally, we will proceed alphabetically this morning so starting with Mr. An Antosca and proceeding in the order of the introductions. And I will order the three individual potentially plaintiffs separated.

So Mr. Phelps and Mr. Baron, if you would kindly step out into the hallway, your counsel will advise you when we are ready for you.

All right. And then with that, do we have Mr. Antosca by Zoom?

All right. Mr. Antosca, are you able to see me?

MR. ANTOSCA: Yes, I can.

THE COURT: And you are able to hear me as well.

MR. ANTOSCA: Yes, I can.

THE COURT: All right. Thank you.

Will you please state and spell your name for the record and the benefit of our court reporter.

MR. ANTOSCA:  Yes.  Paul Antosca, P-a-u-l, A-n-t-o-s-c-a.

THE COURT:  And will the courtroom deputy please swear the witness?

PAUL ANTOSCA

proposed lead plaintiff, called as a witness and being first duly sworn, was examined and testified as follows:

THE COURT:  Thank you.

EXAMINATION

BY THE COURT:

Q.   So Mr. Antosca, is there any reason you can't provide full and truthful answers to the questions here this morning?

A.   There is no reason.

Q.   All right.  And have you testified before, either at deposition or in court?

A.   No.

Q.   All right.  Let me just briefly let you know how this works.  We do have a court reporter here who is making a written record of every word that anyone says, so that means a couple things:

We can't talk over each other.  Make sure you keep your voice up and speak at a reasonable pace for his benefit, and everything you say has to be oral.  No

nods of the head or uh-huh or uh-uh. It has to be yes or no.

Would you please just start by providing a little bit of background about yourself, you know, who you are, where you live, what your educational background is and the like?

A. Sure. As I stated, my name is Paul Antosca. I live in Boston, Massachusetts. I went to Boston College undergrad; Bentley College graduate school. I work at DWS Group, which is the mutual fund segment asset management arm of Deutsch Bank, and I lead up the tax department responsible for oversight of the tax integrity of the mutual funds.

Q. And how long have you worked there and had that role?

A. At DWS Group, I have been here almost 16 years. Prior to that, I worked at Manulife John Hancock and prior to that was ten years at Price Waterhouse.

Q. Have you ever been involved before in a lawsuit in any capacity?

A. No, I have not.

Q. Sounds like given your background you may have a fair amount of experience with investing.

Is that a fair assumption on my part?

A. Yes, it is.

Q.   And could you provide a little bit of explanation or context around that for me?

A.   Sorry.  As far as my investing prowess or experience?

Q.   Yes.

A.   Okay.  I have to know a lot about securities in light of my job for the tax aspects.  I have to know what the tax attributes of various investments our mutual funds may make.

On my personal side, I have been investing since I got out of college here and there.

Q.   And that's been like through individual accounts, taxable as well as like retirement accounts and the like?

A.   For myself, yes.

Q.   And when did you first learn about the stock or the company that brings us together today?

Just for purposes of our conversation, I am probably going to refer to it primarily as Covia but understanding that involves some predecessor entities as well.

A.   Sure.  I first learned about Covia, formerly Fairmont Santrol, in early 2017, shortly before my first purchase.

Q.   All right.  And why did you decide to make that

first purchase?

A.     The investment was brought to my attention from my colleagues at DWS, and I am also friends with them, and we were talking about the fracking business?

And this company came up, Fairmount Santrol, and we thought it was a good company, and there were reasons to invest.  Most predominantly was they were supposed to have the best sand box in the world I guess with the coating resins they use.  It is supposed to be above and beyond competitors, and it looked like an interesting investment at the time.

Q.     And beyond what you've said, did you make the decision to purchase that stock with the assistance of a professional investment adviser of any kind?

A.     No, I did not.  It was 100 percent my choice.

Q.     Can you just give me some sense, I have the submissions from counsel about all your stock holdings and the amount of money that you put in and different valuations of the amount of money you say you lost and things like that.

So I don't need to get into all of that level of detail here with you at the moment, but I just want to try to get some sense from you of your -- in your overall portfolio at the time.

And I appreciate when I say "at the time,"

that's a little in flux because there is a period of time here that spans some number of months, but at the time you held stock in the company, about what percentage of your portfolio would you say those holdings were?

A.    Your Honor, this is going to be an estimate.  You know, I realize I am under oath, so it is going to be an estimate, but I would say it was around 20 percent perhaps.

Q.    And you made various sales of the Covia stock at different times.  What was your thought process on those sales?

A.    Sales of Covia --

Q.    Yes.

A.    -- the offer.  I did not make any sales.  I only made purchases.

Q.    All right.  Thank you for clarifying that for me.

And you will need to clarify that as well.  Some of the details get fuzzy, but did you acquire shares both pre and post merger or only on one side or the other?

A.    Premerger.

Q.    Was there any particular reason you did not purchase shares post merger?

A.    Well, your Honor, I think when you look at that, I had a substantial -- for someone like me, there was a

substantial investment in that firm. So I just held back.

I attempted to, you know, just lower my cost basis with those subsequent purchases, but there is a time when you have to just stop. And so I just left it there with the final purchase in 2017. Sorry to interrupt.

Q. When did you first learn about potential litigation involving the company?

A. That would have been -- I believe, your Honor, that would have been sometime in early 2020.

Q. And how did you hear about it?

A. My friend sent me the notice. It was either through an SEC filing that the company made or through a public press release.

Q. You say your friend. Is that one of the people you mentioned earlier, you had talked about earlier?

A. That's correct.

Q. And just from your perspective and in your own words, I want to get a sense from you what you think the lawsuit is about and what you are hoping to accomplish through this litigation?

A. Sure. Your Honor, I do have a substantial loss there. And when I first heard about the -- let me just step back because there may have been, if my memory is

correct, an announcement or a disclosure about the lack of integrity in the superiority of the sand, and I remember we had that conversation with my friend, you know, to say "oh, look at this, this is something."

And shortly after that, I think the complaints were filed against the company. Beyond that, I don't know if I can give you too much more because my memory is not that -- it is an important event in my life, but that's what I remember, that the disclosures were made through the SEC that my friend mailed to me and then the announcement, which basically was impending bankruptcy.

Q. All right. And why are you interested in being named the lead plaintiff?

A. I think that -- your Honor, I think that I am well suited for it. I do have a fiduciary responsibility at work where I oversee the accounting firms and legal firms that do our work, so I am used to oversight.

I am very much aware about the fact that the entire class has to be protected and treated equally, which means it has to be a reasonable settlement, and as far as my ability to oversee the legal aspects of this, I think I am well suited for it.

Q. And you mentioned treating all the members of the class equally and fairly.

Do you have anything in mind in particular in how you would do that as lead plaintiff?

A.   Well, I would monitor the process here at the law firm, probably with monthly meetings, whatever necessary.  And upon any settlement or conclusion, I would review that with counsel and go over how it was developed.

I would imagine they would go through some kind of market capitalization loss analysis, and I certainly would listen to their input and then make a decision that I trust would benefit not only me but everyone else in that class.

Q.   Would you -- and I appreciate you may not have an answer to this, and you may need to consult with counsel -- but would you ultimately be looking to amend the complaint or to add Covia as a Defendant?

MR. BUELL:  Your Honor, if I may interpose an instruction to Mr. Antosca, subject, of course, to the court ruling on my request not to disclose specific litigation strategy we may have --

THE COURT:  I am going to --

MR. BUELL:  -- at least without -- with defense counsel in the room.

BY THE COURT:

Q.   I am not asking you to disclose anything about your

conversations with counsel, Mr. Antosca, but I would like an answer to my question.

Frankly, it is a question I would put to counsel later today anyway because I need to plan my schedule and the schedule of this case.

So if you are selected as lead plaintiff, would your intention be to seek to amend the complaint, add Covia as a Defendant, and your answer, you may need to consult with counsel.

But I wanted to get your thoughts about that without asking you to disclose anything you have discussed with your counsel.

A.    Yes.  I really would have to discuss that with Thornton and go over all the legal aspects of it. I do leave that to counsel.  That's how I feel about it.

Q.    You understand, as the Court case moves forward, if you are selected as the lead plaintiff, you would have obligations in discovery?

A.    Yes.

Q.    And that would involve producing documents and information about your own claims and stock holdings and things like that.  You --

A.    Yes.

Q.    -- you understand that might be --

A.   I'm sorry.

Q.   No, no.  Go ahead.

A.   No, it is -- I suspected that.  If you want to go into detail, yes, I would love to hear how far that could go.

Q.   Well, I mean, you understand it might get somewhat personal about some of these conversations you've had and some of your stock holdings and things like that.  You understand that?

A.   That it would -- that they would -- they would want to see my other holdings would be brought into the situation?

     Is that --

Q.   I don't know.  But all I am asking you is that the discovery process, the information that you are asked to provide ultimately might feel fairly invasive to you.  Do you understand that?

A.   Could I just discuss that with my counsel here?

Q.   Sure.  That's not anything we have to resolve today.  That's a long way off, but I am just trying to get a sense, I mean, you do understand if the case progresses with you as the lead plaintiff, you are going to have obligations in discovery?

A.   Absolutely.  I do understand that, yes.

Q.   Okay.  And although you are appearing by Zoom, if

selected as the lead plaintiff, you know, you may have to appear here in the Northern District of Ohio if I order that?

A.    I do understand that, your Honor.  I am sure you would take into account the current state of the pandemic or any variance that may be in place at the time as a concern of mine.

