# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM PLAGENS, *et al.*, | ) | Case No. 1:20-cv-2744 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| JENNIFFER D. DECKARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| SERGIO BARON, *et al.*, | ) | Case No. 1:21-cv-238 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| JENNIFFER D. DECKARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Currently before the Court are four motions to consolidate related putative securities class actions, select lead plaintiff, and appoint counsel.  The uncontested issue—whether the cases should be consolidated—can be resolved easily.  Selection of a lead plaintiff, and the appointment of counsel that goes with it, is hotly contested. The Court conducted on-the-record interviews of the three potential lead plaintiffs on July 23, 2021 and then heard arguments from counsel.  Based on that proceeding, the parties' respective arguments, and the record as a whole, the Court makes the following findings of fact and conclusions of law in resolving the pending motions.

## BACKGROUND

On December 10, 2020, Plaintiff William Plagens filed a complaint against Defendants Jenniffer Deckard, Mark Barrus, Michael Biehl, Andrew Eich, and Richard Navarre, all of whom worked for Covia Holdings Corporation or its predecessors. (*Plagens* ECF No. 1, ¶ 6–11, PageID #2–3.) Then, on January 29, 2021, Plaintiff Sergio Baron filed a nearly identical complaint against the same Defendants. (*Baron* ECF No. 1, ¶¶ 17–21, PageID #4–5.) Both actions allege Defendants violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.   For present purposes, when citing the record, the Court refers to the *Plagens* complaint unless otherwise indicated and takes Plaintiffs' allegations as true.

Covia, the company for which all Defendants worked, was created when its two predecessor companies, Fairmount Santrol and Unimin Corporation, merged in 2018. (ECF No. 1, ¶ 13, PageID #4.)    In that merger, shareholders received $0.73 in cash consideration and 0.2 shares of Covia stock for each Fairmount Santrol share held at the time of the merger.  (*Id.*)  For the sake of convenience in this ruling, when the Court refers to Covia, it includes Covia, Fairmount Santrol, and Unimin.  Neither action named Covia as a defendant because at the time the cases were filed, the company was in Chapter 11 bankruptcy.  (*Id.*)

### A.    SEC Investigation and Covia's Bankruptcy

Covia operated in the hydraulic fracturing space.  Better known as fracking, hydraulic fracturing involves—to oversimplify—boring wells into rock and injecting water, sand (also called a proppant), and chemicals at high pressure to crack the rock,

releasing natural gas or oil.  (*Id.*, ¶ 15, PageID #5.)  Covia produced proppant that it marketed and sold to drilling companies.  (*Id.*, ¶ 15, PageID #4–5.)   In this competitive market, Covia distinguished itself by using what it said was a proprietary resin and other coating technologies, for which drillers paid a premium.  (*Id.*, ¶¶ 15, 23, PageID #5, 7.)

Plaintiffs allege that the statements Covia made to the market about its proppant and financial performance were misleading or false.  For example, Plaintiffs allege that in at least one internal review company scientists found Covia's "most-marketed products did not perform much better than ordinary sand."  (*Id.*, ¶ 20, PageID #6.)  Covia was allegedly able to keep this negative information to itself until 2017, when an employee filed a whistleblower complaint with the Securities and Exchange Commission.  (*Id.*, ¶ 21.)

Then, in its 2018 10-K, Covia announced to the market that on March 18, 2019, it had received a subpoena from the SEC seeking information about its proppants.  (*Id.*, ¶ 27, PageID #8.)  After that first subpoena, the SEC continued to request additional information.  (*Id.*, ¶ 31, PageID #9.)  Eventually the SEC subpoenaed current and former Covia employees to testify in connection with its ongoing investigation.  (*Id.*)  On June 29, 2020, Covia voluntarily entered Chapter 11 bankruptcy.  (*Id.*, ¶ 33, PageID #10.)  The next day, the New York Stock Exchange delisted Covia's stock and suspended trading.  (*Id.*, ¶ 34.)  On July 1, 2020, Covia shares were trading over the counter at a fraction of the price they garnered just a week earlier.  (*Id.*, ¶ 35.)  The next week, the company received a Wells Notice from

the SEC, notifying Covia that agency staff recommended the Commission file an action against the company.  (*Id.*, ¶ 37, PageID #10–11.)  These lawsuits followed.

### B.    Movants' Backgrounds and Arguments for Appointment

Four individuals—Paul Antosca, Sergio Baron, Dr. Thomas Phelps, and Christopher Palmer—each moved for appointment as lead plaintiff in both the *Plagens* and *Baron* actions.  Their opening briefs largely track one another:  each argues he suffered the largest financial loss under the framework provided by the Private Securities Litigation Reform Act of 1995, each can adequately represent the class, and the claims each asserts are typical of other putative class members.  After initially seeking appointment as lead plaintiff, Mr. Palmer withdrew his request. (ECF No. 14, PageID #445–46.)  Accordingly, the Court **DENIES** Mr. Palmer's motion for appointment as lead plaintiff and approval of selection of counsel.  (ECF No. 7.)

On July 23, 2021, the Court conducted on the record interviews of Mr. Antosca, Mr. Baron, and Dr. Phelps in connection with discharging its obligations to appoint the lead plaintiff who will most capably and adequately represent the class.  Based on the information presented at the interviews and in Movants' respective papers, the record shows the following about each and his arguments why he is the most adequate plaintiff.

