# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| WILLIAM PLAGENS, Individually and on behalf of all others similarly situated, | Case No: 1:20-cv-2744-JPC |
| Plaintiff, | **CONSOLIDATED AMENDED COMPLAINT** |
| v. | <u>CLASS ACTION</u> |
| JENNIFFER D. DECKARD, MARK E. BARRUS, MICHAEL F. BIEHL, ANDREW D. EICH, RICHARD A. NAVARRE, | JURY TRIAL DEMANDED |
| Defendants. | |

Lead Plaintiff Thomas Phelps and named Plaintiffs Sergio Baron and Neville Arjani ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following facts and assert the claims below. Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys. Such investigation included, among other things, a review of Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Covia Holdings Corporation ("Covia") f/k/a Fairmount Santrol Holdings Inc. ("Fairmount" and collectively with Covia, the "Company"), analysts' reports and advisories about the Company, interviews with confidential witnesses, and information readily obtainable about the Company. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be shown

1

after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who: (1) purchased Covia and/or Fairmount common stock, or purchased call options or sold put options on Covia and/or Fairmount common stock, between March 10, 2016 and June 29, 2020, both dates inclusive ("Class Period"), and were damaged thereby; and/or (2) held Fairmount common stock as of the close of business on April 20, 2018 and were eligible to vote at Fairmount's May 25, 2018 special shareholder meeting.[1] On behalf of the Class, Plaintiffs bring claims pursuant to Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      The Company sold sand and sand-based products to oil and gas companies, to be used as proppants in fracking operations. Proppants are granular materials that prop open fractures in rock formations, promoting the flow of hydrocarbons (oil and gas) through wells. Conductivity is a key measure of proppant performance in the oil and gas industry. Higher conductivity means more oil and gas will be extracted from a well.

3.      The proppant industry is highly competitive, and the Company attempted to differentiate itself with its purportedly high-quality sand and its "value-added proppants,"

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

including resin-coated sand. The Company invested heavily in developing these "value-added" proppant products, which it attempted to sell to energy companies at a premium price based on the Company's claims that these products would improve well output. The Company also repeatedly told investors that its long-term strategy included developing and commercializing these "value-added" proppant products.

4.     Three of the Company's main "value-added" proppant products were PowerProp, Propel SSP, and Propel SSP 350. PowerProp was the Company's purportedly premium resin-coated sand proppant product. The Company claimed that Propel SSP coats sand with a gel, purportedly delivering proppants further into the ground to increase oil and gas recovery. The Company claimed that Propel SSP 350 was a version of Propel SSP that was supposed to be compatible with almost any type of water, whereas Propel SSP was compatible only with freshwater.

5.     Throughout the Class Period, Defendants and the Company repeatedly made false and misleading claims touting the benefits of these purported "value-added" proppants – that these products would improve conductivity to make wells produce more oil and gas. Defendants and the Company made these misrepresentations in an effort to sell the products to a customer base that was slow to adopt these products, and to deceive investors and the Company's creditors into believing there was a nascent demand for the products. In reality, these "value-added" proppant products never achieved the lofty performance metrics that Defendants and the Company touted in their public statements.

6.     Defendants' and the Company's claims about these "value-added" proppant products were not merely optimistic or unproven, they were ***contradicted by the Company's own data and specifically called out by Company whistleblowers.*** Several Company employees raised

concerns about the Company's marketing materials and public statements misrepresenting these products to management, even meeting with the Company's executives after their concerns were not resolved. Yet, despite hearing out the whistleblowers, Defendants and the Company insisted on continuing to misrepresent the performance results of the Company's products.

7.    Eventually, four of these employees brought whistleblower claims to the SEC, which interviewed the employees and opened an investigation. In March 2019, the SEC subpoenaed the Company for documents relating to its "value-added" proppant products. A few weeks later, Defendant Deckard, the Company's long-time President and CEO, abruptly left the Company at the board's direction, with no real public explanation. A few months later, the Company revealed that the SEC subpoena was no mere passing inquiry, but rather the SEC had requested additional information and subpoenaed multiple current and former employees to testify regarding Defendants' and the Company's claims about these products. The price of the Company's securities dropped immediately following each of these disclosures, as the truth about the Company's purported "value-added" proppant products and their commercial viability gradually leaked into the market, harming investors.

8.    In December 2020, the SEC issued an Order Instituting Cease-and-Desist Proceedings ("SEC Order") detailing the factual findings of the SEC following its investigation. A copy of the SEC Order is attached hereto as Exhibit 1 and incorporated by reference herein. The SEC found that the Company: (1) misrepresented PowerProp's performance characteristics; (2) misrepresented that Propel SSP and Propel SSP 350 increased oil and gas production; and (3) made materially false and misleading statements about these products in its SEC filings, presentations to investors and research analysts, and on the Company's website.

9.     The SEC Order detailed how Defendants' and the Company's statements about PowerProp, Propel SSP, and Propel SSP 350 were false and misleading. The SEC Order also described internal documents, correspondence, and meetings at various times before and during the Class Period through which Defendants and the Company were informed that their statements about these products were false and misleading, and how they ignored this information in continuing to make public misrepresentations. For instance, the SEC Order explained that as early as 2014, the Company's internal documents show that PowerProp's actual conductivity was as much as *49% below* the results the Company published on its website. By March 2015, employees had learned that the published, inflated conductivity results for PowerProp were actually based on test results forged by a former employee. Likewise, the Company's public claims about Propel SSP drastically overstated the actual performance of test wells using Propel SSP. As one former employee explained, the problem with Propel SSP was that the laboratory tests provided promising results, *but they were performed in a one-liter container*, while in real-world testing in actual wells, the Company simply was not achieving the same results.

10.    The SEC determined that the Company violated provisions of the Securities Act of 1933, the Exchange Act, and related SEC rules. The SEC also imposed sanctions on the Company, including a $17 million civil penalty.

11.    Despite Defendants' and the Company's repeated misrepresentations painting an optimistic picture of the proppant products' performance and commercial potential, the customer demand for these products simply never materialized. This fact was an acute problem for the Company as it had invested heavily in developing these proppant products and in specialized production facilities.

12.     The Company had been overburdened with debt for years, but it was able to keep renegotiating with creditors to push out its obligations on the strength of the Company's commercial prospects, including the "value-added" proppant products. Due in part to the Company's inability to capitalize on these products, the Company was unable to stay afloat when oil prices declined, and what little demand existed for the Company's expensive, purportedly premium proppant products dried up completely.

13.     In June 2020, the Company filed for Chapter 11 bankruptcy and was delisted by the NYSE. When the Company's securities resumed trading over-the-counter, its value evaporated and shareholders were left with nothing.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5 and 240.14a-9).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district, many of the false and misleading statements were made in or issued from this District, and the Company's U.S. offices were located within this District at all relevant times.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Lead Plaintiff Thomas Phelps, as set forth in his certification on file with the Court (Dkt. No. 8-4) and incorporated by reference herein, purchased Fairmount and Covia common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the series of partial corrective disclosures alleged herein.

20.     Named Plaintiff Sergio Baron, as set forth in his certification on file with the Court (Dkt. No. 5-4), purchased Fairmount and Covia common stock, and sold put options and purchased call options on Fairmount and Covia common stock, at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the series of partial corrective disclosures alleged herein.

21.     Named Plaintiff Neville Arjani, as set forth in his PSLRA Certification attached hereto as Exhibit 2, purchased Fairmount and Covia common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the series of partial corrective disclosures alleged herein.

22.     Defendant Jenniffer D. Deckard served as the President and Chief Executive Officer ("CEO") of Fairmount from 2013 to June 2018, when Fairmount merged with Unimin Corporation. Deckard then served as the President and CEO of Covia following the merger, from June 2018 to May 7, 2019, when she was abruptly terminated from the Company. Deckard was

also a director of the Company when she served CEO.  Upon information and belief, Deckard was terminated as a result of the fraud alleged herein.