Your Honor, that's the main reason why -- I am kind of concerned about the protocol that you have to go through at these airports and traveling under the current state with COVID, and I trust we would all consider that.  But if you order it, yes, I would have to appear.  I recognize that.

Q.    So again, I have a couple more questions here and just -- again, I do not want to ask you to say anything at all about any discussions you've had with your counsel about this, but I do need to ask some of these questions.

If you were selected as lead plaintiff, would you be intending to work with the current counsel you have?  Would you be intending to bring in additional counsel?  I wanted to try to get some sense of that.

A.    I would rely on the current counsel and their opinions and recommendations.  That certainly would weigh

heavily on any decision.  Perhaps they want to bring in other experts.  That would be something that we would have to discuss.

Q.   And what fee structure would you be contemplating, or would you be -- well, let me get your thoughts on that.

A.   As I understand it, your Honor, the Thornton Law Firm has a sliding scale, depending on the amount of work and effort that they have placed into the case.  I think it could range from 18 percent to upper 20 percent or 30 percent.  It depends upon just the nature of the case and the amount of work that they had to place into this, this endeavor.

Q.   And as lead plaintiff, would you intend to seek any additional compensation for your time and effort in that role?

A.   I would talk to counsel about that, but I think it is reasonable that I would be compensated for my time that I spend on this case by submitting time sheets or an accurate and full accounting of the time that I spent.

Q.   And how is it that you ended up working with your current counsel?  Again, I am not interested in any privileged matter or the like.

But one of the concerns of the statute at

issue that brings us here today is whether this is lawyer driven litigation or client driven litigation.  So I need to inquire into that.

A.    Yes.  Your Honor, I saw the notice, the press releases from various law firms.  The first one that was -- that I saw anyway.  I don't know if it is the first one that hit the wires -- but the first one I saw was a firm out in Los Angeles?

And they were looking for a lead plaintiff with a loss in excess of a hundred thousand dollars.  And I thought this is interesting because I know that I had a loss of more than a hundred thousand dollars.  And a few days later I noticed a few other law firms, and Thornton was one of them.  And I live right down the street from Thornton.

And I said, let me answer this inquiry on their e-mail site, and they promptly responded, and that's why I chose that, mostly because they are local.

Q.    And two last questions for you, sir:

One is, there was another person who is in the same position you are who would like to serve as lead plaintiff, who had some questions about whether you purchased stock in the company at prices outside of daily trading ranges.

Have you seen that chart or not?

A.     I am not certain I understand.  Did I purchase securities outside of daily price ranges?  What does that mean?

Q.     There was some suggestion that you provided information to the Court about the purchase prices on certain dates of various lots of stock, but when you matched those prices that you reported to the Court, it fell outside of the publicly reported daily trading ranges?

A.     You know, those numbers I believe are adjusted for the reorganization between Fairmount Santrol and Unimin, the Belgium company that was involved in the reorg.  So the prices I paid -- certainly, the prices I paid were during regular trading hours, and it was at market price I assure you.

            The document that you see has been adjusted for the merger, the reorg.  Frequently, you have to adjust those prices, and it is also adjusted for the special cash distribution that I received upon the merger.

Q.     And the last topic I wanted to ask you about was another concern that was raised in the briefing by another person in your shoes who expressed concern about the fact that you only acquired company stock before the merger.

So I wanted to get your thoughts about that and whether that creates issues about whether you would be in a position to fairly and adequately represent class members who purchased post merger, and go ahead.

A.    Yeah, sure.  I don't think it matters as long as you purchase within that time period that was mentioned in the action, but it looks like if you go back and look at the history of this, I owned it -- I bought it premerger, Fairmount Santrol, and that's where the assertions came from concerning the superior sand.

It was not after the merger, although they may have still maintained that, but remember that Fairmount Santrol is the company that really had the assertion that the sand was superior for the fracking business?

So I don't think that because I purchased it prior to the merger, I don't see why that would have any bearing on my demeanor or behavior in representing the classes.  I would like some extension on that.  I just don't see that.

THE COURT:  All right.  Thank you.  Those are the questions I had, and I do want to give counsel a chance to follow up on any areas briefly to the extent they wish to, and in order to conclude with your counsel, Mr. Antosca, I will start with counsel for Mr. Baron if

you have any questions.

MR. BALASSA: No questions, your Honor. Thank you, your Honor.

THE COURT: Counsel for Dr. Phelps?

MR. KIM: Yes, your Honor. I have some questions. Should I use the lectern?

THE COURT: Yes. And please be sure to speak directly into the microphone so that Mr. Antosca can hear you as well as the court reporter so you are going to move that a little bit closer I think.

FURTHER EXAMINATION ON BEHALF OF COUNSEL FOR DR. PHELPS:

BY MR. KIM:

Q. Good afternoon, Mr. Antosca. I can't see you, so I don't know if you can see me, but I will try to be as brief as possible.

Earlier you testified you selected the Thornton Law Firm because they were local. Did you do any research about the firm's qualifications prior to retaining them as your proposed lead counsel?

A. Yes, I did. I went on their website, and they seemed to have a fairly large practice in this area.

Q. Understood. And you don't need to tell me the substance of the conversations, but did you contact any other law firms to determine whether you would want them

to represent you?

A.     No, I didn't.  I looked on the website of that law firm in IA because that was one of the first press releases that was issued by that law firm.  I went on the their website a couple of days, again there was no rush on this.  I saw the Thornton Law Firm, and I went on their website, and that's the extent of the research that I did among the firms.

Q.     Understood.  And you live in Boston, right?

A.     Yes, I do.

Q.     Do you read the Boston Globe?

A.     No, I don't.

Q.     Well, in researching the Thornton Law Firm, did you ever come across an article online or otherwise that was published in the Boston Globe on March 1st of 2020 entitled, quote, "Judge orders Boston law firm to repay millions in inflated legal fees," cites "egregious misconduct at Thornton."

Do you recall seeing that as part of your research?

MR. BUELL:  Objection, your Honor.

None of this is in the briefing or in the record before the Court, and by reference to a newspaper article, it is reference to hearsay.

THE COURT:  Please.  No speaking objections

for the life of this matter.  I am going to overrule that.

We are getting a bit far afield, but you can answer whether you have seen that article or otherwise heard that information about that law firm.

THE WITNESS:  I did not see that article.

BY MR. KIM:

Q.   Did you know that Federal Judge Mark Wolf in Boston found that misconduct was so, quote unquote, "egregious, that he reported the Thornton Firm to the Board of Bar Observers for potential disciplinary action"?

A.   I did not, sir.

Q.   Are you aware at any time that a Special Master, a retired Federal Judge, Gerald Rosen, issued a Special Master's report that has been widely cited in the media in Boston?

A.   I am not aware of that.

Q.   And you didn't read in any media report quoting Judge Rosen that "the Thornton Law Firm attempted to," quote, "jack up," unquote, "their billable hours and showed a," quote, "troubling disdain for candor and transparency that at times crossed the line to outright concealment of the facts," unquote?  You never saw that?

A.   I did not.

Q.   Had you known these facts, would that have changed your mind in retaining the Thornton Law Firm?

A.   I don't know quite frankly.

Q.   Fair enough.  Do you know who Garrett Bradley is?

A.   Yes.

Q.   And do you know if Federal Judge Mark Wolf found that conduct by Mr. Bradley in the State Street case was sanctionable?

A.   No, I didn't know that.

Q.   You testified earlier if the Court ordered you to appear personally here in Cleveland.  Is that correct?

A.   Yes, I would consistent with the COVID protocols in place at the time, but that would be part of the Judge's decision.  He would obviously consider that, but if he ordered it, yes.

Q.   Did you know that Judge Calabrese initially ordered that the lead plaintiff movant appear in person?

A.   I did.

Q.   Do you have any -- without getting into any specifics -- do you have any health condition that would prohibit your appearance in person in Ohio?

A.   I do not.

Q.   Now, you testified earlier that you work at DWS.  Is that correct?

A.    Yes.

Q.    And that's a financial services firm.  Is that fair to say?

A.    Probably should refine that a little bit.  It is an asset management firm, mutual funds.

Q.    Now, prior to making personal investments, do you have to obtain a clearance from your compliance department to ensure that your investments don't conflict with perhaps the investments your employer is making?

A.    Yes.

Q.    Did you obtain such clearance with respect to your investments here?

A.    Yes.

Q.    Do you know if you are required to obtain clearance from your compliance department to serve as a lead plaintiff in a securities action?

A.    That I would have to take a look at.  I was -- I don't think I do, but I will have to look into that I guess.

Q.    Okay.  So you didn't make any inquiry about that?

A.    I didn't when I was answering -- every quarter we have questionnaires to answer, and I didn't see -- that was not one of the questions.  It was more like "if you

are involved in a criminal" -- a criminal complaint or any litigation of that sort. I didn't see anything about lead plaintiffs involved in securities matters. There was nothing about that.

THE COURT: I will give you about one more minute, Mr. Kim.

MR. KIM: One last question.

BY MR. KIM:

Q. Do you know if DWS made any investments in Covia or its predecessor?

A. My guess is, they were involved on the debt side probably for the funds, loans, short-term loans.

MR. KIM: Understood. I have no further questions. Thank you very much.

THE COURT: All right. Mr. Balassa?

MR. BALASSA: No questions.

THE COURT: All right. Thank you. Mr. Buell?

Hopefully, I am pronouncing everyone's name close to correctly. Mr. Buell?