### B.1.    Paul Antosca

Mr. Antosca works in Boston for DWS Group, an arm of Deutsche Bank.  He heads the tax department responsible for oversight of the mutual funds DWS manages.  (ECF No. 41, PageID #765.)  Mr. Antosca has worked at DWS for sixteen years and previously worked at John Hancock and Price Waterhouse.  (*Id.*)  Both

personally and professionally, he has substantial experience trading and investing and a depth of knowledge of the markets and relevant financial performance metrics. (*Id.*, PageID #756–57.)    Mr. Antosca had not confirmed with his employer's compliance department whether he could serve as a lead plaintiff in a securities class action and was unsure whether such approval was necessary.

Mr. Antosca first learned about Fairmount Santrol from a friend before the merger and decided to invest personally in the company.  (*Id.*, PageID #757–59.)  All of his stock purchases came before the merger, and he did not sell any shares during the class period.  (*Id.*, PageID #759–60.)  Mr. Antosca estimated that his investment in Covia accounted for about twenty percent of his personal investment portfolio.  (*Id.*, PageID #758–59.)

After learning about the SEC investigation and learning of the suit, Mr. Antosca chose a law firm close to his home to represent him, which he found through an advertisement the firm circulated.  (*Id.*, PageID #766–67.)  As lead plaintiff, Mr. Antosca said he would meet monthly with counsel, but otherwise came across as deferential to counsel on the conduct of the litigation.  (*Id.*, PageID #761–64.)  When asked about discovery, Mr. Antosca equivocated on his willingness to produce the sort of documents or information that he might perceive as personal or invasive and that might be required of a lead plaintiff.  (*Id.*, PageID #763–64.)  Further, he expressed reluctance to appear personally in Court, a hesitancy he attributed to travel restrictions due to Covid-19.  (*Id.*, PageID #764–65.)

Mr. Antosca maintains that he should be appointed lead plaintiff because he expended the most money to purchase Covia stock and suffered the largest approximate loss.  (ECF No. 16, PageID #472.)  Further, he argues that the Court only need make preliminary findings of adequacy and typicality, each of which he satisfies.  (*Id.*, PageID #473–74.)  Mr. Antosca also rejects the claims the other Movants make, including that he lacks adequacy and typicality because he traded pre-merger.  (ECF No. 21-1.)

As for the other Movants, Mr. Antosca argues that the certifications of both Mr. Baron and Dr. Phelps contain errors, suggesting they are not sufficiently engaged to be lead plaintiff.  (*Id.*)  For example, Mr. Antosca notes that Dr. Phelps referred to the litigation as "against Covia," which is not actually a named party, and both other movants have only a basic understanding of the actions.  (*Id.*, PageID #475–76.) Because of his claimed suitability and the others' deficiencies, Mr. Antosca contends he is the most adequate plaintiff.

### B.2.   Sergio Baron

Mr. Baron hails from Brazil but has resided in the United States since 2005 and is now a citizen.  (ECF No. 41, PageID #777–78.)  Trained as an engineer, he spent his early career working in the oil and gas industries, but has since worked on the commercial side of the field.  (*Id.*, PageID #777–79.)  For the last three years, Mr. Baron has worked in New York as a market analyst of the oil and gas industries for S&P Global.  (*Id.*)  He too learned about Fairmount Santrol through his work. (*Id.*, PageID #779.)  It is not clear whether Mr. Baron needs or obtained approval from his employer to serve as lead plaintiff or participate in securities litigation.

In discussing his trading activity, Mr. Baron described daily trading that involved shorter-term put and call options, which he exercised often and used as a method for hedging his risks.  (*Id.*, PageID #780–81.)  Sometimes, in exercising those options, the strike price would fall outside the daily trading range.  (*Id.*, PageID #785–86.)  Notwithstanding this sort of trading, Mr. Baron emphasized that he was "long" Covia—holding the stock with a long-term eye toward profit.  (*Id.*, PageID #780–81.)  Mr. Baron estimated that Covia stock comprised between twenty and twenty-five percent of his personal investments.  (*Id.*, PageID #780.)

In response to an email solicitation, Mr. Baron connected with his counsel.  He felt comfortable working with his counsel after some appropriate diligence and time developing a rapport.  (*Id.*, PageID #785.)  At a high level, he understands the litigation process, his discovery obligations, and is willing to work with and oversee counsel.  (*Id.*, PageID #782–85.)

Mr. Baron advocates for a different loss calculation, under which he would be the presumptive lead plaintiff after disqualifying Mr. Antosca for not purchasing shares post-merger.  (*Baron* ECF No. 10, PageID #213–14.)  Mr. Baron argues Mr. Antosca is atypical and subject to unique defenses: "pre-merger shareholders are situated differently from post-merger shareholders because they acquired their Covia shares in connection with the merger," not by purchasing them on the open market.  (*Id.*, PageID #218.)  After excluding Mr. Antosca, Mr. Baron claims the largest financial interest under his proposed modified calculation.  (ECF No. 19, PageID #485–86.)  To position himself in this analysis ahead of Dr. Phelps, Mr. Baron

7

reiterates in reply that net shares purchased should not be the determinative factor and, under his modified loss analysis, Dr. Phelps has not suffered as large of a loss as he has.  (*Id.*, PageID #487.)

### B.3.   Dr. Thomas Phelps

Dr. Phelps is a pediatrician in the Cleveland area and, though he does some consulting overseas, lives and works in this District.  (ECF No. 41, PageID #797–98.) Dr. Phelps indicated that he does not trade in many companies at once or through a broker, but instead chooses a handful of companies to investigate more thoroughly and then invests in two or three of them at a time.  (*Id.*, PageID #799–800.)  He learned about the company because he lives near some of its operations and through involvement in the local community.  (*Id.*, PageID #800–01.)  These experiences caused Dr. Phelps to investigate the company and, based on what he learned about its representations regarding its products, decide to purchase stock. In discussing his transactions during the potential class period, Dr. Phelps indicated his sales of Covia stock were attempts to cost average (though he engaged in some panic selling as the company approached bankruptcy).  (*Id.*, PageID #801–02.)  Covia stock amounted to between thirty and forty percent of his total private portfolio, and roughly twenty-five percent of his net worth was bound up with that stock.  (*Id.*, PageID #801.)