23.     Defendant Mark E. Barrus served as the interim Chief Financial Officer ("CFO") and interim principal accounting officer of Fairmount from October 20, 2015 to May 2016. Mr. Barrus joined the Company in 2014 as Vice President of Accounting and Controls, where he was responsible for external reporting, internal controls, compliance, and taxation.

24.     Defendant Michael F. Biehl served as the CFO of Fairmount from May 2016 to May 2018, also serving as Fairmount's Executive Vice President and principal accounting officer.

25.     Defendant Andrew D. Eich served as the Executive Vice President and CFO of Covia from June 2018 to the end of the Class Period. According to the Company, Eich was "responsible for the Company's finance, accounting, treasury, investor relations, strategy and M&A functions."

26.     Defendant Richard A. Navarre served as the CEO of Covia from September 2019 to the end of the Class Period. Navarre also served as Covia's Chairman of the Board of Directors and Chair of its Executive and Audit Committee since the merger in June 2018.

27.     Each of the Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)   approved or ratified these statements in violation of the federal securities laws.

## RELEVANT NON-PARTY

28.   Fairmount is a provider of sand-based proppant products used by oil and gas exploration and production companies for fracking. Fairmount was headquartered in Chesterland, Ohio and incorporated in Delaware. Fairmount went public in October 2014. Fairmount's shares were listed and traded on the NYSE under the symbol "FMSA" until it merged with Unimin Corporation ("Unimin").

29.   On or about June 1, 2018, Fairmount and Unimin consummated a merger, whereupon Fairmount shareholders received approximately $0.73 in cash consideration and 0.2 shares of Covia for each Fairmount share. Any remaining Fairmount shares that could not be converted into a whole Covia share were redeemed for cash. Fairmount continued to be a wholly-owned subsidiary of Covia, with its operating results included in Covia's financial statements. At the time of the merger, Defendant Deckard owned over 5 million shares of Fairmount stock, entitling her to a payout of nearly $4 million from the merger alone.

30.     Covia's shares traded publicly on the NYSE under the symbol "CVIA." Covia is a Delaware company headquartered in Independence, Ohio. After the merger, Covia continued to market and sell certain of Fairmount's products under Fairmount's name, until eventually switching to market products under Covia's name. Some of the same officers and directors of Fairmount continued with Covia.

31.     On June 29, 2020, Covia and certain of its U.S. subsidiaries, including Fairmount, filed for Chapter 11 reorganization in the United States Bankruptcy Court in the Southern District of Texas. *In re Covia Holdings Corp., et al.*, Case No. 20-33295. The reorganized company will continue Covia's business of providing mineral-based solutions for energy and industrial markets.

32.     On June 30, 2020, NYSE delisted Covia. Covia's shares began trading over-the-counter ("OTC") on July 1, 2020 under the ticker symbol "CVIAQ."

## CONFIDENTIAL WITNESSES

33.     Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

34.     Former Employee 1 ("FE1") served as the Company's Director of Supply Chain from June 2014 to August 2018. FE1 was in charge of the Company's inventory, materials management, production planning and scheduling, and logistics, covering all of the Company's mining facilities and its distribution network. FE1 originally reported to Jerry Clancey, Fairmount's Chief Commercial Officer and most senior sales officer, then post-merger to Cameron Berry. Berry is the Company's Senior Vice President of the Company's Energy Division, overseeing the Company's Sales and Supply Chain functions.

35.     Former Employee 2 ("FE2") served as a Senior District Sales Manager for the Company from 2017 to March 2020, working with oil exploration and production companies in the Permian Basin in western Texas and New Mexico.

36.     Former Employee 3 ("FE3") served as a Process Optimization Engineer at various Company production plants from January 2015 to April 2020.

37.     Former Employee 4 ("FE4") served as a Process Engineer and Quality Manager for Fairmount from July 2014 to September 2016, then returned to the Company as a Process Innovation Engineer from mid-2018 to December 2019. While at the Company, FE4 worked with resin-coated sands and self-suspending proppants. FE4 was the Quality Manager for Self-Suspending Proppants at Fairmount.

38.     Former Employee 5 ("FE5") served as Vice President of Strategic Marketing for the Company from mid-2018 to June 2021, after previously working as a Senior Manager in Strategic Marketing for Unimin from June 2015 to 2017. FE5's responsibilities at the Company included understanding what was happening in the broader markets, looking at business and industry trends, and trying to understand the current industry environment.  FE5 reported directly to Cameron Berry.

## ALLEGATIONS OF SECURITIES FRAUD

### Company Background

39.     Hydraulic fracturing, or fracking, is a technique used to enable the extraction of natural gas or oil from shale and other forms of impermeable rock formations that contain oil and gas reserves that would otherwise be difficult to produce. Large quantities of water, chemicals, and sand are blasted into these formations at pressures high enough to crack the rock, allowing the gas and oil trapped within to flow to the surface.

40.     The fracking process involves the high-pressure injection of "fracking fluid" (primarily water, containing sand or other proppants) into a wellbore to create cracks in the rock formations so that gas and oil can flow more freely. When the hydraulic pressure is removed from the well, small grains of hydraulic fracturing proppants hold the fractures open.

41.     In the early 2010s, fracking became widely accepted in the United States, creating a thriving oil and gas industry, as well as a major demand for fracking-adjacent materials and equipment. Sand, used as a proppant, is an integral component of fracking and quickly became a large and growing business.

42.     Proppants are granular materials that prop open fractures created through the fracking process. Proppants perform the vital function of promoting the flow, or conductivity, of oil and gas through wells. Conductivity is a key measure of proppant performance in the oil and gas industry. Higher conductivity means more oil and gas will be extracted from a well.

43.     Numerous companies strove to provide fracking sand to oil and gas extraction companies around the country. In a competitive industry, the Company attempted to differentiate itself with its purportedly high-quality fracking sand. The Company's Northern White sand, mined primarily from the Great Lakes region, was the Company's chief product as it offered superior strength and spherical shape, which were important to fracking companies.

44.     The Company also marketed its newer "value-added proppants," such as resin-coated sand, to energy companies at a premium price based on the Company's claims that these products would improve well output. FE2 reported that PowerProp resin-coated sand sold for about $250 per ton, while Northern White sold for closer to $100 per ton. As the industry shifted to demand more local brown sand due to markedly lower costs of transportation, FE2 noted that local sand could be purchased for as little as $8-10 per ton.

45.     The Company touted its development of these high-margin proppant products as a way to differentiate the Company in the market. The Company also repeatedly told investors that its long-term strategy included developing and commercializing these products.

### The Company's "Value-Added" Proppants Were Material to Investors

46.     Three of the Company's main "value-added" proppant products were PowerProp, Propel SSP, and Propel SSP 350.

47.     PowerProp was the Company's purported premium resin-coated sand proppant product, first introduced in 2010. In the Company's annual report for 2014, it described PowerProp as "a unique resin-coated sand product with higher crush resistance and conductivity than any other sand-based proppant available on the market. PowerProp utilizes our existing resin coating facilities and proprietarily developed resin chemistry to create substantially increased product performance."

48.     According to the Company, Propel SSP coats sand with a gel to purportedly deliver proppants deeper into the ground to increase ultimate oil and gas recovery from fracking. In its 2014 annual report, the Company described Propel SSP as follows:

> Our Propel SSP product utilizes a polymer coating applied to a proppant substrate. Upon contact with water, the coating hydrates and swells rapidly to create a hydrogel around the proppant substrate. The hydrogel layer, which is primarily water, is attached to the proppant particle and provides a nearly threefold increase in the hydrostatic radius of the proppant. Initial test results indicate that the lower specific gravity allows greater volumes of proppant and/or coarser mesh sizes coated with Propel SSP to be carried deep into the fracture, which in turn allow more hydrocarbons to escape into the wellbore. This technology reduces or eliminates the need for certain frac fluid additives, including guar, which are used to enhance the transport of proppants into the geologic formation.