MR. BUELL: No questions, your Honor. Thank you for your time, Mr. Antosca.

THE COURT: All right. Thank you. With that, Mr. Antosca, we are going to cut off the Zoom connection, but thank you for your time this morning.

MR. ANTOSCA: Thank you.

THE COURT: All right. Would counsel please bring Mr. Baron in?

(Pause.)

THE COURT: All right. Would you please state and spell your last name for the record?

MR. BARON: My name is Sergio Baron, S-e-r-g-i-o, B-a-r-o-n.

THE COURT: All right. And would you please swear the witness?

SERGIO BARON

proposed lead plaintiff, called as a witness and being first duly sworn, was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q. Sir, have you been deposed before or testified in court?

A. No, first time.

Q. All right. So let me just go over the rules briefly with you.

First -- and this may be most important -- you will need to pull the microphone closer so everyone in the courtroom can hear and most importantly that our court reporter can hear. So I will need you to talk

directly into the microphone. You are still too far away.

A. This better?

Q. That's better, but you will need to do better than that for everyone's sake. We have a court reporter here today, and he is making a record of everything that is said here.

There is a few important things about that beyond speaking directly into the microphone. One is you need to wait until anyone asking a question is done, so we are not talking over each other.

Also, the court reporter can't see or hear nods of the head, and it is very difficult to write down things like uh-huh or uh-uh, so it needs to be yes or no.

With that, is there any reason you are not able to fully and truthfully answer the questions this morning?

A. No. I don't think so, no.

Q. All right. Would you please provide a little bit of background about yourself, including where you live, where you work, your educational background, things like that?

A. Sure. My name is Sergio as I mentioned. I am Brazilian born. I am a U.S. citizen. I came to the U.S. in 2005 with my family. I used to work, I work in the

oil business.  I live in Texas for sometime, moved to New York.

We live in New York since 2012, and now I work in a consulting firm in New York.

Q.   And you say New York, is that New York City?

A.   No.  Yeah, the company is -- I live in West Chester.  It is a little bit north of -- the name of the city is Bronxville.

Q.   And what's the consulting company you work for now?

A.   The name of the company is S & P Global Platts, P-l-a-t-t-s.

Q.   And how long have you worked with them?

A.   Just three years.

Q.   Did your work in the oil industry include work around fracking in particular?

A.   No, not really.  I graduated from college in 1979.  I started working for a Brazilian oil company called Betro Brass.  I worked for five years in reservoir engineer but not working on the fields.

And then, I moved to the commercial side, and I stayed there for a total of 29 years.  So I never been directly involved with fracking operations.

Q.   And sir, what's the nature of your consulting?  Is it financial or technical or what?

A.    It is market analysis.  We do analysis about trends, prices, refining margins in oil.

Q.    Have you been involved in a lawsuit before?

A.    No.

Q.    And tell me a little bit about your experience as an investor.

A.    I have been trading oil commodities, so I would say sophisticated for my job working in that futures markets, and as an investor, I have been doing some trades.  I would call perhaps a sophisticated investor, I have the basics, and I understand options.  I understand futures.  I understand the margins, margin calls, and all this.

Q.    So the lawsuit here -- I am going to refer to Covia, but I know there is predecessor companies -- but when did you first learn about the company and decide to purchase stock?

A.    Actually, it was the previous company called Fairmount.  I was -- I had at that time, that was perhaps in 2013 or '14 or so -- I had a bullish view on crude oil, so I thought that the sand business would be a good business to invest.  That was my first approach.

Q.    And I just want to get your best estimate, and I appreciate it will be a best estimate, over the period of time here, what percentage of your holdings or

investments would you say your Covia stock was?

A.    I would say that around 20 percent or so, 25 percent.

Q.    And can you explain for me a little bit at a high level -- I don't think we need to get into any particular trades on any particular day -- but what overall was your investment philosophy or approach with respect to the company here?  It looks like there were -- you were an active trader, and I just want to get a sense of what you were doing.

A.    Yeah.  Basically, I was constructive in the sand business.  And the way that I found out as a strategy to express this view was most of the time in selling put options, which I would be giving up some upside and just collecting the premium if the market goes up.

And if the market goes down in the worst scenario, I would be exercised in needing to buy the stock but at the lower price than I would buy normally.

So that was my strategy, and I had the funds to cope with the worst scenario.  So it was just a question of strategy, and I thought at that time that would be -- my risk would be lower doing that than buying stocks because I had the money to put as a margin.  I need to put margin on those trades.

Q.    And at any point, were you shorting the company?

A.    No.  I short -- no.  I short some calls but was to hedge my long positions on that.  No.  My trade was a hundred percent with the view that the equity will appreciate over the time, all the time.

Q.    When did you first decide to file your lawsuit?

A.    Perhaps was when -- some months I would think after they declare bankruptcy.  I just saw a note in a paper or in a press release, so I decided to join, nothing that I was planning before.

But I decide because I thought that there were -- I felt that there were reasons for that.

Q.    There are some questions I may need to ask you here. I don't want you to talk about anything you've discussed with your lawyers, so you know, I just want to be clear. I am not asking you for any of that information.

But subject to that, do you know why you filed a separate lawsuit as opposed to joining the other case that had been filed?

A.    Can you repeat the question, please?

Q.    Sure.  You filed your own lawsuit.  There is a case with your name on it called Sergio Baron versus Jennifer Deckard and other individual Defendants.  Now, I just want to understand, to the extent you have thoughts that are your thoughts and don't come from your counsel, about why you filed that separate lawsuit instead of

joining one that was already under way.

A.    I didn't know there were others under way.

Q.    And again, in your own words and without getting into anything you've discussed with your lawyers, I just kind of want to understand from your perspective what the lawsuit is about and what you are hoping to accomplish through this litigation.

A.    Basically, the lawsuit -- and forgive me if I am not using right words as I am not English native speaker -- but the lawsuit is management or lack of clarity to the investors about the product they produced that was supposed to enhance the oil rig production?

And it never proved to be right, so in my own words, it is what I would say, if I -- if I make a bad investment decision because the market changes and I had that in the past, that had experience, and that's part of life.  My thought that was not the case.

I think as an investor I did not have -- I did not have a chance to defend myself, defend my positions, and that was the driver for my decision to look for a legal counsel.

Q.    And again, without getting into discussions with counsel, to the extent you are able to say, do you -- would you want to name Covia as a Defendant in the case, or would you want to amend the complaint in any way other

than that?

A.    I understand that Covia is in bankruptcy, so I would think that the managers of the company, those responsible for the company should be involved in the suit.

Q.    And why do you want to be appointed to serve as the lead plaintiff in the litigation?

A.    First of all, it is because of the size of my losses; second is, very honestly, is independently how much I am going to recover if I recover.  I feel that it is my duty because I am really convinced that there was a serious case?

        And I feel it is my duty for me and for the other Plaintiffs that eventually could join, so it is more related to my integrity, my purpose, nothing -- of course, I want to recover, but I am not so optimistic that I am going to recover a good part of my losses.  So it is my desire to help.

Q.    And if you were selected as the lead plaintiff, what would you do to protect and advance the interests of other members of the class?

A.    Oh, yes.

Q.    Well, what specifically would you be doing, or how would you work with counsel?

A.    I will do what I can do, make myself available, you know.  And I'm still working, but you know, I will devote

time for that, and I would do everything that is in my power to help.  So I would make myself available.

Q.    And if you were the lead plaintiff, you understand that you would have obligations in discovery?

A.    Yes, I am aware.

Q.    And so that would involve producing information that in many ways might feel quite personal or invasive, things about your finances and possibly beyond.

A.    Yeah.  I don't have a problem with that, no.

Q.    And would you intend, as lead plaintiff, to proceed with the counsel you are currently with, or would you want to bring in additional or different counsel?

A.    No.  I don't have any plans.  I would continue with the same, yes.

Q.    Do you have any thoughts about fee structures for counsel?

A.    Yeah.  I know that it is -- there is a cap, which is one third, I believe, of the total amount that is in case of success.  So I am aware about the structure of fees, yes.

Q.    And if selected as lead counsel, would you be intended to seek additional compensation for your time and effort in that role?

A.    Let me try to be very specific.  Of course, I would like to have compensation, but it is not what is -- would

move myself.  It is not the most important factor.

Q.    And let me ask how you ended up working with the lawyers that you are working with now.

A.    I think that I saw a note from Lesley Portnoy, and I reach him through e-mail.  So we exchanged some e-mails and information, and then, I felt comfortable in moving forward?

And I think that then Glancy joined as well, and we had some conversations, and I felt comfortable with them.  I think they are equipped to represent me.

Q.    All right.  And I just have a couple more questions for you.  So one of the other people whose kind of in the same position you are trying to advance claims and serve as lead plaintiff raised a question about whether you actually purchased the securities that are at issue on your own behalf or whether you were acting on somebody's else's behalf.

I mean, were they purchased, for example, with an assignment of rights or in a trust or with a power of attorney or anything like that, or were these just through your own personal accounts or what?

A.    Yes, just for my own personal account.

Q.    Then, there was some other suggestion raising a

question, at least, about whether your purchases fell outside of daily trading ranges. What do you -- do you have a response on that issue?

A. I was trading through eTrade, and I was always putting the margin -- one thing and as I mentioned before is the reason of selling puts, which is a non traditional way to own the stock, it is a proxy for buying the stock or potentially buying the stock.