When he learned about litigation involving the company, Dr. Phelps investigated three or four law firms and interviewed at least two of them within a week or two.  (*Id.*, PageID #802–03.)  He expressed an interest in prosecuting this action on behalf of aggrieved investors and understands the demands of litigation and discovery through his professional experience.  (*Id.*, PageID #803–05.)

Dr. Phelps argues that he has the "largest interest by two of the three 'most objective' factors" and should be appointed lead plaintiff.  (ECF No. 15, PageID #452.) Regarding his financial loss, Dr. Phelps argues the "loss calculation is not straightforward" here because of the merger, meaning the other factors the Court needs to consider take precedence over approximate loss.  (*Id.*, PageID #451–52.) Moreover, Dr. Phelps maintains he bought shares both pre- and post-merger, so despite having the second-largest financial interest, he argues he is more than adequate and most typical of the eventual class in this action.  (*Id.*, PageID #452–53.)

Regarding the other Movants, Dr. Phelps maintains Mr. Antosca would be subject to unique defenses that are not typical of the class because he purchased shares only before the merger, and some of his purchases were at "stock prices outside of the day's trading range." (ECF No. 15, PageID #455.)  Also, he dismisses Mr. Baron's "indecipherable and unreplicable [sic] 'modified' loss calculation." (ECF No. 20, PageID #503–04.)  Beyond that, Dr. Phelps argues that Mr. Antosca has "little incentive" to pursue the case "on behalf of the whole class" and his "interest is not aligned with" all involved.  (ECF No. 15, PageID #456–57.)  Perhaps illustrative of his position, Dr. Phelps makes little mention of Mr. Baron, other than that he engaged in options trading, not the activities of the "typical class member in this case." (*Id.*, PageID #458–59.)

## ANALYSIS

The Court considers the easy issue—consolidation under Rule 42—first, then tackles the more involved question—who to appoint as lead plaintiff—second.

9

## I.    Consolidation

Under Rule 42(a), a court is permitted to consolidate actions which involve common questions of law or fact.    Fed. R. Civ. P. 42(a)(2).    "Courts agree that 'consolidation is particularly appropriate in securities class action litigation.'"    *City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*, No. 1:17-cv-1677, 2017 WL 6028213, at *1 (N.D. Ohio Dec. 5, 2017) (quoting *French v. CBL & Assoc. Props., Inc.*, No. 1:16-cv-165, 2016 WL 7668501, at *1 (E.D. Tenn. Sept. 26, 2016)). The Reform Act contemplates consolidation where "more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed."  15 U.S.C. § 78u-4(a)(3)(A)(ii).

All four Movants—Mr. Antosca, Mr. Baron, Mr. Palmer, and Dr. Phelps—agree the *Plagens* and *Baron* actions should be consolidated.  (ECF No. 5-1, PageID #64–65; ECF No. 6-1, PageID #149; ECF No. 7-1, PageID #216; ECF No.8-1, PageID #290.) Defendants do not oppose.    The Court agrees that consolidation of these actions is appropriate.    Both raise common questions of law and fact, and consolidation will serve judicial economy, mitigate delay, and avoid duplicative costs.    Accordingly, under Rule 42(a), the Court consolidates *Baron v. Deckard, et al.*, Case No. 1:21-cv-238 (N.D. Ohio), into *Plagens v. Deckard, et al.*, Case No. 1:20-cv-2744 (N.D. Ohio). The Court will refer to the earlier-filed docket in resolving the remaining issues, unless otherwise indicated.

## II.    Selecting a Lead Plaintiff

The Reform Act directs the Court to appoint as lead plaintiff the member or members of the putative class who are most capable of adequately representing the

interests of class members.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(i).  Under the statute, the Court "shall adopt a presumption that the most adequate plaintiff" is the "person or group of persons" that "filed the complaint or made a motion" for appointment, and by the Court's determination, "has the largest financial interest in the relief sought by the class" *and* "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc).  This presumption can be rebutted with "proof by a member of the purported class" that the presumptively most adequate plaintiff either "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render" that plaintiff "incapable of adequately representing the class."  *Id.* § 78u-4(a)(3)(B)(iii)(II)(aa)–(bb).  Once selected, the lead plaintiff is then empowered, "subject to the approval of the court," to choose and retain class counsel.  *Id.* § 78u-4(a)(3)(B)(v).

These statutory criteria target two principal abuses in securities litigation—that it is pursued by professional plaintiffs or brought by nominal plaintiffs who are actually controlled by counsel.  *See, e.g.*, *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 441–42 (S.D. Tex. 2002) (discussing prior "abusive practices and manipulation" by class action lawyers).  "In place of . . . a practice wherein the class lawyer selected the class plaintiff—Congress sought to substitute a new model" under which "the court would appoint the lead plaintiff who, in turn, would select and direct class counsel." *In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1020 (N.D. Cal. 1999). Consistent with this statutory model, the Reform Act limits the number of times a person may serve as lead plaintiff.  "[A] person may be a lead plaintiff, or an officer,

director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions . . . during any 3-year period."  15 U.S.C. § 78u-4(a)(3)(B)(vi).