49.     According to the SEC Order, the Company purchased the rights to use and develop Propel SSP in 2013 for about $55 million and invested at least another $58 million toward developing Propel SSP for commercial production and sales.

50.     In its 2016 and 2017 annual reports, the Company referred to Propel SSP 350 as one of its "most significant product innovations."

51.     On January 18, 2017, the Company announced in a press release that a new version of Propel SSP, called Propel SSP 350, was "now available for use in high salinity water." Unlike Propel SSP, which was meant to work using freshwater that is not found at most oil and gas well sites, Propel SSP 350 was supposed to be compatible with almost any type of water.

52.     According to the SEC Order, PowerProp and Propel SSP accounted for 4-6.6% of Fairmount's Proppant Solutions segment revenue from 2014-2017, and 4.8-7.8% of Fairmount's total profit margin on products in 2016-2017.

53.     According to the SEC Order, the Company also tracked tons sold and average selling price for resin-coated sands like PowerProp as well as for Propel SSP in its internal "Key P&L Metrics."

54.     Research analysts from various investment banks discussed the Company's proppant products and their commercial potential in their published reports about the Company. The reaction of research analysts covering the Company demonstrates the materiality of the products and of Defendants' and the Company's misrepresentations, as analysts reacted positively to Propel SSP's purported success in these test wells.

55.     For example, on May 20, 2016, the day after the Company held an investor and analyst day event at which it made false and misleading claims about Propel SSP (detailed below), a Wells Fargo analyst report cited and credited the Company's false and misleading claims: "we

14

see potential upside from the Company's self-suspending proppant 'Propel SSP,' which has been successful in increasing production (30%) compared to offset wells in trials with nearly 20 E&Ps and over 90 wells."

56.     A few days after the investor and analyst day event, on May 23, 2016, an analyst report from Jefferies also specifically noted the "upside potential" that Propel SSP provided.

57.     On November 5, 2017, an analyst report from Simmons & Co. International – Energy Specialists of Piper Jaffray, noted management's consistent touting of the Company's value-added proppants, including Propel SSP and credited Defendants' rosy claims about the products. Specifically, the report noted that "value-added proppant, especially Propel SSP, has been a component of the company's product suite that management has long touted," and that as a result, "we believe the increased commercialization of Propel SSP influenced quarterly results. Modeling sales of the product is difficult but we are increasing our estimates and price target largely under the assumption that value added proppant volumes and revenues continue to improve in the coming." The same report later stated that the analyst was increasing their price target "due largely to increased value added proppant volume."

58.     Several analyst reports from Morningstar Equity Research dated between May 2017 and May 2019 each included upside scenarios based on the Company's Propel SSP product and Defendants' false and misleading claims about its performance: "Bulls Say: Fairmount's [or Covia's] Propel SSP product could be a blockbuster seller, as it holds promise of dramatically reducing well costs while increasing well productivity."

59.     A Wells Fargo Securities analyst report from March 9, 2017 noted that "in response to increasing demand for [resin-]coated products and to allow for better origin-destination pairing,

the Company reopened its coating facility in Cutler, IL. We expect these reactivations to allow FMSA to 'catch up' with industry demand growth in 2Q-4Q."

60.     On March 27, 2017, an analyst report from Guggenheim Securities explained that "[o]ur bullish thesis on Fairmount Santrol rests on three pillars: … 3) the company's value-added products offer a free option on an additional avenue of growth." The report continued, noting that "[Fairmount's] self-suspending proppant is a unique technology that could take off and provide an additional source of growth," and describing Fairmount as a "leader in value-added products such as resin coated sand and Propel SSP."

61.     The March 27, 2017 Guggenheim Securities report also noted that "[Fairmount] also offers other value-added proppants such as Propel SSP. … [Fairmount] believes the production uplift [from Propel SSP] is usually at least 30%."

### Defendants and the Company Made False and Misleading Statements
### About Fairmount's Proppant Products Prior to the Class Period

62.     Defendants and the Company made numerous false and misleading claims about PowerProp, Propel SSP and Propel SSP 350, both before and during the Class Period.

63.     According to the SEC Order, both before and during the Class Period, the Company repeatedly misrepresented that the performance of its PowerProp product was comparable to lightweight ceramics. Ceramics are higher-performing, more expensive proppant products as compared to sand.

64.     Specifically, the Company's August 2014 presentation to analysts conveyed that PowerProp is a key innovation with "performance characteristics similar to a light-weight ceramics" and "competes with lightweight ceramics offered by competitors." The Company also provided analysts with a chart showing that PowerProp competed with lightweight ceramics.

16

65.     Similarly, the Company's September 2014 road show presentation stated that PowerProp "competes with lightweight ceramics offered by competitors."

66.     Additionally, the Company's registration statement, filed with the SEC on Form S-1 in connection with Fairmount's October 2, 2014 IPO, which was signed by Defendant Deckard, stated that PowerProp, the company's "high performance proprietary" proppant, had performance characteristics competitive with, and similar to, lightweight ceramics.

67.     As the SEC Order explained, internal documents from Fairmount employees confirmed that PowerProp's performance and purported competitiveness with lightweight ceramics referred specifically to its conductivity metrics. In October 2014, for example, according to the SEC Order, Fairmount employees wrote that: "We have recently communicated (IPO roadshow) that we have PowerProp which is in the ceramic space = very high conductivity."

68.     According to the SEC Order, from at least 2014 to mid-2017, Fairmount posted on its website and provided to customers inflated conductivity results for PowerProp. The inflated conductivity results made it appear as though PowerProp's conductivity was in line with that of lightweight ceramics offered by the Company's competitors.

69.     Both before and during the Class Period, the Company repeatedly overstated Propel SSP's success in increasing hydrocarbon production in test wells. For example, the Company's press release attached to its May 12, 2015 current report filed with the SEC on Form 8-K stated that, "hydrocarbon production in most wells pumped with Propel SSP has increased by more than 30% within six months."

**Defendants Made False and Misleading Statements
of Material Fact During the Class Period**

70.     On March 10, 2016, the Company held a conference call with analysts and investors

to discuss the Company's results and financials from the fourth quarter of 2015 ("15Q4 Earnings

Call"). During the 15Q4 Earnings Call, Defendant Deckard made the following statement:

> We continue to see very positive productivity trends from our Propel
> SSP trial wells. To date, documented third-party field performance
> data demonstrates an average of 30% cumulative enhanced
> hydrocarbon recovery over non-SSP offset wells after only 90 days
> of production, with the differentials continuing to increase over
> producing time.

71.     These statements were false and misleading because Deckard knew, or was

severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP

test wells actually had production increases of 30% or more. In fact, the Company had production

data for only 29 wells, and less than half of those wells showed increased production of more than

30%. The Company's only results came from a very limited set of test wells, only a portion of

which showed any meaningful increases in production.

72.     On March 15, 2016, the Company filed its annual report for 2015 with the SEC on

Form 10-K ("2015 10-K"). Defendants Deckard and Barrus signed the 2015 10-K.

73.     The 2015 10-K stated that PowerProp "delivers strength and performance

characteristics similar to lightweight ceramics."

74.     This statement was false and misleading because Defendants knew, or were

severely reckless in not knowing, but failed to disclose that PowerProp's conductivity was as much

as 49% lower than the Company's published performance results and much lower than that of

lightweight ceramics. Indeed, the Company's published conductivity results for PowerProp were

inflated based on test results forged by a former employee. In reality, PowerProp's conductivity simply could not compete with lightweight ceramics.

75.     The 2015 10-K touted that "Propel SSP continues to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs)."

76.     This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, field trials of Propel SSP did not really demonstrate "increased productivity" or "successful results."

77.     Appended as exhibits to the 2015 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Deckard and Barrus, wherein they certified that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

78.     These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 2015 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in

the 2015 10-K did not fairly present the financial condition and results of operations of the Company.