So it was just a strategy, but I don't think -- at least, I was not never advised that I was exceeding daily limits. I was always trading online by myself and on my laptop and nothing -- I was never advised of anything like that.

THE COURT: All right, Mr. Baron. I want to give counsel an opportunity to ask you some questions and we will conclude by having your lawyers ask questions, but we will start with counsel for Dr. Phelps if you have any questions.

MR. KIM: No questions, your Honor.

THE COURT: Mr. Antosca, counsel for Mr. Antosca?

MR. BUELL: Just a few, your Honor. I will be quick.

THE COURT: Yes.

MR. BUELL: Let me apologize for my speaking

objection earlier.  I didn't realize the Court's preference?

THE COURT:  Make sure to speak into the microphone if you would.

FURTHER EXAMINATION ON BEHALF OF COUNSEL FOR MR. ANTOSCA:

BY MR. BUELL:

Q.   Mr. Baron, my name is Guillaume Buell, and it is pleasure to meet you.

I am an attorney with the Thornton Law Firm, counsel for Paul Antosca, another individual who purchased the securities at issue.

Do you know Mr. Antosca?

A.   No.

Q.   Have you ever heard of him?

A.   No.

Q.   Have you ever heard of my law firm in Boston, the Thornton Law firm?

A.   No.

Q.   Did you file a complaint in one of these two related actions.  Is that correct?

A.   Can you say again.  I'm sorry.

Q.   Did you file a complaint in one of these two lawsuits?

A.   Yes.

Q.   Did you review the complaint before it was filed?

A.   Yes.

Q.   Do you know what the class period alleged in that complaint is?

A.   Class action?

Q.   Do you know what the class period pled in your complaint against the Defendants in your lawsuit is?

A.   You mean the time it is -- I think it is from -- I am not a hundred percent sure, but I think it is from 2017, 2019.  I am not a hundred percent sure.

Q.   Are you aware approximately halfway through the class period that you pled in your complaint Fairmount Santrol merged with another company to form Covia?

A.   Yes.

Q.   Are you aware that shareholders who purchased the relevant securities before and after the merger are members of the class that you pled in your complaint?

A.   No.

Q.   Do you know what class your complaint seeks to represent, sir?

A.   No.

Q.   Do you know what a class is, sir?

A.   No.

Q.    Are you aware of the filing that your counsel made on your behalf last week in this action?

A.    Yes.

Q.    Do you know what that filing is?

A.    Can you repeat the question?

Q.    Do you know what that filing was?

A.    I know they file, yes.

Q.    What was that filing, sir?

A.    I don't know.  What -- can you repeat?

Q.    Yes, of course.  Let me rephrase the question.

            Do you know what document your counsel filed with the Court last week on your behalf?

A.    The name of the document?

Q.    The name or the description.  I am not trying to trick you into the specific name.

A.    No.  I mean, the description, yeah.  I read the whole filing.  I cannot use -- I don't know the legal term.  Yes.

Q.    Speaking in lay terms, then, what generally was the document that was filed last week on your behalf?

A.    No.  I don't --

Q.    Excuse me.  Go ahead.

A.    No, go ahead.

Q.    Can you tell the Court anything about the document that was filed last week by your counsel on your behalf?

A.   No.

Q.   When you filed your lawsuit against Covia, did you sign a certification attesting to your transactions in the relevant securities?

A.   Yes.

Q.   Are you aware that document was signed under oath?

A.   Yes.

Q.   I'm sorry.  Withdrawn.  Under the penalties of perjury?

A.   Yes.

Q.   Did you review it before you signed it?

A.   Yes.

Q.   Do you remember when you signed it?

A.   I sign it back in January or so of -- January -- I believe it was January or February.  I don't remember the exact date.

Q.   Did you sign any documents before January 21 of 2021?

A.   Yes.  I think the first time I signed -- I don't remember the dates.  To be honest, I don't remember the dates.

Q.   Do you remember the document that you first signed that had a list of all of your transactions and the relevant securities?

A.   Yes, yes.

Q.    Did you look at the list of transactions that was attached as Exhibit A to that document before you signed it?

A.    Yes, I looked.

Q.    Did you review any documents before signing that document?

A.    Yes, I review.

Q.    What documents did you review?

A.    I reviewed the filing and the list of all the transactions, and I reconciliate with my statements.

Q.    Have you since reconciliated -- withdrawn.

When you first reviewed your transactions, did you notice any errors between the document you were signing and your statements?

A.    I think that there was two or three transactions that were added later, and I sign again to certify. There was two or three transactions.

Q.    When you first signed the document -- withdrawn.

MR. BUELL:  Your Honor, I don't want to take too much of the court's time.  Would I be -- may I place Mr. Baron's certification in front of him, or I can just ask a leading question.

THE COURT:  You can ask him a leading question.  I was going to give you about another minute.

MR. BUELL:  Okay.

BY MR. BUELL:

Q.   Mr. Baron, what I will tell you is that you signed your original certification on December 10th of 2020. Does that sound familiar to you?

A.   Yeah, I think so.

Q.   When you signed your certification on December 20th of 2020, did you reconcile the transactions in Exhibit A of your certification against the account statements that you had in your possession at the time?

A.   Yes.

Q.   And have you since reconciled your statements with your certification again since December 10th, 2020?

A.   No.

Q.   Did you sign a renewed certification in this action?

A.   At that time you mean?

Q.   Do you recall signing a certification on December 10th of 2020?

A.   Yes.

Q.   Did you sign another certification on July 16th of 2021?

A.   Yes.

Q.   When you signed that document, did you know what you were signing at the time?

A.    Yes.

Q.    Were you aware that there were errors in your certification that was previously submitted to the Court?

A.    I was not -- I was advised that I was aware and that I would need to sign again.

Q.    When you signed again, did you review Exhibit A against your account statements?

A.    I did, yes.

Q.    Do you believe that shareholders who purchased the relevant securities before the merger are part of the case that you filed against the Defendants?

A.    I think so, yes.

          MR. BUELL:  No further questions, your Honor.

          THE COURT:  All right.  Thank you.

          Mr. Balassa?

          MR. BALASSA:  No questions.

          THE COURT:  And counsel for Mr. Baron, you might want to move the podium up.  There is a button on the side.

          MR. RUF:  Oh, I am going to be brief.

          THE COURT:  Okay.

          MR. RUF:  So I would hate to get it all fixed for me.

Kevin Ruf, your Honor, for Mr. Baron.  Just a couple of questions:

- - - - -

FURTHER EXAMINATION ON BEHALF OF COUNSEL FOR
MR. BARON:

BY MR. RUF:

Q.    Counsel just asked you about a filing last week.

Does it refresh your recollection that it was, indeed, the certification, the new certification?

A.    Say again.  I'm sorry.

Q.    You signed another certification?

A.    Yes.

Q.    And it was because of some small errors?

A.    Small errors, yes, yes.

Q.    And had to do whether certain positions or options were open positions or closing positions, right?

A.    Right, correct.

Q.    The Court asked you whether or not you had purchased the stock in Covia outside daily trading ranges.  Do you remember that question?

A.    Yes.

Q.    Do you understand that on any given day the market, you know, establishes the price of the stock, and you can look back historically and see what those prices were,

correct?

A. Right, correct.

Q. However, in situations involving options where you ended up buying the stock as a result of a contractual obligation, the trading price would be established by the contract and not the daily trading range, right?

A. Right. It is the strike price.

Q. So the strike price could be outside the so called --

A. Oh, yes, sure.

Q. -- let me finish.

A. I'm sorry.

Q. -- outside the daily trading range?

A. Yes.

Q. You were asked questions about the so-called class, but the questions didn't include the word "action." You understand this is a class action, right?

A. I understand, yes.

Q. Can you tell the Court your understanding of what a class action is?

A. A class action is an action taken by the universe of investors, and it is -- how can I define it -- it is -- and there is one leader plaintiff appointed but all with the same interest in the action.

Q. So if I were to say that the universe of investors

you just described is the same as a class, you would understand that, right?

A.    Yes.

Q.    And that was your understanding what that was?

A.    That's my understanding, yes.

Q.    You also at one point said that most of your transactions were in options.  Do you remember that?

            But it is true that you owned 160,000 shares of the common stock over the class period, right?

A.    Yes.

Q.    And extracting or subtracting shares you sold at the end of the class period, you had 78,000 and change, 78,200, right?

A.    Yes.

            MR. BALASSA:  That's all I have, your Honor.

            THE COURT:  Thank you.  Mr. Baron, you may step down.  Thank you very much.

            And if counsel would bring Dr. Phelps in.

            (Pause.)

            THE COURT:  All right.  Good morning. Please start by just stating and spelling your name for the record.

            DR. PHELPS:  Thomas Edwin Phelps, P-h-e-l-p-s.

            THE COURT:  Would you please swear the

witness?  Please stand and raise your right hand.

THOMAS E. PHELPS, M.D.

proposed lead plaintiff, called as a witness and

being first duly sworn, was examined and testified

as follows:

EXAMINATION

BY THE COURT:

Q.    All right.  Sir, have you been deposed before or

testified in court?

A.    Yes.

Q.    All right.  Just to refresh your recollection on how

that works, there are just a few ground rules I want to

make sure you are aware of, so we proceed smoothly this

morning.

First, I will ask you to pull the microphone

a little bit closer.  It will be easier for folks in the

courtroom to hear you, but more importantly, it will be

easier for our court reporter to hear you.

A.    Okay.

Q.    So please just speak slowly and directly into the

microphone for his benefit.