Procedurally, the Court must first verify that the plaintiff who filed the action published notice describing the claims asserted and the prospective class period in a "widely circulated national business-oriented publication or wire service" within twenty days of the lawsuit's filing.  *Id*. § 78u-4(a)(3)(A)(i).  That notice must advise potential class members that they have sixty days from the notice date to move for appointment as lead plaintiff.  *Id*. § 78u-4(a)(3)(A)(i)(II).  This notice requirement aims "to draw all potential lead plaintiffs into the suit so that the district court will have the full roster of contenders before deciding which contender to appoint."  *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1807 (2018).  Here, the notice requirements are satisfied, focusing the dispute between Movants on who should be appointed lead plaintiff.

### II.A.  Largest Financial Interest in the Relief Sought

Congress did not provide a definitive definition for, and failed to elaborate much on, what constitutes the "most adequate plaintiff."  To fill this gap, courts have created various tests and analyzed several factors to aid in this inquiry.  *See, e.g.*, *Owens v. FirstEnergy Corp.*, Nos. 2:20-cv-3785, 2:20-cv-4287, 2020 WL 6873421, at *5 (S.D. Ohio Nov. 23, 2020) (deploying the test developed in *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2716, 1997 WL 461036, at *6 (N.D. Ill. Aug. 11, 1997), and *In re Olsten Securities Litigation*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)); *see also* 7 Newberg on Class Actions § 22:42 (5th ed. 2011); Manual for Complex Litigation § 31.31 (finding the four-factor test helpful).

To determine which movant has the largest financial interest, the *Lax/Olsten* test analyzes:  (1) number of shares purchased during the class period; (2) number of net shares purchased during the class period; (3) total net funds expended during the class period; and (4) approximate loss suffered during the class period.  *City of Hollywood*, 2017 WL 6028213, at *2.  These "objective indicators" help "reveal whether plaintiffs actually profited during the Class Period from the inflated stock prices."  *Owens*, 2020 WL 6873421, at *5 (cleaned up).  Determining the method and appropriate factors for identifying the most adequate plaintiff rests within the Court's discretion.  *Id.*  Movants focus on the *Lax/Olsten* factors, so the Court begins with their arguments for determining who has the largest financial interest.

### II.A.1. Gross and Net Shares Purchased

The Court considers the first two *Lax/Olsten* factors together because each relates to the number of shares purchased during the class period.  Each Movant presents different calculations of the total shares and net shares each purchased.

Mr. Antosca summarizes the three Movant's positions as follows:

| Movant | Shares Purchased | Net Shares Purchased |
|---|---|---|
| Mr. Antosca | 26,000 | 26,000 |
| Mr. Baron | 160,638 | 78,200 |
| Dr. Phelps | 1,113,465 | 712,940 |

([ECF No. 16](#), PageID #473.)  Mr. Antosca's reply brief accurately states Mr. Baron's positions, despite an inadvertent typographical error in his response.  (*Compare id.*, *with* [ECF No. 21-1](#) n.2, PageID #520–21.)

Mr. Baron's calculations differ slightly:

| Movant | Shares Purchased | Net Shares Purchased |
|---|---|---|
| Mr. Antosca | 26,000 | 26,000 |
| Mr. Baron | 160,836 | 78,200 |
| Dr. Phelps | 1,338,925 | 724,400 |

(*Baron* ECF No. 10, PageID #217; ECF No. 19, PageID #486 (correcting errors).)  By excluding options transactions, Mr. Baron reaches somewhat different figures than Mr. Antosca.  (*Baron* ECF No. 10, PageID #217 n.4.)

Dr. Phelps offers yet a third summary:

| Movant | Shares Purchased | Net Shares Purchased |
|---|---|---|
| Mr. Antosca | 26,000 | 26,000 |
| Mr. Baron | 70,860 | 70,860 |
| Dr. Phelps | 1,338,925 | 724,400 |

(ECF No. 15, PageID #449.)

Movants' competing arguments identify two differences in their calculations, namely Mr. Baron's gross shares and Dr. Phelps' net shares.  In sum:

| Movant | Shares Purchased | Net Shares Purchased |
|---|---|---|
| Mr. Antosca | 26,000 | 26,000 |
| Mr. Baron | 160,836 or 70,860 | 78,200 |
| Dr. Phelps | 1,338,925 | 724,400 or 712,940 |

(*Baron* ECF No. 10, PageID #217; ECF No. 15, PageID #449; ECF No. 16, PageID #473; ECF No. 19, PageID #486; ECF No. 21-1, PageID #521.)  Dr. Phelps does not

raise any mathematical issues in his reply, largely because he maintains that by any measure, he purchased more shares, both gross and net, than either of the other two. (ECF No. 20, PageID #504–05.)

Under the first two *Lax*/*Olsten* factors, Dr. Phelps appears to have the largest financial stake in this litigation, measured by number of shares, however one counts. With respect to these two *Lax*/*Olsten* factors, the Court finds that Dr. Phelps has the largest financial interest.

### II.A.2. Net Expenditure and Approximate Loss

While the largest stake determined solely by number of shares provides one measure of how the Court can calculate "the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), the two remaining *Lax*/*Olsten* factors provide others.  The third factor looks to net funds expended, and the fourth approximates the loss each Movant sustained.

Ascertaining net expenditures—the amount each Movant spent on Covia stock during the class period—is relatively straightforward.  The following table summarizes Movants' respective positions on the net expenditures each made during the class period, with each row identifying the net expenditures that Movant shows as the correct amount:

|  | Net Expenditures by Mr. Antosca | Net Expenditures by Mr. Baron | Net Expenditures by Dr. Phelps |
|---|---|---|---|
| As Calculated by Mr. Antosca | $786,249.00 | $490,907.16 | $340,350.22 |
| As Calculated by Mr. Baron | $786,252.00 | $355,875.05 | $274,479.50 |
| As Calculated by Dr. Phelps | $786,249.00 | $492,643.82 | $629,938.35 |

(ECF No. 16, PageID #473; *Baron* ECF No. 10, PageID #217; ECF No. 15, PageID #449.)  However one analyzes the numbers here, Mr. Antosca expended the greatest amount on Covia stock during the class period.  That makes sense because he acquired Covia stock pre-merger.