79.     On May 10, 2016, the Company held a conference call with analysts and investors to discuss the Company's results and financials from the first quarter of 2016 ("16Q1 Earnings Call"). During the 16Q1 Earnings Call, Defendant Deckard made the following statement:

> To date, trials have included placement of Propel SSP in 87 wells with 19 different operators across all major U.S. basins. And we continue to work with our customers to document their improved operational efficiency and their enhanced production rate.
>
> ***Third-party field performance data continues to demonstrate an average of 30% cumulative enhanced hydrocarbon recovery over non-SSP offset wells after 90 days of production, with differentials continuing to increase over producing time. After seeing successful results during field trials, multiple customers have committed to ongoing commercial use of Propel SSP.***
>
> (Emphasis added).

80.     These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Moreover, the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP.

81.     Also during the 16Q1 Earnings Call, Defendant Deckard made the following statement in response to a question posed by an analyst regarding the Company's Propel SSP product:

**Analyst:**
On this SSP, could you tell us which regions is it more successful or is it pretty widespread?

**Deckard:**
It's pretty widespread. And the productivity gains are across most of the basins that we've tested the product. So we're feeling pretty confident and we don't, at this point, have a targeted market with a difference in productivity gains.

82.      These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus Propel SSP did not really have "widespread" success in terms of "productivity gains."

83.      In a presentation attached as Exhibit 99.1 to a current report filed by the Company with the SEC on Form 8-K on May 18, 2016, which was also used at a May 19, 2016 investor and analyst day event, the Company stated that based on "field activity," the use of Propel SSP in over 90 wells typically resulted in production increases greater than 30%.



84.     This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production.

85.     On August 4, 2016, the Company held a conference call with analysts and investors to discuss the Company's results and financials from the second quarter of 2016 ("16Q2 Earnings Call"). During the 16Q2 Earnings Call, Defendant Deckard made the following statement:

> ***Our recent reservoir engineering study of Propel SSP trial well[s], as validated by an external petroleum engineering firm, confirms our previous communications regarding 30% to 50% production enhancement with an optimized completion design using Propel SSP*. …**

> We remain very excited about the prospects for Propel SSP. Moving forward and as operators once again become more focused on maximizing well productivity, the company is well-positioned to provide the most advanced proppant technology solution from base resin to resin-coated proppants, to Propel SSP and to many other value added solutions.

86.  These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Deckard also knew, or was severely reckless in not knowing, but failed to disclose that neither Propel SSP nor the Company's resin-coated proppant, PowerProp, were able to "maximiz[e] well productivity."

87.  On September 19, 2016, the Company filed another investor presentation attached to a current report filed with the SEC on Form 8-K. This presentation also claimed that based on "field activity," Propel SSP typically increased production by more than 30% in about 100 wells.

23



88.     This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production.

89.     On November 3, 2016, the Company held a conference call with analysts and investors to discuss the Company's results and financials from the third quarter of 2016 ("16Q3 Earnings Call"). During the 16Q3 Earnings Call, Defendant Deckard made the following statement:

Accordingly, we're pleased to provide an update on Propel SSP, our Self-Suspending Proppant solution, which optimizes frac geometry to superior subsurface transport and placement of proppant, while also providing key operational benefits at the wellhead.

***The operational benefits and the significant production uplift that have been experienced by our customers continue to be both convincing and repeatable. During the third quarter, the successful completion of additional trial wells with new customers and the commercial adoption of Propel SSP by repeat customers, added to our successful track record*** and we believe further differentiated Propel SSP from other products. We remain truly energized by the value of the Propel SSP provides the customers, as well as a prospects for broader market adoption.

(Emphasis added).

90.    These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus the "production uplift that [had] been experienced by [Fairmount's] customers" was neither "significant," "convincing," nor "repeatable." Additionally, Deckard knew, or was severely reckless in not knowing, but failed to disclose that the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP, thus there was no "commercial adoption of Propel SSP by repeat customers." In truth, neither the productivity results nor the supposed repeat customers actually contributed to the Company's purported "successful track record" for Propel SSP.

91.   The Company's January 18, 2017 press release stated that Propel SSP 350 "leverages the field-proven characteristics of Propel SSP technology into the realm of high salinity water sources."

92.   This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, to the extent that this statement referred to increased productivity as Propel SSP's "field-proven characteristics," it was false and misleading. Additionally, at this time the Company had not yet conducted field testing for Propel SSP 350 and did not have any field results showing that Propel SSP 350 increased oil and gas production in wells.

93.   On March 9, 2017, the Company filed its annual report for 2016 with the SEC on Form 10-K ("2016 10-K"). Defendants Deckard and Biehl signed the 2016 10-K.

94.   The 2016 10-K touted the Company's proprietary proppant, stating that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics."

95.   This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that PowerProp's conductivity was as much as 49% lower than the Company's published performance results and much lower than that of lightweight ceramics. Indeed, the Company's published conductivity results for PowerProp were inflated based on test results forged by a former employee. In reality, PowerProp's conductivity simply could not compete with lightweight ceramics.

26

96.     The 2016 10-K also claimed that Propel SSP continued to undergo extensive field trials with successful results and increased oil production. Specifically, the 2016 10-K stated that:

> Test results indicate that the lower specific gravity allows greater volumes of proppant and/or coarser mesh sizes coated with the Propel SSP® product to be carried deep into the fracture, which in turn allow more hydrocarbons to escape into the wellbore. ***As a result, field trials have shown a variety of benefits, including increased production, decreased use of fluids, and reduced pumping time.***

> (Emphasis added).

97.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, field trials for Propel SSP had not actually shown "increased production."

98.     Similarly, the 2016 10-K stated that:

> Propel SSP® products continue to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs). … Extensive field tests have shown the benefits of Propel SSP® products, including increased initial production, reduced fluid usage, and reduced pumping time. Propel SSP® 350 products can now accomplish the same results in hard water.

99.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than

30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, field trials for Propel SSP did not show "increased productivity," or "increased production." Additionally, at this time the Company had not yet conducted field testing for Propel SSP 350 and did not have any field results showing that Propel SSP 350 increased oil and gas production in wells.

100.    Appended as exhibits to the 2016 10-K were SOX certifications signed by Defendants Deckard and Biehl, wherein they certified that the 2016 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

101.    These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 2016 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 2016 10-K did not fairly present the financial condition and results of operations of the Company.

102.    On March 9, 2017, the Company held a conference call with analysts and investors to discuss the Company's results and financials from the fourth quarter of 2016 ("16Q4 Earnings Call"). During the 16Q4 Earnings Call, Defendant Deckard made the following statement:

> Before we get to Q&A, I'd also like to provide an update on Propel SSP. In addition to ongoing commercial activity driven by wells which continue to yield meaningful productivity gains, we're also

28

> building a compelling case on operational efficiencies that produce
> benefits for both E&Ps and for service companies. …
>
> We continue to invest in the commercialization of Propel SSP,
> including the recently launched product line extension, Propel SSP
> 350. … We remain optimistic on Propel SSP's future.

103.    These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the field results for Propel SSP did not "continue to yield meaningful productivity gains." Deckard also knew, or was severely reckless in not knowing, but failed to disclose that there was no basis for the professed optimism on Propel SSP or Propel SSP 350, as (1) the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP; and (2) the Company was not able to manufacture Propel SSP 350 in large enough quantities to be sold at commercially competitive prices, the Company did not have any field results showing that Propel SSP 350 increased oil and gas production in wells, and the Company could not consistently produce Propel SSP 350 to specifications, the formula was too expensive, and the Company could only manufacture the product at one plant, which had limited capacity.

104.    On May 4, 2017, the Company held a conference call with analysts and investors to discuss the Company's results and financials from the first quarter of 2017 ("17Q1 Earnings Call"). During the 17Q1 Earnings Call, Defendant Deckard made the following statements:

> Another key value-add on which I'd like to provide an update is Propel SSP. We saw good growth in demand in quarter 1, as users were able to leverage Propel SSP to both gain productivity and operational efficiencies, which are valuable to both E&P and service companies. The productivity enhancements that Propel SSP provide have been well demonstrated through many trial wells in different basins over the past 2 years.