You will recall from prior testimony that

you need to wait until a question has been asked so that

people are not speaking over one another, and you need to

answer every question orally, no nodding of the head like

you are doing now and no uh-huh or uh-uh or anything like that.  That's very hard to translate, so yes or no.

And with that, I just want to start by getting a little bit of background about yourself, including your educational background, where you live and what you do for a living.

A.   Okay.  For education, I went to the University of Notre Dame in Indiana for undergrad in 1976 to 80; '80 to '84, I went to Ohio State Medical College and came to Cleveland in '84 to '87 for residency at Rainbow Babies & Children's.

I went a year to Boston in a pediatric practice and came back to Cleveland, and I have been here since 1988 working in Geauga County as a pediatrician.

Lately, I have been -- I was independent once, and I was with University Hospitals, and I am with the Cleveland Clinic currently?

And I am doing some pediatric practice in Euclid and Mayfield Village, Ohio, and I am doing some consulting overseas.  I live in southwest -- I live in Russell, Ohio, which is Geauga County.

Q.   You said you have testified before.  I assume in your line of work there is periodically litigation over care or treatment of patients and the like.  Is that what you are referring to?

A.    Yes.  Actually, the one time I received a notice, it was to testify for University Hospitals, and there was an employee issue, and I had to be the representative for the hospital.

Q.    Okay.  Other than that, any other prior litigation experience or involvement?

A.    No.  We -- as a pediatrician, I worked with an internist, and we had an internist we hired who had a malpractice lawsuit against him, but they labeled us because we were the owners of the practice, and my name as a pediatrician was withdrawn, but those are the only two I can think of.

Q.    All right.  I want to try to get some sense of your experience as an investor.

Can you talk a little bit about kind of what background you have in that?

A.    So I do investing, I do things through my 401(k), through the employer, and I do investing on my own through research that I look into.

So I generally don't invest on a lot of companies.  I tend to pick a couple that I follow closely, and I usually make positions in them, and then, I might trade in and out of a base position to try to lower the cost.

Q.    Do you make those decisions on a number of company

basis or a number, you know, a dollar basis?  In other words, do you try to have say like five investments in a company or up to X number of dollars at any one time?

A.    I don't -- I don't set a number as much, but I usually have one or two or three companies.  When I follow, I don't try to follow a lot of them because I can't do it.  So when I follow, I tend to follow it closely and know a lot about what's going on but not enough as in -- because you only know so much.

Q.    And about how long would you say have you been doing this kind of investing?

A.    At least 20 years I would say.

Q.    And when did you first learn about Covia or any of its predecessor companies?

A.    So I learned -- at that time, it was Fairmount Minerals, and I -- it would have been around 2016.  Where I live in Geauga County was about a half mile away.  We used to live in Chesterland, Ohio, and Fairmount Minerals' main office was basically a mile away.

At that time, I had read about things like the oil and sand mines, and I knew the business was right there.  I also knew that because they were active in our community through United Way, and they were active in -- I was on the school board, and as a school board member, they delivered sand to our school because we built a new

stadium, so I knew about them, and that's what led me to tend to invest in them.

Q. When you made those investments, did you do that on your own initiative, or were you doing it on the recommendation of a broker or someone else?

A. On my own, yeah.

Q. And this is going to be an estimate, and it may have changed over time, but what's your best estimate of what percentage of your portfolio your investment in Covia was?

A. So like the loss percentage or the --

Q. I am just trying to get a sense -- and we can focus it at the outset of time here if you want -- I am just trying to get a sense overall of whether this is a hundred percent of your investments or one percent or fall somewhere in between perhaps?

A. Yeah. If it is -- if we said investments, it is 30 to 40 percent. Of my net worth, it was about 25 or 30 percent.

Q. And you talked a little bit about purchase decisions? You also sold Covia stock?

A. Yes.

Q. And why did you sell -- kind of what went into your thought process on that?

A. Well, I sold it at different times trying -- my main

thinking was trying to -- since it was dropping, since it came public from $25 to $30 a share down to -- down, down down a lot of it -- I was trying to cost average.

Fairmount Minerals had done the same thing back in '16 or whatever where it went back to a dollar and came back. I was trying to ride out the time that I thought that the market would drop.

I sold it towards -- I might have sold a lot toward the end because I panicked when the oil went negative honestly, and I bought it back because I thought this was -- I was more -- I am a physician. I was very optimistic about COVID, thinking, number one, it wouldn't do the damage it would.

I was optimistic that there would be the oil, I was optimistic there would be a major infrastructure bill coming, and I believe our country needs that, and I thought sand would -- even though it is sand, it would be very big in infrastructure.

Q. So when did you first hear about the litigation involving the company?

A. I think as far as the -- for the class action suit, I think that was around December I read about it.

Q. Of 2020?

A. Right, yes.

Q. And when did you decide to do what you are doing

now, try to become a plaintiff in the case?

A.    When I read -- first, it brought back all the memories of what happened.

So I looked into the different companies that were representing it, and I reached out.  I kind of looked at three or four of them and reached out to one of them and called them and talked to them.

And then, I decided to call another firm because I looked at Rosen, because I think they had done initially the first filing.  So when I saw it on Yahoo, I would probably say it was within a week or two.  It was not too long after.

Q.    And in your own words, I just want to get a sense from you what this lawsuit is about and what you are hoping to achieve with it.

And I will also say, you are the first witness who we have had this problem with, you may just need to back up a little bit from the microphone.

A.    I'm so sorry.

Q.    Everybody else doesn't get closer, so every day is a first, but just in your own words, I want to try to get a sense of what the lawsuit is about and what you are hoping to achieve.

A.    Okay.  So from my understanding, the lawsuit is -- is that better?  Okay.  Sorry.  I can hear it now.

From my understanding, the lawsuit is a class action lawsuit against basically the leaders of the company, Jennifer Deckard, the three chief financial officers, and Mr. Navarre who was the new CEO.

And it is regarding the alleged misstatement or misrepresentation of profits that are used to improve the flow of oil. As I followed the company closely, that was probably the main selling point to me of why I invested in it.

And I visited their corporate office. I saw the research. They constantly talked about how their research delivered the best sand, the best result. And so obviously, I took a really big loss. And I knew they filed bankruptcy, but I was really shocked and really, really shocked that I found out that this was going on because I didn't expect that there was misrepresentation of a product.

I knew about sand. I knew about the market. I knew about all that stuff, but I didn't know about that. So that's what led me to call the different firms.

When I talked to the -- when I talked to Erica, they helped me, at least Erica Stone, listened to what I had to say, and that's what kind of led me to them. So it was kind of a healing process but also a

grieving process.

Q.   And why do you want to be appointed as the lead plaintiff?

A.   I thought when that question came up, I thought of a number of things:

I had a big loss, so I like to understand more about what's happening about the process, if there was any contribution I could do to helping pursue the suit.  I live very nearby, at least, to Cleveland.  I'm 30, 40 minutes outside of Cleveland?

And my thinking was that if I was involved in it, I would be able to add some value to the legal team in addition to being a local person and also being a representative for somebody who lives in this community, who invested in a local company, who invests in its community passionately.

So there is a lot of pain for me, but part of this was to hopefully contribute, if there was something wrong, to contribute to the class of people, not just to me but to the class.

Q.   And I don't want you to talk about anything you've discussed with the lawyers or the like; I am just trying to get your own thoughts here.

But do you have any interest in naming Covia as a Defendant or otherwise amending the allegations

in the complaint if you were selected as the lead plaintiff?

A.    At this time, I wouldn't have any thoughts of it because I wouldn't know -- I know they are in bankruptcy from what I understand, but I don't have any thoughts of naming them.  I just believe the people are named because the company was in bankruptcy at the time.

Q.    And if you were to be the lead plaintiff, do you have any ideas about what you would be doing to protect the interests of other investors or how you would propose to work with counsel to do that?

A.    I think -- the main thing I would be able to provide would be being available, being local, and being available, helping to answer questions, listening to -- aside from the story -- as far as if there is a settlement or to try to help give the individual investors' point of view what I consider fairness for the class.

Q.    And as lead plaintiff, you understand that you would have obligations in discovery --

A.    Yes.

Q.    -- that might involve producing documents or other information that might be very personal and might feel very invasive?

A.    Yes.

Q. And you are prepared to do that?

A. Yes.

Q. And if you were the lead plaintiff, would you intend to work with the counsel you have, or would you be looking to consider different counsel or additional lawyers?

A. My plan would be to stay with the Rosen Firm.

Q. And do you have thoughts about the fee structure for your counsel in the case?

A. I just heard that it was up to like a third potentially, I think 20 to 30 percent of the settlement.

Q. And if you were the lead plaintiff, would you be seeking any additional compensation for your time and effort in serving in that role?

I know that's always an issue with doctors in litigation generally, so you may be sensitive to that issue already, but I wanted to ask you about that.

A. No. I guess I don't plan on that unless for some reason it really took me away for a long, long time. I have flexibility in my schedule, so if I can work through that, it is not a problem with me.

Q. You mentioned that you looked at a couple of other firms potentially as counsel.

Could you tell me why you landed on the

counsel you did?

A.   Well, I noticed that they had filed, I think, the first claim at that time, and I had seen that they had success from what I could see, and I had heard about them just in -- just reading about it.

So I think compared to the -- I had called one other firm, and I don't remember the name of the other firm, but compared to that firm, I felt like I had someone I could really -- I guess as a pediatrician I like talking to people and knowing relationships -- and that I felt a connection.