Translating these net expenditures and stock holdings into recoverable losses provides a more challenging exercise, particularly at this stage of the proceedings. Movants offer different calculations of their losses, based on competing valuation methods.  Two predominant methodologies feature in this calculation—the "Last In, First Out" or LIFO method, and the "First In, First Out" or FIFO method.

Mr. Antosca argues for using a standard LIFO calculation and urges the Court to afford the fourth *Lax/Olsten* factor the deference other courts often give it.  (ECF No. 16, PageID #472–73.)  Mr. Baron advocates a "modified LIFO methodology" that the Second Circuit uses, which excludes losses from investments sold before a corrective disclosure is made.  (*Baron* ECF No. 10, PageID #215–16.)  This analysis is proper, he argues, based on the Supreme Court's holding in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005).  (*Id.*, PageID #216.)  Dr. Phelps

maintains that approximate loss is "less useful" in circumstances where competing movants offer "different methodologies" to approximate loss and, in such cases, the other factors become more important.  (ECF No. 15, PageID #451 (cleaned up).)

### II.A.2.a. FIFO Versus LIFO

FIFO calculates loss by matching purchases of stock against sales in the order in which each occurs:

> [T]he first shares sold are matched against the first shares purchased. If the 'first shares purchased' are pre-class period purchases, then the first shares sold are matched against these pre-class purchases and the resulting gain or loss is excluded from the loss calculation.  Thereafter, class period sales are matched against class period purchases to calculate losses.  For any shares retained at the end of the class period, those shares are assigned a value, often a 60-day or 90-day post-fraud disclosure average.

*In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 303 (S.D. Ohio 2005).  Under the FIFO method, "a plaintiff can 'zero out' class period sales by matching them to pre-class period purchases, which can 'grossly inflate' damages."  *Owens*, 2020 WL 6873421, at *6.

Under the LIFO method, in contrast, "a plaintiff's gains during the class period are offset from its ultimate losses."  *Id.*  That is, any sale of stock during the class period is "matched against" the last shares purchased.  *Id.*  "In other words, LIFO helps reveal whether plaintiffs actually profited from class period transactions due to inflated stock prices."  *Id.*

District courts within this Circuit decidedly favor LIFO over the FIFO, and so do Movants.  *See id.* (citing *Cardinal Health*, 226 F.R.D. at 304). A case from this District illustrates why.  In *In re Goodyear Tire & Rubber Co. Securities Litigation*,

No. 5:03-cv-2166, 2004 WL 3314943 (N.D. Ohio May 12, 2004), an institutional fund claimed it lost $3.7 million using a FIFO analysis. During the class period, the fund sold over 200,000 more shares than it purchased, such that it derived more in profit than it suffered in losses on the purchase of shares. *Id.* at *4. In other words, the fund made money because the share price was allegedly inflated when the fund sold stock it previously purchased. *Id.* Although the fund acquired some shares during the class period, overall its trading history showed that its gains exceeded its losses. In this way, the fund was not "left holding the bag" when the alleged fraud was revealed. *Id.* (quoting *In re McKesson HBOC Sec. Litig.*, 97 F. Supp. 2d 993, 996–97 (N.D. Cal. 1999)). As a result, the FIFO method "grossly inflate[d]" the fund's damages calculation, rendering the millions claimed in losses illusory. *Id.* at *4.

By and large, the Court agrees that a standard LIFO approach is the appropriate measure for determining which prospective lead plaintiff has the largest approximate loss on the facts and circumstances presented. In this respect, the Court follows the weight of authority within this Circuit.

### II.A.2.b. Movants' Losses

Even using a LIFO methodology, however, Movants offer competing calculations of who suffered the largest approximate loss.

Mr. Antosca presents his calculations of net expenditures and approximate loss under which he claims the largest financial stake in this litigation:

| Movant | Net Funds Expended | Approximate Loss |
|---|---|---|
| Mr. Antosca | $786,249.00 | $758,716.50 |
| Mr. Baron | $490,907.16 | $484,192.16 |
| Dr. Phelps | $340,350.22 | $585,642.43 |

(ECF No. 16, PageID #473.)

Mr. Baron proposes the following:

| Movant | Net Expenditure | LIFO Losses | Modified LIFO Losses |
|---|---|---|---|
| Mr. Antosca | $786,252.00 | $785,719.50 | $785,719.50 |
| Mr. Baron | $355,875.05 | $354,081.04 | $484,192.16 |
| Dr. Phelps | $274,479.50 | $588,642.20 | $401,579.15 |

(*Baron* ECF No. 10, PageID #217.)  Mr. Baron's table reflects his modified LIFO losses and corrections he made in his reply brief.  Further he omits options transactions, which he says "is customary[.]"  (ECF No. 19, PageID #486; *id.*, n.3.)

Finally, Dr. Phelps identifies Movants' net expenditures and losses as:

| Movant | Net Funds Expended | Approximate Loss |
|---|---|---|
| Mr. Antosca | $786,249.00 | $785,716.50 |
| Mr. Baron | $492,643.82 | $490,907.16 |
| Dr. Phelps | $629,938.35 | $585,642.43 |

(ECF No. 15, PageID #449.)

No matter how Movants count, Mr. Antosca has the largest approximate loss, even accounting for variation between their respective calculations.