105.    These statements were false and misleading because Deckard knew, or was severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the Propel SSP trial wells did not "gain productivity" or demonstrate "productivity enhancements."

106.    On March 13, 2018, the Company filed its annual report for 2017 with the SEC on Form 10-K ("2017 10-K"). Defendants Deckard and Biehl signed the 2017 10-K.

107.    The 2017 10-K touted the Company's proprietary proppant, stating that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics."

108.    This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that PowerProp's conductivity was as much as 49% lower than the Company's published performance results and much lower than that of lightweight ceramics. Indeed, the Company's published conductivity results for PowerProp were inflated based on test results forged by a former employee. In reality, PowerProp's conductivity simply could not compete with lightweight ceramics.

30

109.    The 2017 10-K also claimed that Propel SSP continued to undergo extensive field trials with successful results and increased oil production. Specifically, the 2017 10-K stated that Propel SSP "field trials have shown a variety of benefits, including increased production."

110.    This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production.

111.    The 2017 10-K also stated that "Extensive field tests have shown the benefits of Propel SSP® products, including increased production…. Propel SSP® 350 products accomplish the same results."

112.    This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Defendants also knew, or were severely reckless in not knowing, but failed to disclose that at this time the Company had not yet conducted field testing for Propel SSP 350 and did not have any field results showing that Propel SSP 350 increased production.

113.    Appended as exhibits to the 2017 10-K were SOX certifications signed by Defendants Deckard and Biehl, wherein they certified that the 2017 10-K "does not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

114.    These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 2017 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 2017 10-K did not fairly present the financial condition and results of operations of the Company.

### The Company's Annual Reports During the Class Period Also Contained Misleading Risk Disclosures

115.    The Company's risk disclosures in its annual reports for 2015-2018 were not sufficient to inform investors of the actual, materialized impediments with the Propel products, such as the limited positive field trial results and lack of commercial demand.

116.    Specifically, the 2015 10-K included the following generic risk disclosure about Propel SSP:

> **The development and marketing of Propel SSP may prove to be unsuccessful.**
>
> In April 2013, we acquired intellectual property rights to self-suspending proppant technology which led to the development of Propel SSP. We are currently conducting field trials on Propel SSP. The technology supporting Propel SSP is still unproven. Although the results of field trials have been encouraging, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

117.    This statement was misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the field results for Propel SSP were not "encouraging." Additionally, the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP. Thus, the warned-of risks had already materialized.

118.    Similarly, the 2016 10-K included the following generic risk disclosure about Propel SSP:

> **The development and marketing of Propel SSP® products may prove to be unsuccessful.**
>
> The technology supporting Propel SSP® products is still being proven through field trials. Although the results of field trials have been encouraging, and one customer in particular is using Propel SSP® products on a commercial basis in all of its wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(Emphasis in original).

119.    This statement was misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the field results for Propel SSP were not

"encouraging." Additionally, the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP. Thus, the warned-of risks had already materialized.

120.    Similarly, the 2017 10-K included the following generic risk disclosure about Propel SSP:

> **The development and marketing of Propel SSP® products may prove to be unsuccessful.**
>
> The technology supporting Propel SSP® products is unproven through field trials.  Although the results of field trials have been encouraging, and some customers are using Propel SSP® products on a commercial basis in all of thier [sic] wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

121.    This statement was misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the field results for Propel SSP were not "encouraging." Additionally, the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP. Thus, the warned-of risks had already materialized.

122.    On March 22, 2019, after market hours, the Company filed its annual report for 2018 with the SEC on Form 10-K ("2018 10-K"). Defendants, Deckard, Eich, and Navarre signed the 2018 10-K.

123.   The 2018 10-K included the following generic risk disclosure, specifically mentioning Propel SSP as an example:

> ***The initial and sustained commercialization of our products may prove to be unsuccessful.***
>
> The products we develop may or may not be technically viable, and those that are technically viable may not be or remain commercially viable. … A failure to capitalize on Propel SSP® products in commercial application would result in a significant unrecouped investment and the failure to realize certain anticipated benefits, each of which may have a material adverse effect on our business, financial condition, and results of operations.

124.   This statement was misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that only a small subset of all Propel SSP test wells actually had production increases of 30% or more. In fact, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%. The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production. Thus, the field results for Propel SSP were not "encouraging." The Company also consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP. Additionally, the Company was not able to manufacture Propel SSP 350 in large enough quantities to be sold at commercially competitive prices, the Company did not have any field results showing that Propel SSP 350 increased oil and gas production in wells, the Company could not consistently produce Propel SSP 350 to specifications, the formula was too expensive, and the Company could only manufacture the product at one plant, which had limited capacity. Thus, the warned-of risks had already materialized. Neither Propel SSP nor Propel SSP 350 were technically or commercially viable in that they did not demonstrate increased well productivity in the field and there was an utter lack of customer demand for the products. Accordingly, the

Company had already failed to capitalize on the Propel SSP products, which were already a significant unrecouped investment resulting in material adverse effects on the Company's business and financial condition.

125.    Appended as exhibits to the 2018 10-K were SOX certifications signed by Defendants Deckard and Eich, wherein they certified that the 2018 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

126.    These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 2018 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 2018 10-K did not fairly present the financial condition and results of operations of the Company.

### THE SEC INVESTIGATES, DECKARD IS TERMINATED, AND THE COMPANY GOES BANKRUPT, TANKING COVIA'S STOCK PRICE

127.    In the 2018 10-K, the Company revealed that it had received a subpoena from the SEC investigating certain value-added proppants. In relevant part, the 2018 10-K disclosed that "On March 18, 2019, we received a subpoena from the SEC seeking information relating to certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014."

128.    This disclosure revealed to the market for the first time that the SEC was investigating the Company's "value-added" proppant products, dating back as far as the beginning of 2014 when Fairmount first went public. This disclosure also partially revealed to the market

that the Company faced the previously undisclosed risk of governmental penalties relating to these products, which would later materialize upon the SEC Order.

129.    On this news, Covia's share prices dropped by $0.45, or approximately 6.9%, from closing at $6.50 on March 22, 2019 to close at $6.05 on March 25, 2019, the next trading day.

130.    After the close of markets on May 9, 2019, mere weeks after announcing the SEC subpoena, Covia filed a current report with the SEC on Form 8-K, announcing the purported resignation of Defendant Deckard as President, CEO, and director of Covia and its subsidiaries, effective immediately, "following the Board's decision to pursue a different direction with our leadership."

131.    Covia stated that it "expects to treat her resignation as a termination by us without cause" and that "Ms. Deckard will receive the enhanced severance benefits provided for a termination." Upon information and belief, given the abrupt, immediate timing of her "resignation," based on "the Board's decision," with no period of transition, no substantive reason given, coming just weeks following the SEC subpoena, Deckard's departure was effectively a termination *for* cause despite the Company's euphemistic language.

132.    Despite terminating Deckard while the SEC was investigating the Company for fraud, Covia still granted Deckard a lucrative severance package comprising: (1) *triple* her base salary plus her target annual cash bonus for the year; (2) her prorated annual bonus; and (3) a $250,000 "consulting" fee, for a total of approximately $5.5 million.

133.    The circumstances of Defendant Deckard's abrupt departure, coming just weeks after Covia received a subpoena from the SEC regarding the products developed and heralded under Deckard's stewardship at the Company, supports an inference that Defendants and the Company acted with scienter in making the false and misleading statements noted herein. The

announcement of Deckard's departure also partially revealed to investors that she was, or at least may have been, implicated in the SEC's investigation, which led to her termination.

134.    On this news, Covia's share prices dropped by $0.29, or approximately 7.7%, from closing at $3.76 on May 9, 2019 to close at $3.47 on May 10, 2019.