So I felt like they would listen to what I had to say and didn't just want my numbers, which I know they need the numbers, but I was looking for someone to, at least, hear me, and that was important to my deciding to stay with them and not keep calling places.

Q.   And given your professional occupation and the demands on your time that way, do you think you have the time, effort, and energy to take on a lead plaintiff role?

A.   Yes.

THE COURT:  All right.  I do want to give counsel an opportunity to follow up on that, and we will conclude with your counsel.  So why don't we start with counsel for Mr. Antosca.

Any questions?

MR. BUELL:  Yes, your Honor.

- - - - -

FURTHER EXAMINATION ON BEHALF OF COUNSEL FOR
MR. ANTOSCA:

BY MR. BUELL:

Q.   Good morning, sir.  My name is Guillaume Buell.

I am an attorney with the Thornton Law Firm in Boston, Massachusetts.  Thank you for being here.

A.   Thank you.

Q.   Have you ever heard of my law firm before, sir?

A.   Well, I just heard you were coming today, but that's all.

Q.   Are you aware of any prior litigation that my law firm has been involved in?

A.   No.

Q.   Have you ever heard of the name Paul Antosca?

A.   No.

Q.   Have you ever heard of the name Sergio Baron?

A.   No.

Q.   Have you ever heard of the name Christopher Palmer?

A.   No.

Q.   Have you heard of a law firm Wolf Haldenstein?

A.   No.

Q.    Have you ever heard of a law firm Zoll & Kranz?

A.    No.

Q.    Are you aware that Christopher Palmer -- withdrawn.

If I told you that Christopher Palmer filed a motion to seek appointment as lead plaintiff in this action, would that refresh your recollection?

A.    I don't recognize the name.

Q.    Did your attorneys disclose to you whether they have any agreement with Mr. Palmer's counsel to work on this case if you are appointed lead Plaintiff?

MR. RUF:  Objection.

MR. BUELL:  Sure.  I will withdraw the question.

BY MR. BUELL:

Q.    Have your attorneys disclosed -- I am going to ask you a yes or no question, sir.

Have your attorneys disclosed to you whether they have an agreement with either the Wolf Haldenstein Firm or Zoll & Kranz Law Firm to work on this lawsuit or a different lawsuit with them if you are appointed lead plaintiff in this action?

A.    I am not aware of that.

Q.    Are you aware of the fact that there was previous litigation involving the merger of Fairmount and Unimin?

A.    I knew there was previous litigation.  I knew there was some litigation at the time of the merger, and I don't know specifics of it.

Q.    Your attorneys have filed a number of briefs, legal arguments to the Court on your behalf in this case.  Are you aware of that?

A.    Yes.

Q.    Have you reviewed any of those briefs before they were filed?

A.    I -- some of them I reviewed, at least, that I know of.

Q.    Did you review a brief that argued that the merger litigation involving the Fairmont-Unimin merger may have discharged or released certain claims covered by this class action?

A.    I don't remember that.

Q.    I just asked you a yes or no question.

A.    Oh, okay.

Q.    Have you discussed that concept with your attorneys?

A.    No.

Q.    Do you believe that shareholders who purchased relevant securities prior to the merger should be included in this class action?

A.    Yes, I believe.

Q.    Do you believe that those shareholders are situated

any differently from shareholders who purchased the relevant securities after the merger in the same class action?

A.   No.

Q.   Have you read the release of claims -- withdrawn.

Have you read the notice to class members in the merger litigation involving Fairmount and Unimin from several years ago?

A.   I don't remember.

Q.   Do you remember your attorneys filed a brief on your behalf on February 8th, 2021, seeking your appointment as lead plaintiff in this case?

A.   Yes, if the date is right, but I don't know the dates, but, yes.

Q.   Do you understand the mechanism by which the Court under the Private Securities Litigation Reform Act in 1995 will be appointing a lead plaintiff on behalf of the class in this case?

A.   Yes.

Q.   Do you have an understanding that part of the analysis the Court is required to undertake is to determine which plaintiff has the largest financial interest in the relief sought?

A.   I don't know specifics of that, but I know there is something about who had the bigger loss, but I don't know

exactly if it is the largest.  I don't know all the details, I guess.

Q.   Do you think that the largest shareholder who has the largest loss in the case is the one who should be appointed the lead plaintiff, who steps forward and seeks appointment as lead plaintiff?

A.   I don't know about the law that they take into all that or just that number.  I don't know that.

Q.   Are you aware that on February 8, 2021, your attorneys filed a brief on your behalf that said, quote, "Courts in the Sixth Circuit have determined that the plaintiff with the largest losses has the largest financial interest," closed quote?

A.   I don't remember that.

Q.   Do you recall that two weeks later on February 22nd, 2021, your attorneys filed a brief on your behalf that made a different argument?

A.   I don't remember that from February.

Q.   Do you recall filing a certification in this case in connection with seeking appointment as lead plaintiff?

A.   Yes.

Q.   That certification you reviewed included a list of your transactions and the relevant securities?

A.   Yes.

Q.   That document was signed under the penalties of

perjury?

A.   Yes.

Q.   I'm sorry.  I didn't hear your answer.

A.   Yes.

Q.   Did you review the document before you signed it?

A.   Yes.

Q.   I am going to represent to you that the first paragraph, the first numbered paragraph in your certification says "Plaintiff has reviewed a complaint against Covia and retains the Rosen Law Firm, P.A. and authorizes it to file a lead plaintiff motion on his behalf," closed quote.

Does that sound familiar to you?

A.   Yes.

Q.   Did you review a complaint against Covia before filing your certification -- withdrawn.

Did you review a complaint against Covia before signing your certification back beyond February 4th of this year?

A.   To be honest, I don't know the timing of that.  I saw the complaint, so I know -- I don't know the timing of it.

Q.   Did you write your certification?

MR. KIM:  Objection.

THE COURT: Basis in a word or two?

MR. KIM: Hype.

THE COURT: Overruled. You may answer the question.

A. Did I write it? No.

Q. Did you make any edits before you signed it?

A. No.

MR. BUELL: No further questions. Thank you, your Honor.

THE COURT: All right. Thank you.

Counsel for Mr. Baron?

MR. BALASSA: No questions.

THE COURT: Mr. Balassa?

MR. BALASSA: No questions.

MR. KIM: I have a few follow-up.

THE COURT: Yes.

FURTHER EXAMINATION ON BEHALF OF COUNSEL FOR
DR. PHELPS:

BY MR. KIM:

Q. Dr. Phelps, counsel for Mr. Antosca asked you questions about whether you reviewed a complaint before signing your certification. Do you recall those questions?

A. From the attorney?

Q. Yes.

A.    Yes.

Q.    Now, prior to agreeing to be a lead plaintiff in this case, you reviewed a complaint, correct?

A.    Yes.

Q.    And it was only after you agreed to be lead plaintiff you signed the certification form.  Is that correct?

A.    I think, the timing of it in my mind is hard to know, but I know I read the complaint, and I know I signed it.

                    MR. KIM:  No further questions.

                    THE COURT:  All right.  Thank you.  You may step down.

                    DR. PHELPS:  Thank you.

                    MR. KIM:  Your Honor, can Dr. Phelps stay for argument or --

                    THE COURT:  You are certainly welcome to if you want, but you are not obligated.

                    As I said at the outset, at this point, I would be happy to hear arguments briefly beyond what's in the papers and the like.

                    Mr. Buell, did you wish to make any additional argument at this point?

                    MR. BUELL:  Very briefly, your Honor.

                    This is actually the most, until an hour

ago, civilly plaintiffs' dispute I have ever been involved in where we were limited to the technicalities of the PSLRA, and it seemed like it was going to be a rather pleasant exercise.

THE COURT:  All right.  I am going to ask you just to slow down for the benefit of our court reporter.  Pull the podium up.  I'm going to ask you to raise the podium.

There is a button on the side on your right.  All right.  Sorry about that.  Go ahead.

MR. BUELL:  The attacks on my firm that were lodged by counsel for Dr. Phelps are without merit, and I need to review the transcript, and some of them may not have been factually accurate.

There was a lead plaintiff dispute until now that had avoided character attacks and the like, and that typically is how this should go.

Putting that aside, the arguments before the Court are limited to the technicalities of the Private Securities Litigation Reform Act.

First, in sum, who has the largest financial interest?  Everybody here agrees in their briefing that Mr. Antosca has the largest loss.  Technical arguments are made regarding other factors that certain courts, including courts within the Sixth Circuit, would apply,

but the takeaway of all those cases, because I won't spend ten minutes belaboring our briefs, but the PO case and all the other cases involve differing methodologies.

Here no one disputes that Mr. Antosca under the fourth LaxFactor has the largest financial loss. And --

THE COURT: I understand we always get into these areas of legal doctrine with four-factor tests and six-factor and all that, but let's come back to the language in the statute, largest financial interest.

I agree with you about there being general agreement about loss here among the parties. That can be parsed any number of different ways, but what the statute says is "largest financial interest in the relief sought by the class."

So sooner or later, presumably, if there is relief for the class here -- and I don't know whether there will be or there won't be -- we will get that relief either by judgment or by settlement. Either way, isn't that going to be allocated out on an investor-by-investor basis on shares?

MR. BUELL: Yes, your Honor, based on their pro rata interest in the relief sought, and one of the competing movants -- I believe it was Mr. Baron, so I will let his counsel, since they briefed the argument,

make it -- pointed out that under what was the Supreme Court's precedent in Dura, Mr. Antosca still had the largest loss.