### II.A.2.c. Applying *Dura Pharmaceuticals*

This result likely holds even applying *Dura Pharmaceuticals* at this stage.  By way of background, in 2015 the Supreme Court held that where a shareholder buys a company's stock, then sells it for a lower price, that selling shareholder cannot recover losses when the company later makes a corrective disclosure because the corrective disclosure did not cause the loss on that particular sale.  *See Dura Pharms.*, 544 U.S. at 345–46.  Lower courts have conflicting views on whether to apply *Dura Pharmaceuticals* to loss calculations for determining a lead plaintiff.  *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Citigroup, Inc.*, Nos. 20-cv-9132, 20-cv-3573, 20-cv-10360, 2021 WL 396343, at *3–4 (S.D.N.Y. Feb. 4, 20201) (collecting cases). The Sixth Circuit has yet to address the issue, and some district courts within this Circuit decline to take this approach.  *See, e.g.*, *Owens*, 2020 WL 6873421, at *7 (citing *Blitz v. AgFeed Indus., Inc.*, No. 3:11-0992, 2012 WL 1192814, at *4 (M.D. Tenn. Apr. 10, 2012)) ("Most courts in the Sixth Circuit do not adopt the *Dura* analysis to calculate financial interest at the lead plaintiff stage.").

In the Court's view, however, *Dura Pharmaceuticals* should apply at the lead plaintiff stage based on the plain language of the statute.  The Reform Act directs the Court to select a lead plaintiff "with the largest financial interest in the *relief* sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (emphasis added).  Mindful that a district court has discretion to use a methodology appropriate in the particular circumstances of each case, it is difficult to see how approximating losses that a lead plaintiff may not recover as a matter of law individually or on behalf of a class advances the statutory text of or the congressional goals in enacting the Reform Act.

Further, a lead plaintiff with material losses not recoverable under *Dura Pharmaceuticals* may subject that person or entity to unique defenses that rebut a presumption that he, she, or it is the most adequate lead plaintiff.

In fairness, calculating recoverable loss "at this [early] stage may not always be so simple," and certainly is difficult to do without sufficient evidence. *See City of Sunrise Firefighters' Pension Fund*, 2021 WL 396343, at *3. But that is the case whether applying *Dura Pharmaceuticals* or not. "Because the lead plaintiff should be the class member who stands to recover the most from that litigation, courts should only consider those losses that will actually be recoverable in the class action[.]" *Id.* (cleaned up). The facts here, as in many securities class actions, make performing a calculation pursuant to *Dura Pharmaceuticals* highly speculative and nearly impossible, at least on the information available to the Court and without expert assistance.

### II.A.3. *Lax/Olsten* Findings and the Rebuttable Presumption

To summarize the foregoing analysis, using a last-in, first-out methodology and setting aside a calculation under *Dura Pharmaceuticals*, the Court finds that the following person satisfies each of the *Lax/Olsten* factors: (1) number of shares purchased during the class period—Dr. Phelps; (2) number of net shares purchased during the class period—Dr. Phelps; (3) total net funds expended during the class period—Mr. Antosca; and (4) approximate loss suffered during the class period—Mr. Antosca.

Some courts afford "[a]ll four factors . . . equal weight." *City of Hollywood*, 2017 WL 6028213, at *2 (citing *Pio v. General Motors Co.*, No. Civ. 14-11191, 2014

WL 5421230, at *4 (E.D. Mich. Oct. 24, 2014)). Others believe "the fourth factor, loss," is "the most important in determining financial interest," *Owens*, 2020 WL 6873421, at *10; *In re Cardinal Health*, 226 F.R.D. at 302 (same). Seeing no statutory directive to give more weight to any one factor, or for that matter to use any factor in preference to a determination of the Movant with "the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), the Court considers them equally, resulting in equipoise between Mr. Antosca and Dr. Phelps. Put another way, the record here demonstrates that the plaintiff with the largest financial interest depends on the methodology, the propriety of which will vary depending on the course of the litigation. Accordingly, no presumption arises, and the Court relies on the text of the statute to appoint "as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]" *Id.*, § 78u4(a)(3)(B)(i).

### II.B. The Movants' Arguments Against the Others

Each Movant attacks the others, arguing they are atypical or inadequate to represent the class. Although no presumption arises on the facts and circumstances here, Movants' papers and their interview aid the Court in appointing the member who is "most capable of adequately representing the" putative class. 15 U.S.C. § 78u-4(a)(3)(B)(I).

### II.B.1. Mr. Antosca

Both Mr. Baron and Dr. Phelps maintain Mr. Antosca cannot serve as lead plaintiff because he purchased "all of his shares prior [to] the merger," which in their view is "problematic" for the class and would make him subject to unique defenses.

(ECF No. 15, PageID #456.)   To support this claim, Mr. Baron cites *Ross v. Abercrombie & Fitch, Co.*, 257 F.R.D. 435 (S.D. Ohio 2009).  But *Ross* is inapposite.  First, *Ross* was decided at class certification, which deploys a different standard than the comparatively lower bar when appointing a lead plaintiff.  Instead, *Ross* engaged in the required "rigorous analysis into whether the prerequisites of Rule 23 are met." *Id.* at 440.  To the extent Mr. Baron cites *Ross* for the proposition that a pre-merger shareholder may not be typical of a class because of a "material distinction between" investors who bought shares pre-merger and those who purchased post-merger, the *Ross* Court expressly rejected that argument.  *Id.* at 445 ("Differences in the timing of stock purchases by class representatives do not make their claims atypical if plaintiffs allege a common scheme of misrepresentation.").