135.    On November 6, 2019, during market hours, the Company filed its quarterly report for the third quarter of 2019 with the SEC on Form 10-Q ("3Q19 10-Q"). In the 3Q19 10-Q, the Company revealed that after the SEC's March 2019 subpoena, the SEC requested additional information and subpoenaed multiple current and former employees to testify regarding "certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014."

136.    The 3Q19 10-Q also disclosed that in September 2019, Covia had discontinued its sales and marketing (*i.e.*, commercialization efforts) of Propel SSP, recording an impairment charge of $7.8 million related to the product.

137.    This disclosure partially revealed to the market that the Company had utterly failed to commercialize Propel SSP, despite the millions invested in the product and Defendants' repeated claims touting its technology, lab and field results, and customer adoption. This disclosure also further indicated to the market that the SEC's investigation into the Company's "value-added" proppants posed a serious, ongoing risk and confirmed that the SEC's interest in the matter was more than a passing inquiry.

138.    On this news, Covia's share prices dropped by $0.11, or approximately 6.6%, from closing at $1.67 on November 5, 2019 to close at $1.56 on November 6, 2019.

139.     On June 29, 2020, after market hours, Covia announced that it had entered into a comprehensive restructuring agreement with lenders and voluntarily filed petitions under Chapter 11 of the United States Bankruptcy Code to implement the agreement.

140.     The failure of the Company's "value-added" proppant products to achieve sustainable commercial success was an undisclosed risk that Defendants attempted to hide through the Class Period through their misrepresentations about the products' test results and customer demand, and thus commercial appeal and profitability. This failure was a material factor leading to the Company's bankruptcy.

141.     During the Class Period, while Defendants were making false and misleading claims about PowerProp, Propel SSP, and Propel SSP 350, the Company had to renegotiate its debt obligations on multiple occasions. It was able to continue refinancing its debt in part due to Defendants' false and misleading statements touting the commercial promise of its value-added proppant products.

142.     In April and May of 2015, Fairmount amended credit agreements to extend the maturity date of over $160 million of its loans by two years. In April 2016, Fairmount amended credit agreements to extend the maturity date of approximately $70 million of its loans.

143.     On November 1, 2017, Fairmount refinanced $781.4 million balance of its credit facilities with a new $700 million credit facility and a $125 million revolving credit facility, extending the maturity date of the debt to 2022 and paying off the rest of the balance with a combination of cash and the revolving credit line.

144.     In connection with the 2018 merger, the Company completed another debt refinancing transaction, by entering into a $1.65 billion term loan and a $200 million revolving credit facility, pushing the maturity date of the debt out to 2025. The Company used this debt

restructure to repay the indebtedness of Fairmount and Unimin and to pay the cash portion of the merger consideration and merger-related expenses.

145.    As recognized in several analyst reports from Morningstar Equity Research between May 2017 and May 2019, "the company is weighed down by its large yet very unprofitable resin-coated sand operations. Although the company does not disclose assets or profitability disaggregated into resin-coated sand versus 'raw' frac sand, the company has nearly twice as much property, plant, and equipment per 2014 ton sold as peers. By our estimates and company commentary, the bulk of this difference is attributable to the company's large resin-coating and other value-added proppant operations."

146.    In other words, analysts recognized that if the Company was not able to achieve the supposed impending commercial success that Defendants touted based on the purported test results and customer adoption of its "value-added" proppants, these operations would weigh heavily on the Company's financial sustainability due to the large, fixed costs associated with these products.

147.    Ultimately, that is precisely what happened – the sales of the expensive "value-added" proppants never materialized because the real-life data did not support the Company's public claims about the products. Without this supposedly promising revenue stream, and weighed down by the large, fixed costs associated with these products, Covia was unable to withstand the downturn in oil prices, was unable to refinance its substantial debts as it had previously been able to during the Class Period and had to declare bankruptcy.

148.    The day after Covia's bankruptcy announcement, the NYSE delisted Covia and suspended all trading in Covia's public securities in light of the bankruptcy, stating in part that "the Company is no longer suitable for listing."

149.    Covia's stock resumed trading over-the-counter on July 1, 2020. When trading resumed, on the news of the bankruptcy and concomitant delisting, the value of Covia's securities evaporated. Covia's share price fell from $0.48 at closing on June 29, 2020, to $0.04 at close on July 1, 2020.

150.    On August 10, 2020, Covia filed a quarterly report for the second quarter of 2020 with the SEC on Form 10-Q ("2Q20 10-Q"). The 2Q20 10-Q announced that on July 7, 2020, Covia received a Wells Notice from the SEC indicating the staff's recommendation that the SEC file an action against the Company relating to the SEC's investigation into the Company's "value-added" proppant products.

### The SEC Finds the Company Misrepresented its "Value-Added" Proppant Products Before and During the Class Period

151.    On December 8, 2020, as the Company was wrapping up its bankruptcy proceedings, the SEC issued the SEC Order.

152.    The SEC Order detailed the factual findings of the SEC as a result of its investigation into the Company's and Defendants' false and misleading public statements. The SEC Order included central findings that:

> 3.    *Fairmount misrepresented that its premium resin-coated sand proppant, PowerProp, had performance characteristics similar to lightweight ceramics.* …
>
> 4.    *Additionally, Fairmount misrepresented that two polymer coated proppant products, Propel SSP and Propel SSP 350, increased oil and gas production in a large number of test wells, when Fairmount's test well results did not support these statements.*
>
> 5.    *Fairmount made materially false and misleading statements about these products* … in annual, quarterly and current reports filed with the Commission; presentations to investors and research analysts; and on the company's website.
>
> (Emphasis added).

153.    As a result of the misconduct detailed in the SEC Order, the SEC determined that the Company violated Sections 17(a)(2) and (3) of the Securities Act, as well as Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

154.    The SEC also imposed sanctions, requiring that the Company cease and desist from committing further violations, and imposing a $17 million civil penalty, to be distributed as restitution to harmed investors. Due to Covia's pending Chapter 11 bankruptcy case, the SEC agreed to deem the monetary penalty satisfied by a mere $1 million cash payment pursuant to Covia's confirmed Chapter 11 plan.

155.    The SEC Order described in detail how Defendants' statements about PowerProp, Propel SSP, and Propel SSP 350 were false and misleading. Moreover, the SEC Order described internal documents, correspondence, and meetings through which Defendants were apprised that their statements about these products were false and misleading, yet they continued to make misrepresentations to investors.

### *Defendants' Statements About PowerProp were False and Misleading*

156.    According to the SEC Order, as early as October 2014, Fairmount employees acknowledged in internal documents and communications that, in truth, PowerProp's conductivity was below the Company's published performance results and much lower than that of lightweight ceramics.

157.    According to the SEC Order, at the time of Defendants' misrepresentations about PowerProp, it was known within the Company that the conductivity of PowerProp fell materially short of lightweight ceramics. For example, for several years beginning in 2011, the Company's product performance team and its conductivity improvement team met to discuss the performance of the Company's resin-coated products, including PowerProp. The teams included employees

from the Company's research and development, sales and marketing, and investor relations departments, as well as the Company's product experts and executives. According to the SEC Order, team meeting minutes described the Company's attempts to increase the conductivity of PowerProp, and that they were unsuccessful. The team meeting minutes also noted internal concerns about continuing to market PowerProp as having comparable conductivity to lightweight ceramics where the data did not support this characterization.

158. According to the SEC Order, from at least January 2014 to March 2014, the Company's internal documents show that PowerProp's actual conductivity was as much as *49% below* the results the Company published on its website.

159. According to the SEC Order, internal Fairmount documents also show that two Fairmount managers acknowledged in June 2014 that PowerProp's conductivity could not compete with lightweight ceramics.

160. By March 2015, Fairmount's employees had learned even more negative information about the underperformance of PowerProp. According to the SEC Order, by March 2015 employees had learned that the inflated conductivity results for PowerProp that were published on the Company's website were actually based on test results forged by a former employee.