There became a side show between Dr. Phelps and Mr. Baron as to who was second and third, but under that Dura analysis, which some courts assert is a closer representation to what may be ultimately recoverable, Mr. Antosca still had the largest loss.

And I would say that, as the Owens case indicated -- and I believe that was Chief Judge Maraboli, but I may have the jurist wrong -- the determinative factor and the weight of authority of courts within the Sixth Circuit is that the fourth LaxFactor controls --

THE COURT:  I guess what I am getting at, what's ultimately -- if we are focusing on the words of the statute and we are ultimately looking at who has the largest interest in the relief sought, how is that going to be determined?  Ultimately, there is going to have to be an allocation by shares at some level.  Am I right about that?

I mean, I guess it is ultimately shares times the amount of the loss or just a straight -- you know, there is a million-dollar recovery and divide by the number of shares each investor has.

MR. BUELL: My colleagues will correct me if they disagree, but I think what we can all agree on is that if this case is successful and it ends in a settlement, even in a judgment, there would be a plan of allocation that this Court, your Honor, would be asked to approve.

A plan of allocation typically looks at a wide-ranging number of factors, including the purchase and the sales of the relevant securities, but ultimately, an investor who purchased fewer shares by volume but expended more money would likely, in almost every circumstance unless it is an unusual case with odd partial corrective disclosures and the like, the investor who purchased more shares by funds would be the one who would recover more than the shareholder who corrected more shares by volume.

And because your Honor is stuck on it, if anyone disagrees, please let me know. I don't want to speak for the entire Plaintiffs' bar on this, but that's typically how it would proceed.

THE COURT: All right. I'm sorry, I interrupted you so --

MR. BUELL: No. Thank you. I appreciate the --

THE COURT: I appreciate you had the chance

to say --

MR. BUELL:  I appreciate the time, your Honor.

In fact, Dr. Phelps' counsel argued in his opening brief that the most important factor is the fourth LaxFactor.  They abandoned that argument in opposition and pivoted to a new argument that other factors of shares by volume should count because they realize that was the way that they could shoehorn into a win in a lead-plaintiff dispute.

But in their initial briefing in docket number -- I believe it was 8 -- they argued that the most important factor was the financial loss.  That we think is dispositive.

If there was a disagreement amongst even Mr. Baron and Dr. Phelps as to who had the largest loss under this fourth LaxFactor, I may not be up here speaking quite as unequivocally.  But they don't disagree that he lost more money in the relevant securities.

So putting that aside, the Court moves on to the second part of the analysis, which generally looks at the movant's adequacy, technicality; requires the Court to look at whether the movants have a common interest with the class and whether they will vigorously prosecute through qualified counsel.

Let me do the second one first because I think it is easy.  Everybody agreed in the papers because no one disputed that all three of these law firms seeking to be appointed lead counsel are good law firms.  I won't dispute it.  Mr. Kim's firm is a good firm.  Mr. Portnoy's firm is a good firm.  And until this morning, I was of the opinion they had the same thought about me.  I suspect they still do.

So we go back to the common interests of the class.  The argument that Dr. Phelps' attorneys have forwarded to this court regarding the Jennings merger litigation is nowhere near the kind of proof that the statute requires.

THE COURT:  I guess I am not so much hung up on that question of proof as I am -- is there an argument here that might ultimately be available to the Defendants that would be directed at Mr. Antosca in a way that would not be able to be directed at the other movants to the effect that because he only purchased premerger, that those particular statements are not actionable, even though later ones might be?

MR. BUELL:  That could arguably be true. Any securities class action involves more than one misstatement.

THE COURT:  But it would create a particular

problem for Mr. Antosca, wouldn't it?  Because if, let's just say hypothetically there is eight statements at issue, two premerger and six post, you know, if only those six post merger turn out to be actionable, that might be a problem for Mr. Antosca, wouldn't it?

MR. BUELL:  No, your Honor.  There is not a single case that stands for that proposition in the context of PSLRA lead-plaintiff case law because any movant could take a class period, draw a line in the sand and say, well, if these four misstatements get dismissed, this person who only bought before those four wouldn't be adequate down the line.

THE COURT:  Your client would have to have standing though.

MR. BUELL:  My client would have to have standing, but it is a speculative argument regarding the potential future success, at least, in part, of a motion to dismiss, which could be made in every securities case that has more than one misstatement.

And I think there is -- the reason that no one has cited a single case where an individual was disqualified as a lead plaintiff because they did not purchase the relevant security throughout the class period is because that kind of a slippery-slope argument is speculation founded on speculation, and it is simply

not what the statute permits to disqualify the presumptively plaintiff movant.

And in fact, you know, Dr. Phelps' counsel pointed to the brief in the Jennings merger litigation, didn't attach it to their filings; we did on reply.  The release was extremely narrow.

And Dr. Phelps' counsel, Mr. Karon, was counsel in that Jennings litigation.  And if you read the briefing to the Court in that case and if one reads the notice to shareholders, it says this is a narrow release only related to disclosures regarding the terms of the merger.  There is nothing about statements regarding the products or the company's products.

It is whether there is adequate disclosures related to the merger, and they received additional disclosure regarding Wells Fargo's role as a financial adviser and some cash flow analyses.  We have that all in our briefing.

So we would respectfully submit that the argument regarding purchases only prior to the merger should have absolutely no ability to be the kind of proof.  It is speculation heaped on speculation.

THE COURT:  And do you agree on Mr. Baron's argument based on Dura, or is your position, it doesn't matter because you're with the largest loss either

way?

MR. BUELL: The latter, your Honor. It doesn't matter. He has the largest financial interest either way.

A few minor points, and then, I will sit down for the Court's time.

Mr. Palmer's withdrawal and endorsement of Mr. Phelps -- of Dr. Phelps, my apologies -- is of no moment. If anything, it raises questions of the circumstances leading to his counsel's endorsement of Dr. Phelps.

And I think, unless the Court has any questions, you know, we would rest on the briefings, but we think that based on the weight of authority before the Sixth Circuit Mr. Antosca is indisputably the candidate that should be appointed lead plaintiff.

Thank you for your time, your Honor.

THE COURT: All right. Thank you.

Mr. Ruf, counsel for Mr. Baron?

MR. RUF: Thank you, your Honor, and I will be brief.

First, I would just like to thank the Court. This was a great morning. I have never -- been doing this a long time -- and I have not had a court conduct interviews like this, and I think it is a really great

way to go about this because it is a significant question as to who you choose as your lead plaintiff.

And I think integrity and the kinds of things that can only be determined in a face-to-face encounter with somebody are really important, so I want to thank you, the Court.

And also, this is my first court appearance since COVID, so it feels good.

THE COURT: I'm getting a lot of that.

MR. RUF: So a couple of things:

One of the things is, we talked about Dura, and the Court had asked some questions about the relief sought. I think it is important to say the way these cases typically play out is that expert witnesses will look at a stock and look at these, you know, as we've alleged in the complaint, these partial disclosures along the road, right, where you have, oh, there is an SEC investigation, oh, they are now asking for witnesses, et cetera, and each one of those gives rise to losses that pull out of the stock some amount of the so-called inflation.

So I think it is a very real thing that we would expect the question not just to be -- let's put it this way: I think it would be very reasonable to expect that the number of shares would come into play, at least

in the context, well, how many shares were owned at this disclosure, how many shares at this disclosure, et cetera.

So the relief sought and the number of shares is not just irrelevant. There clearly are relevant questions.

And typically, what you would see is whatever the plan of allocation is, if the case resolves favorably, would be divided up usually by shares but shares in relation to what happened to those shares in time.

THE COURT: And so it would be -- if I am following Mr. Buell's comments correctly as well as yours, it would be shares relative to a loss, which is then, in turn, a percentage of the recovery.

MR. RUF: I think so.

So there was an interesting thing that happened. I will speak to Mr. Antosca. When he was examined about his compliance issues, it did seem like there was a real moment there.

It seems like Mr. Antosca really does need to follow-up and make sure that he doesn't have a compliance issue with respect to acting as a lead plaintiff in this case.

I also have to say that while I appreciate

concerns about COVID Mr. Kim made the point that the Court ordered all parties to be here, and it turns out, apparently, that the reason for Mr. Antosca to not be here is because he is concerned about COVID.

And so I would expect that that concern would continue, and I think that's a real issue for whether or not he is an appropriate lead plaintiff. The Court had seen the papers.

Our position is that we are in second position with respect to the largest loss if you consider Dura, and you know, we have 160,000 gross shares, 78,200 net shares, and I think that's really the only points I wanted to make.

Thank you, your Honor.

THE COURT: All right. Thank you.

And for Dr. Phelps?

MR. KIM: Yes, your Honor. I will be -- try to be as brief as possible. I know many a lawyer would say or "one more question" at deposition, and all of a sudden we are 40 minutes into it. So I will try to stop that.

As to the largest financial interest, I think the Court earlier had questions about, you know, whether the number of shares were relevant, and counsel for Mr. Antosca said something to the effect of, well, if

there is a settlement or a judgment, there would be a plan of allocation.

And he did say something. And I think I wrote it down, that unless this was a case with unusual partial corrective disclosures, you know, that you would look at it differently. You would look at the number of shares but that's exactly what we have here.