Similarly, Mr. Baron's reliance on *In re Hebron Technology Co., Ltd. Securities Litigation*, Nos. 20 Civ. 4420, 20 Civ. 4746, 2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020), is misplaced.  (*Baron* ECF No. 10, PageID #218.)  There, the court disqualified a potential lead plaintiff due to idiosyncrasies related to that individual's purchase *after* a corrective disclosure, which would have subjected him to a defense that the misstatements "were really not a factor in the purchasing decision" at all.  *Id.* at *7–8 (quoting *George v. China Auto. Sys., Inc.*, No. 11 Civ 7533 (KBF), 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013)).  Such a defense would not apply to pre-merger purchases.

Dr. Phelps attacks Mr. Antosca by questioning whether his claims are barred by the settlement agreement in *Jennings v. Fairmount Santrol Holdings, Inc.*,

No. 1:18-cv-931 (N.D. Ohio May 3, 2019).  He argues Mr. Antosca "may be subject to the release of claims" related to a class action brought in connection with the merger that created Covia.  (*Id.*, PageID #456.)  That release, Dr. Phelps argues, required Mr. Antosca to release all claims "related to any disclosures (or lack thereof) to Fairmount Santrol's stockholders concerning" the merger that created Covia, including all claims under the securities laws.  (*Id.*)

But the *Jennings* settlement relates to the merger, not to securities claims.  It specifically provides for the release of "all claims of every nature" brought by a shareholder and "related to any disclosures (or lack thereof) to Fairmount Santrol's stockholders concerning *the Merger and any fiduciary-duty claims concerning the decision to enter into the Merger . . . .*" (*Jennings* ECF No. 30-3, PageID #1215.)  The release continues:  "for avoidance of doubt, the Released Claims *shall not include . . .* any claims under the federal securities laws that *do not arise out of, or relate to*" the merger.  (*Id.*)  Accordingly, even if Mr. Antosca were a party to this settlement, the release relates to the merger, not to this litigation—which involves alleged statements and omissions related to the company's financial performance, products, and statements to the markets and investors.

Finally, Mr. Baron and Dr. Phelps raise several other issues with Mr. Antosca, including speculation about the class period being shortened "for whatever reason" (ECF No. 15, PageID #457) and accusations that his certification is inaccurate (*id.*, PageID #455).  As to the former, there is little basis for this conjecture at this juncture.  As for the latter, none of the cases Dr. Phelps offers as examples requires

disqualifying Mr. Antosca here.  In one case, the court disqualified a potential lead plaintiff for *overstating* its losses after the movant failed to correct mistakes, even after the court provided an opportunity to do so.  *Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, Nos. 14 Civ. 8495 (RMB); 14 Civ. 8696 (RMB); 14 Civ. 9757 (RMB); 14 Civ. 9927 (RMB); 14 Civ. 10020 (RMB), 2015 WL 1345931, at *3 (S.D.N.Y. Mar. 19, 2015).  In another, the court disqualified a movant for making "exaggerated loss totals" that were "no slight error" and "struck at the core of the Reform Act's lead plaintiff inquiry:  determining which movant holds the largest financial stake in the litigation."  *Karp v. Diebold Nixdorf, Inc.*, Nos. 19 Civ. 6180 (LAP), 19 Civ. 6514 (LAP), 2019 WL 5587148, at *6 (S.D.N.Y. Oct. 30, 2019).  That potential lead plaintiff made "an error of some 34%" when calculating total loss.  *Id.*

Indeed, "a substantial degree of carelessness" may cast doubt on a movant's ability to represent the class.  *See Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 414 (E.D. Pa. 2019) (noting that the potential lead plaintiff conceded errors based on massaging data that resulted in overstating total losses by some $500).  Taken to an extreme, such errors may demonstrate a willingness to make false statements under oath that are disqualifying.  *Camp v. Qualcomm Inc.*, No. 3:18-cv-1208, 2019 WL 3554798, at *2 (S.D. Cal. Aug. 5, 2019).  Unlike the authorities on which Dr. Phelps relies, Mr. Antosca's claimed errors contain at most minor mathematical mistakes that present only a *de minimis* concern about his ability to serve as lead plaintiff.  In fact, none of the errors Movants complain about regarding one another give rise to any concern about the suitability of any to serve as the lead plaintiff.

### II.B.2.        Mr. Baron

In turn, Mr. Antosca and Dr. Phelps argue Mr. Baron should not be appointed lead plaintiff.  (ECF No. 16, PageID #474–76; ECF No. 15, PageID #457–60.) Mr. Antosca argues that Mr. Baron's certification raises a question of whether he is suing on his own behalf, or not.  (*Id.*, PageID #475.)  Dr. Phelps makes a more full-throated argument against appointing Mr. Baron lead plaintiff contending that, because Mr. Baron engaged in options transactions and short selling, he is unlike most long-term investors that would constitute the class and that he may have also profited from Covia's bankruptcy.  (ECF No. 15, PageID #457–60.)

 Mr. Baron responds that their attacks on him are "specious" and should be disregarded.  (ECF No. 19, PageID #488–89.)  During his interview, Mr. Baron clarified that he traded on his own behalf in his personal investment account.  As for Dr. Phelps' attack, Mr. Baron responds that his complaint seeks to recover for all who traded "securities," which would include recovery for traders who bought common stock or options.  (*Id.*, PageID #490.)  Mr. Baron advocates for ignoring his options positions, arguing that he "also traded in and had substantial losses from common stock transactions."  (*Id.*, PageID #491.)  Instead, he says whatever "the nuances of [his] trading strategy" were regarding options contracts, he also held common stock "at all relevant times" and, therefore, was not a short seller.  (*Id.*)