161. According to the SEC Order, in late 2015 and early 2016, employees learned that a third-party supplier substituted common household products such as table salt and antifreeze for special chemicals used to manufacture PowerProp, which was not effective. Fairmount took write-downs for this inventory in 2015 and 2016, without publicly disclosing that the inventory related to PowerProp. According to the SEC Order, by April 2016 employees determined after further

testing that manufacturing PowerProp with the prescribed chemicals, as opposed to the substituted household products, still failed to increase PowerProp's conductivity.

162.    According to the SEC Order, by mid-2017 several of Fairmount's sales employees and research and development employees raised issues internally about PowerProp's performance. For example, Fairmount executive stated that "[w]e can't position ourselves as a technical leader unless we actually lead in product performance."

163.    Despite knowing that PowerProp's conductivity results were fraudulently inflated based on forged test results, the inflated conductivity results for PowerProp remained on the Company's website until mid-2017. The Company never disclosed the actual lower conductivity of PowerProp.

### Defendants' Statements About Propel SSP were False and Misleading

164.    According to the SEC Order, contrary to Defendants' and the Company's claims about Propel SSP's field test results, only a small subset of all Propel SSP test wells actually had increases of over 30%. In fact, the Company did not even have data for many of the test wells. In truth, the Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production.

165.    According to the SEC Order, the Company had production data for only 29 wells and less than half of those wells showed increased production of more than 30%.

166.    The SEC Order also found that between 2015 and 2018, the Company received negative feedback from some of its customers that its data did not support the Company's claims about Propel SSP's effectiveness.

167.     Indeed, the Company consistently failed to convert Propel SSP trial customers into commercial customers. According to the SEC Order, the Company only ever signed one contract with a repeat commercial customer for Propel SSP.

### *Defendants' Statements About Propel SSP 350 were False and Misleading*

168.     According to the SEC Order, at the time of Defendants' public claims about Propel SSP 350 (as detailed above), in reality the product was not commercially available. According to the SEC Order, at the time of Defendants' claims the Company had not yet conducted field testing for Propel SSP 350. In fact, the Company was not even able to manufacture the product in large enough quantities to be sold at commercially competitive prices.

169.     The SEC Order further details that despite the Company's claims as to the effectiveness of Propel SSP 350 in increasing oil production, the Company did not have any field results supporting its claim that Propel SSP 350 increased oil and gas production in wells. This was still the case by the time of the 2017 10-K. In fact, by the time of the 2017 10-K, Company employees had been alerted to at least one dissatisfied customer who experienced an unsuccessful field trial.

170.     In the end, Propel SSP 350 never became a commercially viable product. According to the SEC Order, by December 2018 the Company had decided to stop selling Propel SSP 350 while they tried to develop a new formula. The Company could not consistently produce Propel SSP 350 to specifications, the formula was too expensive, and the Company could only manufacture the product at one plant, which had limited capacity. Covia stopped developing Propel SSP 350 by the third quarter of 2019.

**Whistleblowers Alerted Company Executives
to the Falsity of Defendants' Claims**

171. On November 19, 2020, Bloomberg Businessweek published an article titled, "Some Fracking Sand Was 'Revolutionary,' or Maybe It Was Just Sand." This article explained how in May 2017, four Fairmount employees explained to their bosses at formal meetings "why they thought the company was committing fraud."

172. According to the Bloomberg article, when Fairmount merged with Unimin to create Covia, the Company became the biggest fracking sand producer in the country. The Bloomberg article quoted Tudor Pickering Holt & Co. calling Covia the "800-pound gorilla in the sand game."

173. According to the Bloomberg article, which was based on interviews with former Company employees, multiple whistleblower complaints, and other court documents, in 2017 a Fairmount employee described the Company's fraud in a whistleblower complaint to the SEC as "particularly brazen because the company aggressively markets scientific testing to create the illusion of proven performance and reliability." Bloomberg reported that in 2018, another whistleblower blamed executives who "wholly adopted and reinforced a culture of covering up its lies without regard to who might suffer."

174. According to the Bloomberg article, while Fairmount was touting its "value-added" proppant solutions like PowerProp and Propel SSP, its own scientists were voicing internal complaints about how the Company was misrepresenting its products. Specifically, in May 2017 four Fairmount employees took turns speaking to a pair of the Company's executives, who met with each employee for at least one hour, some for more than two hours.

175. According to the Bloomberg article, one of the whistleblowers reported that the meetings were more like an interrogation than a fact-finding mission. The whistleblowers explained that they never heard Company executives mention the meeting ever again.

176. The Bloomberg article also reported that as of November 2020, SEC staff had interviewed all four Company employees who filed whistleblower complaints with the SEC, some multiple times. One month later, armed with the information gleaned from interviewing these whistleblowers, the SEC entered into a settlement with the Company and issued its Order.

**Former Employees Corroborate the Whistleblowers and the SEC's Findings
and Further Demonstrate Defendants' and the Company's Scienter**

177. FE1 was suspicious of the Company's claims about PowerProp's conductivity because within the Company there was no evidence that sales were increasing, noting that "there was no market adoption of the technology whatsoever."

178. In 2014, when FE1 joined the Company, Fairmount had developed some resin-coated products, but they were not yet being pushed commercially. Some of Fairmount's competitors at the time, including U.S. Silica, Prop X, and Unimin (pre-merger) were also developing resin-coated products. According to FE1, across the industry at that time, sales were simply not developing, in part because the oil and gas industry was traditionally very slow to adopt new products. The major entities in the industry such as Haliburton, Slumber J, and Noble Energy, preferred sticking with known processes for fracking, and were very slow to buy in to new technology such as the resin-coated proppants.

179. FE1 spoke regularly with a chemist from the New Product Development team who was the "mouthpiece" for resin-coated sand. Through FE1's conversations with the chemist, FE1 learned that the Company was not able to get the results they expected with respect to conductivity and performance for its PowerProp product.

180. FE1 identified Jerry Clancey, Fairmount's Chief Commercial Officer, as the main decision maker with respect to PowerProp, Propel SSP, and Propel SSP 350. FE1 recalled that a field-testing group also reported to Mr. Clancey.

47

181.     FE1 also reported that PowerProp, Propel SSP, and Propel SSP 350 were highly touted by the Company as potential saviors that could enhance profitability and improve the Company's debt position. As FE1 reported, the Company emphasized selling these resin-coated products in order to gain an advantage over their competitors, some of whom had sand mines just miles away from the Company's and were selling the same sand to the same customers. However, the resin-coated products never achieved high sales volumes.

182.     Indeed, FE1 stated that the Company's resin-coated products were discussed among the Company's executives at monthly sales meetings run by Mr. Clancey. FE1 recalled that by 2018, PowerProp was discussed less frequently internally because it was not gaining any sales traction or commercial adoption. At that time, the Company's focus shifted to trying to sell Propel SSP – the new purported savior.

183.     FE2 struggled to sell PowerProp to the Company's customers, noting that there was little opportunity to do so because the product was so expensive, even compared to the Company's high-end Northern White sand. Likewise, while there was a major initiative at the Company to sell Propel SSP, FE2 and the sales team were simply unable to sell much of it. With respect to PowerProp, Propel SSP, and Propel SSP 350, FE2 said that despite the Company's claims about the products, "we just couldn't move it out here, it was too expensive."

184.     FE2 reported that there were annual in-person meetings in Houston, attended by Mr. Berry and Defendants Deckard and Eich, along with other senior executives. The Company's resin-coated products, including its sales (or lack thereof) were discussed at these meetings, and FE2 recalled there being "a considerable amount of conversation as to what was happening with PowerProp and Propel [SSP]."

185.    FE3 described the Company's Propel SSP products as scam, and that the Propel SSP 350 product was "snake oil that they were trying to sell for profit." FE3 heard numerous complaints from the Company's customers who tried the Propel SSP products, noting that "we could barely give the stuff away, and nobody wanted to buy it.  It was like 400% more expensive than any other product and didn't give you any additional gain." FE3 also recalled that PowerProp did not work well either and the Company received a lot of complaints from customers that productivity was not increasing and that the coated sand actually plugged some wells entirely.