They were partial corrective disclosures during the class period, starting March 22nd of 2019, where they received the SEC subpoena as alleged in the complaints. There is a November 6th, 2019, where the SEC requested more information. That caused the stock price to decline.

Of course, there was the June 29, 2020, Chapter 11 filing, which was the end of the class period, and the bottom of the stock felt out.

Now, it is fair to say there are cases on both sides of this issue when you look at the Lax/Olsten factors. There are cases that say, you know, loss is most important. There are other courts that look at the other factors.

Now, reading these cases and trying to sort of reconcile them, I would like to point out in the FirstEnergy case that Mr. Antosca's lawyer has really put forth as the case here, in that case, there was only one

corrective disclosure, and it was at the end of the class period one disclosure, that was it.

Here we have multiple disclosures over the course of a multi-year class period. It is undisputed that Dr. Phelps purchased 724,400 net shares. There was an argument by Mr. Baron's counsel that we were a net seller. They withdrew that argument because they made a clerical mistake.

So by far, we have ten times the number of net shares than Mr. Baron who has 70,000 and Mr. Antosca who has 26,000. So I think we have the largest financial interest here. And even if the Court were to say, "okay, two of the four factors, let's call it a dead heat," even if the Court were to call it a tie, largest financial interest isn't the only requirement for a lead plaintiff.

They must otherwise satisfy the requirements of Rule 23. And clearly, the Court is focused on that. That's why the Court had the hearing. Oftentimes courts would just look at the financial interest and appoint the lead plaintiff and kind of pass on the adequacy.

Here I think the record shows that that's where Mr. Antosca fails. There is no dispute that the relevant standard is that a potential class representative relief plaintiff -- and I am quoting from Mr. Antosca's opening brief -- must, quote, "number one,

the representative must have common interest with unnamed class members of the class, and two, it must appear that the representatives will vigorously prosecute the interests of the class or qualified counsel."

And the fact of the matter is, Mr. Antosca conducted very little research in selecting his law firm. He picked one that was closest to him. He did not talk to any other law firms.

When I asked him about questions that received heavy news coverage in Boston in the papers and otherwise, about findings that Judge Wolf found in the District of Massachusetts and also retired Judge Gerald Rosen, finding that the Thornton Firm overbilled in a securities class action and was ordered to pay millions in legal fees back in a securities class action, when I asked Mr. Antosca would that impact his decision in selecting counsel, he said he didn't know.

That is not what a lead plaintiff is supposed to do. A lead plaintiff is supposed to ask questions. They are supposed to be involved. They are supposed to be engaged, and I think at the end of the day I am a little bias, but I think Dr. Phelps took the day today.

He was most knowledgeable about the case, he is local, he is willing to put his busy schedule aside,

come to court.  He was in Saudi Arabia.  He is here now. He is going to be here, and if you were to look at it and say the financial interest is a dead heat, you have got to look at Rule 23 adequacy, and I think we take it here.

The argument about the release -- and I am just reading from the text of the release -- it is very broad, and whatever arguments that were presented in the briefing, that doesn't mean the Defendants aren't going to raise it.

And the issue of whether a unique defense is disabling at this preliminary stage is not ultimately whether it will be successful on the merits.  It may be. Who knows?  It is whether it will become a distraction and a major focus of a major litigation.

And if Mr. Antosca is appointed lead Plaintiff and Defendants believe that if the Court were to accept that argument, he would be knocked out.  There would be a class action with no lead plaintiff, and we would have to start the process again.

And the other point is, once Defendants get an idea that Mr. Antosca -- you, know, it really doesn't show --

THE COURT:  Why wouldn't the case be able to proceed?

It is somewhat analogous to settlement with

an individual plaintiff after certification of a class. Even though that named plaintiff may no longer have a live claim, the class has taken on a separate interest on its own, and the action is able to proceed.

So why wouldn't, even accepting the premise of the issue you present, why wouldn't Mr. Antosca be able to proceed?

MR. KIM:  Mr. Antosca would only have an individual claim.  Defendants would raise this argument of class certification.  They would say that he is atypical because he bought before the merger.  The claims were released.

If the Court were to accept that argument, that would mean that people who bought before the merger would have no claim.  Mr. Antosca then would have no standing to represent the rest of the class because he did not buy in whatever the class period would be.

If the claims before the merger were released, the class period would have to change from the date of the merger forward.

So that would create a situation where there would be no lead plaintiff.  And the fact of the matter is, Dr. Phelps purchased throughout the class period. There is no risk because if Defendants make that argument, Dr. Phelps still had purchases and sales and

losses following the merger, and that's a reason.

It is not that every class action you would face this issue, every class action where there is a misstatement.  Here this is particular.

There aren't many class actions where in the middle of the class period there is a merger like this and a settlement.  That's part of, in the mix, of a class action.

THE COURT:  What's your view of the Dura issue that Mr. Baron raises?

MR. KIM:  Well, you know, courts do take into consideration outside of this jurisdiction Dura losses.  We still haven't been able to replicate how they calculated that.  I thought that would have been in some of the spreadsheets.

But I guess everyone just submitted their own loss calculations, but the plan of allocation here, though, will look to the number of shares throughout the class period and assign them to the relevant partial corrective disclosures, and just looking at it, we have ten times the number of net shares.  I mean, those are the shares that are going to be damaged.

And I think I might have had one other point, your Honor.

And then, the other point I would like to

make, you know, just about the largest financial interest.  Even on a personal level, Dr. Phelps' investment -- I mean obviously we heard him testify today.

This case means a lot to him.  He is willing to put forth the time, but it is also a greater percentage of his personal investment compared to Mr. Antosca.

And lastly, I will echo the point that Mr. Ruf made, and that point was being the fact that Mr. Antosca did not check with his compliance department, whether he could be a lead plaintiff in the case is pretty -- is very questionable.

I mean, I have been doing this for 15 years.  I talk to clients.  You know, I talk to people in hedge funds, and I talk to people in asset management companies, and they always say, "hey, I need to run this by compliance."  The fact that he didn't do that, I think, raises a lot of questions.

Thank you.

THE COURT:  All right.  Thank you.

MR. KIM:  And one other point, your Honor.  I have no agreement with the Wolf Haldenstein firm.  That sets the record straight.

THE COURT:  Thank you.

Yes, Mr. Buell.

MR. BUELL: Your Honor, I want to respond to the comments made outside the briefing regarding my firm. The Court should disregard those. I don't think your Honor wants to hear a motion to strike from me, but it is an argument as to the adequacy of the Plaintiff that was not raised in the briefs. We didn't have opportunity to respond to it. It is not accurate.

I need to review the transcript to see how things were asserted, but the Court should disregard those comments.

And the final point, one of the quotes that Mr. Kim quoted about lodestar, I will point out that we are the only firm that sent one attorney to this hearing.

Everybody else seems to have sent -- spent more in attorneys' fees on this hearing other than Defendants who, of course, only sent one attorney, not surprisingly, Kirkland, a very good firm. And to the extent --

THE COURT: But in fairness, Ms. Landry was remote with Mr. Antosca?

MR. BUELL: To assist with the technology, that's right, yes. We didn't want him holding the remotes, and I will also say that the litigation Mr. Kim refers to predates my time with the Thornton Law Firm.

Thank you, your Honor.

THE COURT:  All right.  Thank you.

Let me have a few housekeeping items before we adjourn.

First, Mr. Balassa, I didn't want you to feel left out, so I will ask you one question:

Do the Defendants have any position with respect to consolidation all right.  Of the two lawsuits.

MR. BALASSA:  Your Honor, we do not oppose consolidation.

THE COURT:  Thank you.  I did want to ask, and Mr. Balassa may be in the best position to answer these questions, I just wanted to find out the status of the bankruptcy proceedings, first, and if you would, you can remain seated or come up to the podium just so long as you are speaking into a microphone.

MR. BALASSA:  Your Honor, the Bankruptcy court in December of 2020 approved a plan of confirmation, and the company has emerged from bankruptcy.

THE COURT:  Okay.  And then --

MR. BALASSA:  Excuse me.  A plan of reorganization.

THE COURT:  Fair enough.  The other question:  I am just trying to get my arms around some

procedural issues that may arise as things move forward. Is there an ongoing SEC or other investigation.

MR. BALASSA: There was a resolution, which is in the public record, I believe, in the bankruptcy record, your Honor, of the SEC investigation. So that's not ongoing.

THE COURT: Okay. Thank you.

With that, I will make a decision on this and issue a ruling as promptly as I can. I would love to tell you that it would be next week, but that's probably not the case as we are scheduled to have a trial next week.

I will make an effort to get it by the end of the month, but that may be an aspirational target, but I will certainly do my best to get you a ruling by the end of the month.

And then, at that point, I think we will have some additional steps in terms of whether there needs to be an amendment and initial pleadings and things like that, but that's probably what everyone expects at this point.

So with that, are there any other issues that we should talk about while we are together, that any party wishes to raise before we adjourn?

(No response.)

THE COURT:  Hearing nothing, we are adjourned.  Thank you, everyone.

(Hearing concluded at 11:11 a.m.)

- - - - -


C E R T I F I C A T E

I, George J. Staiduhar, Official Court Reporter in and for the United States District Court, for the Northern District of Ohio, Eastern Division, do hereby certify that the foregoing is a true and correct transcript of the proceedings herein.


s/George J. Staiduhar
George J. Staiduhar,
Official Court Reporter

U.S. District Court
801 W. Superior Ave., Suite 7-184
Cleveland, Ohio 44113
(216) 357-7128