If a movant *only* trades in options where the majority of the class holds common stock, legitimate questions may arise whether the movant could adequately represent the class.  *See, e.g.*, *In re Bank One S'holders Class Actions*, 96 F. Supp. 2d 780, 783–84 (N.D. Ill. 2000) (noting that a hedge fund was not an appropriate lead plaintiff

because it "engaged in extensive day trading, first shorting Bank One stock" and then "buying to cover the short position"). In other instances, short sellers may be uniquely vulnerable to certain defenses. *See, e.g.*, *Zlotnick v. Tie Comms.*, 836 F.2d 818, 823–24 (3d Cir. 1988) (declining to presume fraud-on-the-market reliance for a short seller). But Mr. Baron points out he engaged in both options trading and more conventional long-term investing. ([ECF No. 19](#), PageID #491.) Engaging in both types of trades does not render a movant incapable of representing the class *per se*. *See, e.g.*, *Goldstein v. Puda Coal, Inc.*, 827 F. Supp. 2d 348, 355 (S.D.N.Y. 2011) (declining to deny a presumptive lead plaintiff's motion because it "traded in both common stock and options during the class period").

### II.B.3.  Dr. Phelps

Mr. Antosca and Mr. Baron argue Dr. Phelps should not be appointed lead plaintiff either, although less forcefully than they attacked each other. ([ECF No. 16](#), PageID #474–76; *Baron* ECF No. 10, PageID #219.) Mr. Antosca again argues Dr. Phelps failed to provide enough detailed information about himself, as required by the Reform Act. ([ECF No. 16](#), PageID #474–75.) Mr. Baron abandoned his primary argument against Dr. Phelps. (*See Baron* ECF No. 19, PageID #485 n.1.) Between his papers and interview, the Court finds that Dr. Phelps has provided enough information to be considered for appointment as lead plaintiff and that, at the end of the putative class period, Dr. Phelps retained approximately 724,400 Covia shares. (*Id.*)

### II.C.  Presumptive Lead Plaintiff

In the end, these arguments do not definitively confirm or exclude anyone as the lead plaintiff.  In similar circumstances, some courts refuse to appoint *any* lead plaintiff, opting instead to request a hearing absent "a resolution by plaintiffs and their chosen counsel."  *See In re Century Bus. Servs. Sec. Litig.*, 202 F.R.D. 532, 541 (N.D. Ohio 2001).  Others opt for multiple lead plaintiffs.  *See, e.g.*, *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 439 (S.D.N.Y. 2008) (noting that "[t]here is no presumption" in the Reform Act "that co-lead plaintiffs are better than one lead plaintiff").  In the Court's view, each approach threatens to create administrative and case management problems from the outset.  Moreover, no one has advocated for co-lead plaintiff status.  Accordingly, based on the record as a whole and the arguments of each Movant, the Court will appoint the lead plaintiff who "the court determines to be most capable of adequately representing the interests of class members in accordance with" the Reform Act.  15 U.S.C. § 78u-4(a)(3)(B)(i).

For the following reasons, the Court appoints Dr. Phelps as the lead plaintiff.  By two measures using the *Lax/Olsten* factors, Dr. Phelps has the largest financial interest.  Additionally, his losses represent a larger share of his investment portfolio than the other Movants and a relatively larger share of his total net worth.  For each of these reasons, he has strong incentives to pursue relief.  Of the three Movants, Dr. Phelps is the most typical or representative of the likely putative class members.  Unlike Mr. Antosca, he purchased shares pre- and post-merger, and unlike Mr. Baron he did not trade extensively in options, puts, calls, or other exotic investment vehicles.  Dr. Phelps is not subject to potential compliance concerns with his employer, as Mr.

Antosca and Mr. Baron may be given their employment in firms involved in the markets.

Finally, the Court is mindful of a central goal Congress sought to achieve in enacting the Reform Act and its lead plaintiff provision in particular:  replacing class litigation driven by lawyers with a lead plaintiff who will direct and control counsel and the litigation.  None of the Movants is a professional plaintiff.  Of the three, however, the Court finds that Dr. Phelps displayed the greatest independence from counsel.  He interviewed multiple firms and did so quickly, and he showed the greatest willingness to engage with counsel and the litigation process to benefit the class as a whole.

For all these reasons, the Court finds that Dr. Phelps is the plaintiff "most capable of adequately representing the interests of class members" on the facts and circumstances of this case based on the record before the Court.

## III.    Appointing Counsel

The Reform Act permits the lead plaintiff, once appointed, to "select and retain counsel to represent the class," subject to the Court's approval.    15 U.S.C. § 78u-4(a)(3)(B)(v).  Although Dr. Phelps previously performed diligence in selecting counsel, the Court **DIRECTS** Dr. Phelps to certify his choice of counsel no sooner than 7 days from the date of this Order (not before August 9, 2021) and no later than 14 days from the date of this Order (August 16, 2021), unless he requests more time to do so.  In terms of selecting counsel, Dr. Phelps may continue with his current counsel or make a change as he sees fit, subject to Court approval.  For Dr. Phelps to certify his choice of counsel, he should email the Court.

29

## CONCLUSION

For the foregoing reasons, the Court **CONSOLIDATES** *Baron v. Deckard*, No. 1:21-cv-238, into *Plagens v. Deckard*, No. 1:20-cv-2744, **GRANTS** Dr. Phelps' motion for appointment as lead plaintiff (ECF No. 8), and **DENIES** Mr. Antosca's, Mr. Baron's, and Mr. Palmer's motions for the same (ECF No. 6; *Baron* ECF No. 5, ECF No. 7).  All future filings should only be in *Plagens v. Deckard*, No. 1:20-cv-2744.   Following appointment of counsel, the Court will enter a preliminary scheduling order.

**SO ORDERED**.

Dated: August 2, 2021

_____
        J. Philip Calabrese
        United States District Judge
        Northern District of Ohio