186.    FE3 also attended an annual Company-wide meeting in 2019 at the Company's headquarters in Ohio. According to FE3, Defendant Deckard led the meeting, and the Company's resin-coated sand products were a major topic of discussion. FE3 recalled that Defendant Deckard in particular was strongly emphasizing sales of the resin-coated products.

187.    FE4 reported that while Propel SSP was performing adequately in laboratory tests, the problem was that *the laboratory tests were performed in a one-liter cylindrical container*. Conversely, "as far as the real-world application, when you actually get to the oil fields, we were hearing that it was dirty and wasn't working as well as anticipated." This was the feedback the Company received from customers in the field. In other words, testing on a small laboratory sample simply did not translate to a similar result in the field, and the Company was aware of this problem. According to FE4, Haliburton and Slumber J were two of the customers who complained about Propel SSP, reporting that it had gummed up their fracking and completion equipment and created a mess in their facilities as the polymer product sheared off the sand, creating a lot of dust, which was a significant workplace hazard.

188.    FE4 explained that the development of the Propel SSP products had been a "nightmare." The products were stuck in research and development for five to six years. The

49

Company's employees were told by the executives that this was a revolutionary product that would revitalize the market. In actuality, production of the Propel SSP products created big headaches. Despite the development and production issues, FE4 reported that the Company considered sales of resin-coated sands and the Propel SSP products to be critical due to their higher profit margins.

189.    FE4 also reported attending the Company's annual meetings, where resin-coated products were a major topic of discussion. FE4 recalled that Defendant Deckard attended the annual meetings, as well as the Company's product directors, VPs, directors, site managers, and critical site personnel, noting that in attendance was "pretty much everyone except the operators running the plants."

190.    When FE5 worked for Unimin (pre-merger), Unimin competed directly with Fairmount. FE5 recalled going to trade shows and seeing Fairmount's claims trumpeting their ability to increase production by 30% with Propel SSP. FE5 and their colleagues were suspicious and started asking customers if any of them were using Fairmount's resin-coated products, but it appeared that none of them were. After the merger, FE5 was excited to see the extent of Fairmount's commercialization efforts with Propel SSP, but "what they had was really nothing." According to FE5, the post-merger Company had only one commercialized customer for Propel SSP, a single producer working in the Bakken oil field in North Dakota.

191.    FE5 personally attempted to research Fairmount's claims of Propel SSP enhancing well performance, consulting public records and databases containing actual production data for the oil and gas industry – which is publicly collected and aggregated – as opposed to internal Company data. Through these sources FE5 had access to production data for every well in North America. Before the merger, FE5 was unable to perform this analysis because FE5 did not know which customers were using the Propel SSP products in which wells. FE5 was finally able to

perform this analysis after joining the Company after the merger, with access to the customers' identities. In the end, FE 5 found "no discernible difference" in production between wells using the Company's conventional Northern White sand and its resin-coated products.

192.    According to FE5, shortly after the merger the Fairmount group conducted a large-scale meeting in Houston focused solely on how to sell the Company's resin-coated products. FE5 recalled that Defendant Deckard, Mr. Clancey, other senior executives, sales directors, research and development personnel, and other VP-level employees in the Company's Energy division all attended the meeting. Defendant Deckard took an active part in the discussions, hyping up the resin-coated products and emphasizing the critical role they would play in driving Covia into profitability. FE5 also attended several other meetings throughout 2018 and 2019, during which the Company's executives continued to push the resin-coated products.

193.    According to FE5, at the meeting there was a strong push to sell the Company's value-added proppant products. This perplexed FE5 because Unimin already had some resin-coated products and a good understanding of how the industry operated. According to FE5, the Unimin employees already knew there were significant challenges facing the commercialization of these products, including that demand for these products was quickly dying out as the industry continued to push toward lower costs and lower quality products.

194.    With respect to the knowledge and insight of the Company's senior executives, FE5 reported that they were constantly asking questions about data and financial reporting, and had a "robust" monthly financial reporting system. Indeed, FE5 remarked that "you wouldn't believe how much [low]-level detail that they would come down and ask about." According to FE5, various Company executives regularly participated during monthly conference calls, including Defendants Deckard and Eich, Mr. Clancey, and others. FE5 recalled that Defendant Eich was

often actively involved in the conversations and asked a lot of questions. FE5 described the senior executives as very "hands on" in overseeing the business.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.

196.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Covia and/or Fairmount securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

197.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

198.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

199.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws;

(b)     whether during the Class Period Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(e)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

200.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

201.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

202.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are in large part grounded on

Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

203.    Alternatively, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's common stock traded in an efficient market during the Class Period, in that, among other things:

A.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

B.    As a regulated issuer, the Company filed periodic public reports with the SEC;

C.    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

D.    The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 19.8 million shares of Fairmount common stock, or roughly 10.3% of Fairmount's total shares outstanding, were traded weekly before the merger, and approximately 2.6 million shares of Covia common stock, or roughly 2.0% of Covia's total shares outstanding, were traded weekly after the merger, with a weighted average weekly trading representing approximately 6.3% of the Company's shares outstanding during the

whole Class Period, permitting a very strong presumption that its shares traded on an efficient market;

E.    The Company's securities traded on the NYSE during the Class Period, and the Company was covered by multiple analysts;

F.    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

G.    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

204.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

**For Violations of Section 10(b) And SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Covia and/or Fairmount were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

210.     Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiffs and the Class.

211.     As a result of the foregoing, the market price of Covia and/or Fairmount securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Covia and/or Fairmount securities during the Class

Period in purchasing Covia and/or Fairmount securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

212. Had Plaintiffs and the other members of the Class been aware that the market price of Covia and/or Fairmount securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Covia and/or Fairmount securities at the artificially inflated prices that they did, or at all.

213. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

214. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Covia and/or Fairmount securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

215. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216. During the Class Period, Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

217. As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial

condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

218.     Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Covia and/or Fairmount securities.

219.     Plaintiffs and the Class do not assert claims or seek to recover in this action as against the Company. Nonetheless, the Company's conduct as alleged above violated Section 10(b) of the Exchange Act, constituting a primary violation for purposes of Section 20(a) of the Exchange Act.

220.     By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT III

### Violation of Section 14(a) of the Exchange Act and Rule 14a-9
### Against Defendant Deckard

221.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

222.     The claims set forth herein do not sound in fraud and are based on negligent conduct by Defendant Deckard.

223. Deckard violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder in that she and the Company solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that, through her and the Company's negligence, contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

224. Plaintiffs and other members of the Class were misled by Deckard's and the Company's false and misleading statements and omissions. As a result of Deckard's and the Company's false and misleading statements and omissions, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of Deckard's and the Company's statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the false and misleading statements.

225. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

226. By reason of the foregoing, Defendant Deckard has violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and is liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.


Dated: October 20, 2021                         Respectfully submitted,

                                                **KARON LLC**
                                                */s/ Daniel Karon*
                                                Daniel Karon
                                                700 W. St. Clair Ave., Ste. 200,
                                                Cleveland, Ohio 44113
                                                Telephone: (216) 622-1851
                                                Email: dkaron@karonllc.com

                                                *Liaison Counsel for Plaintiffs and the Class*

                                                **THE ROSEN LAW FIRM, P.A.**
                                                Phillip Kim
                                                Laurence M. Rosen
                                                Joshua Baker
                                                275 Madison Avenue, 40th Floor
                                                New York, NY 10016
                                                Telephone: (212) 686-1060
                                                Fax: (212) 202-3827

Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**GLANCY PRONGAY & HURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-91 SO
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        clinehan@glancylaw.com
        esams@glancylaw.com

*Additional Counsel for Plaintiffs*