**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| WILLIAM PLAGENS, Individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>       v. <br><br> JENNIFFER D. DECKARD, MARK E. BARRUS, MICHAEL F. BIEHL, ANDREW D. EICH, RICHARD A. NAVARRE, <br><br>     Defendants. | Case No. 1:20-cv-2744-JPC <br><br> <u>CLASS ACTION</u> |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**</u>
<u>**TO DEFENDANTS' MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................................ 3

III.   ARGUMENT ................................................................................................................ 11

    A.  The Complaint Adequately Alleges Loss Causation ....................................... 12

    B.  The Complaint Adequately Alleges Falsity ................................................... 22

      1. The Alleged Risk Disclosure Statements are Misleading and Actionable ................. 22

      2. The Alleged False and Misleading Statements are not Puffery ................................ 24

    C.  The Complaint Adequately Alleges Materiality ............................................ 27

      1. Materiality Typically Cannot Be Resolved at the Pleading Stage ............................ 28

      2. Plaintiffs Allege Qualitative Factors that Demonstrate Materiality .......................... 28

      3. Plaintiffs Allege Quantitative Factors that Demonstrate Materiality ........................ 30

    D.  The Complaint Adequately Alleges a Strong Inference of Scienter as to Defendants and the Company ......................................................................... 32

    E.  The Complaint Adequately Alleges Control Person Claims ........................... 37

IV.   CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ................................................................................ 32

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) .................................................................................. 33

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ................................................................................. 11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...................................................................................... 27, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 19

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................... 22

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
3:16-CV-2127(AWT), 2021 WL 3675180 (D. Conn. Aug. 19, 2021) .................... 38

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ................................................................................. 19

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ............................................................................... 24

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) .......................................................... 17, 18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ....................................................................... 24, 25, 35

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
No. 17 CIV. 0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ............... 19

*Constr. Indus. and Laborers Joint Pension Trust v. Carbonite Inc.*,
22 F.4th 1 (1st Cir. 2021) ............................................................................. 31, 36, 37

*D.E.&J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ......................................................................... 12

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................ 12, 14

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) .......................................................................................... 11

*Forman v. Meridian Bioscience, Inc.*,
   367 F. Supp. 3d 674 (S.D. Ohio) ................................................................................. 37

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ................................................................................. 32, 33

*Ganino v. Citizens Util. Co.*,
   228 F.3d 154 (2d Cir. 2000) ........................................................................................ 29

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999) ........................................................................................ 34

*Halford v. AtriCure, Inc.*,
   No. 1:08CV867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ................................ 15, 36, 39

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ................................................................................. 12, 28, 34

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) ........................................................................................ 21

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   No. CV169449KSHCLW, 2019 WL 3562134 (D.N.J. Aug. 6, 2019) ............................ 15

*In re Almost Fam., Inc. Sec. Litig.*,
   No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ............................ 14

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..................................................................... 23, 24

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) .......................................................................................... 32

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ................................................................. 12, 13, 35, 40

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 19

*In re Fed.-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001) ..................................................................... 12

iii

*In re FirstEnergy Corp. Sec. Litig*,
316 F. Supp. 2d 581 (N.D. Ohio 2004) ................................................................. 40

*In re Ford Motor Co. Sec. Litig., Class Action*,
381 F.3d 563 (6th Cir. 2004) ............................................................................... 24

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ............................................................................... 19

*In re Home Health Corp. of Am. Sec. Litig.*,
No. CIV.A. 98-834, 1999 WL 79057 (E.D. Pa. Jan. 28, 1999) ............................ 31

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................. 24

*In re Kidder Peabody Sec. Litig.*,
10 F. Supp. 2d 398 (S.D.N.Y. 1998) ..................................................................... 31

*In re Lehman Bros. Sec. & Erisa Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) ............................................................. 21, 22

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008) ................................................................... 20

*In re Nat'l Century Fin. Enterprises, Inc.*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) ................................................................. 39

*In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*,
No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ........................ 37

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ............................................................. 18, 20

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ....................................................................... 28, 30, 35

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................................... 31

*In re Sipex Corp. Sec. Litig.*,
No. 05-392, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ................................... 30

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................. 14, 15

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000) ........................................................ 35, 39

iv

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020)..................................................................... 14, 25

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)....................................................................................... 23

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)..................................................................... 39

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)....................................................................................... 31

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..................................................................................... 34

*King Cty., Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)..................................................................... 19

*Lawrence v. Chancery Ct. of Tennessee*,
    188 F.3d 687 (6th Cir. 1999) ................................................................................... 11

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................... 21

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................... 15, 16

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ................................................................................... 14

*Louisiana Mun. Police Emps. Ret. Sys. v. KPMG LLP*,
    822 F. Supp. 2d 711 (N.D. Ohio 2011).................................................................... 19

*Massachusetts Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013).................................................................................... 13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).............................................................................................. passim

*Mauss v. NuVasive, Inc.*,
    No. 13CV2005 JM (JLB), 2016 WL 3681831 (S.D. Cal. July 12, 2016) .......... 16, 17

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................................... 14

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................................... 26

v

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................... 30

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  877 F.3d 687 (6th Cir. 2017) ...................................................... 13, 15, 19

*Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
  22 F. Supp. 3d 669 (E.D. Ky. 2014) ............................................................ 25

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ................................................................ 13, 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................... 26

*Palazzolo v. Fiat Chrysler Automobiles N.V.*,
  No. CV 16-12803, 2017 WL 6389573 (E.D. Mich. Dec. 14, 2017)........................................... 29

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .............................. 21

*Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*,
  No. 1:19-CV-2115, 2021 WL 3773330 (N.D. Ohio Aug. 25, 2021)........................................ 38

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009)..................................................................... 18

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ........................................................................ passim

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ................................................................ 15, 17

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ........................................................................ 22

*Robbins v. Koger Properties, Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .................................................................. 19, 21

*Rok v. Identiv, Inc.*,
  No. 15-CV-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017).......................................... 16

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ........................................................................ 34

*S.E.C. v. Penthouse Int'l, Inc.*,
  390 F. Supp. 2d 344 (S.D.N.Y. 2005)................................................................... 29

vi

*Scottsdale Ins. Co. v. Flowers*,
   513 F.3d 546 (6th Cir. 2008) ................................................................................... 22

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015)...................................................................... 31

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).......................................................................................... 32, 35

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...................................................................................... 27, 28, 30

*United States v. Clark*,
   717 F.3d 790 (10th Cir. 2013) ................................................................................. 29

*United States v. Hatfield*,
   No. 06-CR-0550 JS AKT, 2014 WL 7271616 (E.D.N.Y. Dec. 18, 2014) ................................. 18

*United States v. Jenkins*,
   633 F.3d 788 (9th Cir. 2011) ................................................................................... 29

*United States v. Nichols*,
   No. SACR 08-00139CJC, 2008 WL 5233199 (C.D. Cal. Dec. 15, 2008)................................. 30

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)................................... 31

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
   No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)................................................. 22

*Wool v. Tandem Computers Inc.*,
   818 F.2d 1433 (9th Cir. 1987) ................................................................................. 38

**Statutes**

11 U.S.C. § 362(a) ............................................................................................................ 38

15 U.S.C. § 78u-4(b)(2) ................................................................................................... 32

**Rules**

Fed. R. Civ. P. 8(a)(2)...................................................................................................... 12

**Other Authorities**

Staff Accounting Bulletin No. 99
   1999 WL 1123073 (Aug. 12, 1999)............................................................... 27, 28, 29

Lead Plaintiff Thomas Phelps and named Plaintiffs Sergio Baron and Neville Arjani ("Plaintiffs") submit this memorandum in opposition to Defendants' motion (Dkt. No. 51, "Motion") to dismiss Plaintiffs' Consolidated Amended Complaint (Dkt. No. 50, "Complaint").

## I.    INTRODUCTION

In December 2020, the U.S. Securities and Exchange Commission ("SEC") found that Covia Holdings Corporation ("Covia"), the successor via merger to Fairmount Santrol Holdings Inc. ("Fairmount" and collectively with Covia, the "Company"), made material misrepresentations in statements to investors about the Company's "value-added" proppant products dating back to at least 2014.[1] Based on largely the same types of false and misleading statements about the same products, Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of a class of investors who purchased the Company's stock at artificially inflated prices. The Company had already entered bankruptcy by the time the SEC issued its Order Instituting Cease-and-Desist Proceedings ("SEC Order"), so Plaintiffs allege claims against certain of the Company's officers and directors who signed or made the false and misleading statements, both directly and as control persons responsible for the Company's violations. Due to the Company's bankruptcy, the SEC was only able to recover for investors $1 million of the $17 million that it ordered the Company to pay in restitution. For the reasons stated herein, the Court should find that the Complaint adequately alleges securities fraud and permit Plaintiffs and the investors they represent to pursue their claims for the damages they suffered.

This is not a case where Plaintiffs are grasping at straws and hoping the Court will allow them to dredge up a fraud claim in discovery. The Complaint draws from the SEC's completed

---

[1] References to the "Company" are to Fairmount, pre-merger, and to Covia, post-merger. References to Fairmount or to Covia are to the public parent company.

1

investigation and Order, which found that the Company made material misrepresentations in its public statements. The SEC Order incorporates internal Company documents as well as allegations from whistleblowers who *met with executives* before turning to the SEC, and includes findings that the Company's own internal data contradicted its public statements. The Complaint corroborates the SEC's factual findings with further allegations from former employees. This is a case where there is little doubt that, should the Court deny Defendants' motion, the same evidence the SEC already reviewed will continue to support Plaintiffs' valid claims for securities fraud.

The Court must deny Defendants' Motion because Plaintiffs adequately allege each element of their Section 10(b) and 20(a) claims.[2] The Complaint alleges actionable statements of material facts, where Defendants and the Company made objectively verifiable statements and omissions about the Company's "value-added" proppant products and the products' commercial prospects. These products, their commercial prospects, and the statements concerning them, were qualitatively and quantitatively material to investors, and Defendants deemed them "critical" to the Company's success. The Complaint also alleges ample facts supporting a strong inference that Defendants and the Company acted with scienter through their knowledge, or reckless disregard, of material facts contradicting their statements. Finally, the Complaint alleges that the Company's stock price dropped immediately following each of three events which served as partial corrective disclosures or materializations of the risk: (1) the announcement of the SEC's investigation; (2) Defendant Deckard's abrupt termination as CEO shortly following the announcement of the SEC's investigation; and (3) the Company's bankruptcy filing and concomitant delisting. These allegations easily satisfy the low standard for pleading loss causation.

---

[2] Upon reviewing Defendants' arguments and further review of the relevant case law, Plaintiffs concede that the Complaint fails to state a claim under Section 14(a).

2

Plaintiffs also adequately allege controlling person claims against Defendants, based on the Company's underlying violation of the Exchange Act. Even if the Court were to find that the Complaint does not adequately allege Section 10(b) claims against the Defendants, it should still hold Defendants liable as controlling persons for the fraud perpetrated by the Company.

## II.    STATEMENT OF FACTS

### A.    The Company Sold Fracking Proppants in a Competitive Market

Fairmount, and its successor by merger, Covia, sold sand-based proppants to oil and gas companies for use in fracking operations. ¶28.[3] Fracking involves injecting "fracking fluid" (primarily water, containing sand or other proppants) at high pressure into a wellbore to create cracks in rock formations, allowing gas and oil to flow more freely. ¶40. When the pressure is removed, proppants hold the fractures open. *Id*. Proppants are granular materials that prop open these fractures, promoting the flow of oil and gas through wells. ¶42. Conductivity is a key measure of proppant performance in the oil and gas industry. Higher conductivity means more oil and gas will be extracted from a well. *Id.*

The proppant industry is highly competitive, and the Company attempted to differentiate itself with its "value-added proppants," including resin- or polymer-coated sand products. ¶44. The Company invested heavily in developing these "value-added" proppants, which it tried to sell to oil and gas companies at a premium based on its claims that these products would improve conductivity, and thus increase well output. *Id.* The Company repeatedly told investors that its long-term strategy included developing and commercializing these "value-added" proppants. ¶45. Three of the Company's key "value-added" proppants were PowerProp, Propel SSP, and Propel

---

[3] References to "¶__" are to the paragraphs of the Complaint.

SSP 350. ¶46. Indeed, the Company tracked tons sold and average selling price for coated sand products like PowerProp and Propel SSP in its "Key P&L Metrics." ¶53.

**B. Defendants and the Company Made False Statements About PowerProp**

PowerProp was touted as the Company's premium resin-coated sand proppant, first introduced in 2010. ¶47. Fairmount described PowerProp as "a unique resin-coated sand product with higher crush resistance and conductivity than any other sand-based proppant available on the market. PowerProp utilizes our existing resin coating facilities and proprietarily developed resin chemistry to create substantially increased product performance." *Id.* Fairmount considered PowerProp to be one of its key innovations. ¶64.

Both before and during the Class Period, Defendants and the Company repeatedly misrepresented that PowerProp's performance was comparable to lightweight ceramics.[4] Ceramics are higher-performing, more expensive proppants as compared to sand. ¶63. Prior to the Class Period, Fairmount claimed that PowerProp had "performance characteristics similar to light-weight ceramics," and that it "competes with lightweight ceramics offered by competitors." ¶64. Fairmount's IPO registration statement made the same claims. ¶66. Additionally, both before and during the Class Period, Fairmount posted inflated conductivity results for PowerProp on its website, making it appear as though PowerProp's conductivity was in line with that of lightweight ceramics. ¶68. The Company's statements regarding PowerProp's performance and its competitiveness with ceramics referred specifically to its conductivity. ¶67.

During the Class Period, Defendants and the Company continued to make the same misrepresentations about PowerProp. In its 2015-2017 annual reports, Fairmount claimed that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics."

---

[4] Plaintiffs do not assert claims based on the statements predating the Class Period.

¶¶73, 94, 107. Plaintiffs allege these statements were false and misleading because the conductivity of PowerProp was substantially lower than lightweight ceramics, to the point that PowerProp simply could not compete with lightweight ceramics. ¶¶74, 95, 108.

In its Order, the SEC found that the Company had repeatedly misrepresented that PowerProp had performance characteristics similar to lightweight ceramics. ¶151. As early as October 2014, employees acknowledged in internal documents and communications that PowerProp's actual conductivity fell significantly short of the Company's published performance results and the conductivity of lightweight ceramics. ¶¶155-56. Minutes from inter-departmental meetings concerning the performance of PowerProp noted employees concerns about the Company continuing to market PowerProp as competing with ceramics on conductivity when the data they had did not support this claim. ¶156. In fact, internal documents showed that PowerProp's actual conductivity results were as much as *49% below* the results that the Company claimed. ¶157. Two Company managers admitted in June 2014 that PowerProp could not actually compete with ceramics. ¶158. By March 2015, employees had learned that the inflated conductivity results for PowerProp, on which the Company's claims were based, were actually from test results that were forged by a former employee. ¶159. The Company recognized its product was falling short and it repeatedly tried, but failed, to increase PowerProp's conductivity. ¶160. By mid-2017, several employees raised concerns internally about how the Company was misrepresenting PowerProp's performance. ¶161.

### C.       Defendants and the Company Made False Statements About Propel SSP

According to the Company, Propel SSP coats sand with a gel to deliver proppants deeper into the ground to increase oil and gas recovery in fracking wells. ¶48. The Company purchased

the rights to Propel SSP in 2013 for about $55 million and spent approximately $58 million trying to develop Propel SSP for commercial production and sales. ¶49.

Both during and prior to the Class Period, Defendants and the Company misrepresented Propel SSP's ability to increase production.

- Prior to the Class Period, in a May 2015 press release, the Company claimed that production in wells using Propel SSP "increased by more than 30% within six months." ¶69.

- During a March 2016 earnings call, Deckard claimed that the Company was seeing "very positive productivity trends from our Propel SSP trial wells," with "an average of 30% cumulative enhanced hydrocarbon recovery." ¶70.

- Fairmount's 2015-2017 annual reports claimed that Propel SSP had "successful results" from its field trials, ¶75, including increased productivity. ¶75, 96, 98, 109, 111.

- During a May 2016 earnings call, Deckard claimed that "field performance data continues to demonstrate an average of 30% cumulative enhanced hydrocarbon recovery," and that Propel SSP's successful test results and productivity gains were "pretty widespread." ¶¶79, 81.

- In investor presentations from May and September 2016, the Company claimed that based on "field activity" the use of Propel SSP in "90+ wells" (May) or "100+ wells" (September) resulted in production increases of over 30%. ¶¶83, 87.

- During an August 2016 earnings call, Deckard stated that a Company study of Propel SSP trials well[s] "confirms our previous communications regarding 30% to 50% production enhancement." ¶85.

- During a November 2016 earnings call, Deckard claimed that "the significant production uplift that have been experienced by our customers continue to be both convincing and repeatable." ¶89.

- In a January 2017 press release, the Company referred to the "field-proven characteristics of Propel SSP." ¶91.

- During a March 2017 earnings call, Deckard claimed that wells using Propel SSP "continue to yield meaningful productivity gains." ¶102.

- During a May 2017 earnings call, Deckard claimed that "users were able to leverage Propel SSP to … gain productivity," and that "[t]he productivity enhancements that Propel SSP provide have been well demonstrated through many trial wells in different basins over the past 2 years." ¶104.

6

Plaintiffs allege these statements about Propel SSP's ability to increase production in wells were false and misleading because the Company's own data contradicted the claims. In truth, only a small subset of all Propel SSP test wells actually saw production increases of 30% or more. ¶¶163-64. In fact, the Company had production data for only 29 wells (not "90+" or "100+") and *less than half* of those wells showed increased production of more than 30%. *Id.* Thus, Defendants' and the Company's claims about Propel SSP's field test results showing increased production were each demonstrably false or at least materially misleading.

Deckard also made false and misleading claims during the Class Period about the commercialization of Propel SSP. During the May 2016 earnings call, Deckard claimed that due to "successful results during field trials, multiple customers have committed to ongoing commercial use of Propel SSP." ¶79. During the November 2016 earnings call, Deckard stated that "the successful completion of additional trial wells with new customers and the commercial adoption of Propel SSP by repeat customers, added to our successful track record." ¶89.

Plaintiffs allege these statements were false or misleading because the Company consistently failed to convert Propel SSP trial customers into commercial customers, only ever signing one contract with a repeat commercial customer for Propel SSP. ¶166. Between 2015 and 2018, the Company received negative feedback from some of its customers complaining that the customers' own data (*i.e.*, field results) did not support the Company's claims about Propel SSP's effectiveness. ¶165. Thus, Plaintiffs allege it was false or misleading to say that "multiple customers have committed to ongoing commercial use of Propel SSP," and that "the commercial adoption of Propel SSP by repeat customers, added to our successful track record." ¶¶80, 90.

Finally, during the March 2017 earnings call, Deckard stated that the Company "remain[s] optimistic on Propel SSP's future." ¶102. This statement was misleading because it omitted

material facts about the basis (or lack thereof) for Deckard's purported optimism, specifically that the Company had consistently failed to get repeat customers, its own data did not support its claims about Propel SSP's benefits, and customers had been complaining that their actual field results belied the Company's claims. ¶¶163-65, 182, 184, 190.

As a former Fairmount engineer explained, the problem was that Fairmount's laboratory tests for Propel SSP were successful, but those tests were conducted in a one-liter container. ¶186. When Propel SSP was used outside the laboratory in actual oil wells, customers reported that the product was not working as well. *Id.* A former Company Vice President, who had previously worked for Unimin before it merged with Fairmount, reported that the Company had only one commercialized (non-trial basis) customer for Propel SSP. ¶189. When this same former employee compared the production data from wells using Propel SSP with wells using ordinary sand, they found "no discernable difference" in production. ¶190.

### D. Defendants and the Company Made False Statements About Propel SSP 350

In 2017 and 2018, the Company referred to Propel SSP 350 as one of its "most significant product innovations." ¶50. Propel SSP 350 was meant to work like Propel SSP, but it was designed to be compatible with any type of water, whereas Propel SSP worked only with freshwater. ¶51.

During the Class Period, Defendants and the Company made several misrepresentations about Propel SSP 350. First, the Company issued a press release in January 2017 claiming that Propel SSP 350 "leverages the field-proven characteristics of Propel SSP technology into the realm of high salinity water sources." ¶91. In the Company's 2016 and 2017 annual reports, it claimed that Propel SSP 350 achieved the same results as Propel SSP, including "increased productivity" and "increased production." ¶¶98, 111. During a March 2017 earnings call, Deckard claimed that

8

Fairmount was "continu[ing] to invest in the commercialization of … Propel SSP 350," and "remain[ed] optimistic" on its future. ¶102.

Plaintiffs allege these statements were false and misleading because at the time they were made, the Company had not yet conducted field testing for Propel SSP 350, and accordingly did not have any field results supporting its claims that the product increased production. ¶168. As discussed above, the field results for Propel SSP likewise did not support the Company's claims. ¶¶163-64. The SEC found that Fairmount misrepresented that Propel SSP 350 increased production. ¶151. Further, there was no basis for Deckard to express optimism on the future of Propel SSP 350 because, in addition to the lack of field results, the Company was not able to manufacture Propel SSP 350 in commercially viable quantities and the Company could not consistently produce Propel SSP 350 to specifications, the formula was too expensive, and the Company could only manufacture the product at one plant, which had limited capacity. ¶169.

**E.      Defendants and the Company Provided False and Misleading Risk Disclosures and SOX Certifications**

In each of its annual reports for 2015-2018, the Company also made misleading risk disclosures concerning the commercial prospects of its Propel SSP products, where the warned-of risks had already materialized. In its 2015-2017 annual reports, the Company stated that the "development and marketing of Propel SSP *may* prove to be unsuccessful," and claimed that "the results of field trials have been encouraging." ¶¶116, 118, 120 (emphasis added). Plaintiffs allege these statements were misleading because at the time these statements were made the Company had consistently failed to develop commercial customers for its Propel SSP products because, as detailed above, the Company's field results were substantially overstated and were not "encouraging." In Covia's 2018 10-K, it stated that "[a] failure to capitalize on Propel SSP® products in commercial application *would* result in a significant unrecouped investment and the

9

failure to realize certain anticipated benefits." ¶123 (emphasis added). Plaintiffs allege this statements was misleading because at the time it was made, the Company had already invested years of development and millions of dollars into Propel SSP, yet it still had consistently failed to commercialize the Propel SSP products. ¶¶166, 182, 184, 186, 189.

Each of the 2015-2018 annual reports also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants as the Company's CEOs and CFOs. These SOX certifications stated that the respective annual reports to which they were attached did not contain any false or misleading statements or omissions and that reports fairly presented the financial condition and results of operations of the Company. ¶¶77, 100, 113, 125. Plaintiffs allege these SOX certifications were false and misleading to the same extent that the underlying annual reports contained misrepresentations and omissions and did not fairly present the financial condition and results of operations of the Company. ¶¶78, 101, 114, 126.

**F.      Deckard Resigns Amid the SEC's Investigation as Covia Falls into Insolvency**

On March 22, 2019, Covia revealed that it had received a subpoena from the SEC, investigating "certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014." ¶127. On this news, the first time the market learned of the SEC's investigation, Covia's stock price dropped by $0.45, or roughly 7%. ¶129. A few weeks later, on May 9, 2019, Covia abruptly announced that its Board of Directors had decided to terminate Deckard as President, CEO, and director, effective immediately. ¶130. On news of Deckard's termination, Covia's stock price fell again by $0.29, or roughly 8%. ¶134.

On June 29, 2020, Covia announced that it had filed for Chapter 11 bankruptcy. ¶138. The NYSE delisted Covia and suspended all trading in Covia securities in light of the bankruptcy.

¶147. On this news, when Covia's stock resumed trading over-the-counter, its share price fell from $0.48 to $0.04, losing 92% of its remaining value. ¶148.

On December 8, 2020, as the Company was wrapping up its bankruptcy, the SEC issued the SEC Order, detailing the SEC's factual findings resulting from its investigation. ¶¶150-51. The SEC Order's central findings included that the Company "made materially false and misleading statements about these products [PowerProp, Propel SSP, and Propel SSP 350]" in the Company's SEC filings, investor presentations, and on its website. ¶151. The SEC determined that the Company violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") and Section 13(a) of the Exchange Act. ¶152. The SEC also imposed a $17 million civil penalty, to be distributed as restitution to investors. ¶153. However, due to the pending bankruptcy, the SEC agreed to accept a mere $1 million to satisfy the penalty. ¶153.

## III. ARGUMENT

When considering Defendants' motion to dismiss, the allegations of the Complaint must be taken as true and construed liberally in Plaintiffs' favor. *Lawrence v. Chancery Ct. of Tennessee*, 188 F.3d 687, 691 (6th Cir. 1999).[5] On a motion to dismiss, a complaint "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). "It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (citing *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), *cert. denied*, 568 U.S. 1087 (2013) ("A court ruling on ... a [Rule 12(b)(6)] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a

---

[5] Emphasis is added and internal citations and quotations are omitted unless otherwise indicated.

11

different version more plausible.")). In considering a motion to dismiss in a case, such as this one, subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the need to "draw inferences in favor of the plaintiff remains unchanged." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001), *abrogated by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). The PSLRA was not intended to be a "choke point" preventing the prosecution of legitimate claims. *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 561 (E.D. Mich. 2001).

The elements of a claim for securities fraud under Section 10(b) of the Exchange Act are falsity, materiality, scienter, reliance, loss causation, and damages. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge the elements of falsity, materiality, scienter, and loss causation. *See* Dkt. No. 51-1 ("MTD"). The Court should deny Defendants' Motion because the Complaint adequately alleges each of the required elements.

### A.    The Complaint Adequately Alleges Loss Causation

For the element of loss causation, the Rule 8(a) notice pleading standard applies. *Dura*, 544 U.S. at 346 ("the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' ... neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation"); *see also In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 758 (S.D. Ohio 2006) (citing Fed. R. Civ. P. 8(a)(2)). Plaintiffs need only "allege a drop in stock price; establish a causal connection; and connect the alleged fraud with the ultimate disclosure and loss." *See D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 998–99 (6th Cir. 2005). Indeed, pleading loss causation "should not prove burdensome," as a plaintiff need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. "At the dismissal

12

stage, it is sufficient that [Plaintiffs'] allegations be plausible—no final determination of amount of loss or its cause is required." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016).

The Sixth Circuit has recognized that loss causation events "need not come all at once but can come in a series of partial disclosures." *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017). "[A] corrective disclosure need not be a 'mirror-image' disclosure— a direct admission that a previous statement is untrue," but rather "[t]he appropriate inquiry is whether" the disclosures, taken "as a whole, plausibly revealed to the market" the alleged fraud. *Massachusetts Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013); *see also Cardinal Health*, 426 F. Supp. 2d at 760.

The Complaint adequately alleges loss causation with respect to three disclosures. First, on March 22, 2019, Covia disclosed for the first time the SEC's investigation into its "value-added proppants," causing Covia's stock price to fall $0.45, or roughly 7%. ¶¶127-29. Second, on May 9, 2019, Covia abruptly announced Deckard's immediate termination, just weeks after revealing the SEC's investigation. ¶130. This announcement caused Covia's stock price to fall $0.29, or nearly 8%. ¶134. Third, on June 29, 2020, Covia announced it had filed for Chapter 11 bankruptcy, ¶138, and the NYSE delisted Covia due to the bankruptcy. ¶147. When Covia's stock resumed trading, its share price fell $0.44, or approximately 92%. ¶148. Plaintiffs allege that the first two events were partial corrective disclosures, confirmed by the SEC Order, and the bankruptcy was a materialization of undisclosed risk. *See Ohio Pub. Emps.*, 830 F.3d at 384-85 (holding that "loss causation can be shown through a corrective disclosure" and that "we join our fellow circuits in recognizing the viability of … materialization of the risk").

### 1.     The Announcement of the SEC Investigation Satisfies Loss Causation

With respect to Plaintiffs' first alleged partial corrective disclosure, the March 2019 disclosure of the SEC investigation, Plaintiffs clearly provide an "indication of the loss"—the $0.45 stock drop—and the "causal connection" Plaintiffs have in mind. *Dura*, 544 U.S. at 347. Plaintiffs allege that this disclosure revealed to the market for the first time that the SEC was investigating the Company's "value-added proppants," which included PowerProp, Propel SSP, and Propel SSP 350, and that the Company faced the previously undisclosed risk of sanctions relating to the Company's marketing and sales of these products; a risk that later came to bear in the form of the SEC Order. ¶128. Defendants make two arguments that these allegations fail to satisfy loss causation: (1) that the announcement of the SEC investigation, "without more," is insufficient to establish loss causation; and (2) that Covia's stock price inched up by six cents[6] upon a later disclosure concerning the same investigation somehow negates the price reaction from the initial disclosure. Both arguments fail.

First, the very cases Defendants cite (MTD at 18) for the proposition that the announcement of an SEC investigation, *without more*, is insufficient to support loss causation, underscore how Plaintiffs have adequately alleged loss causation here. The SEC Order—which Defendants pretend does not exist—is the "something more." *Id.*[7] Controlling precedent from the Sixth Circuit holds

---

[6] *See* Dkt. No. 51-7 (Defendants' Exhibit 6 – Covia stock chart) at 7.

[7] The cases Defendants cite (MTD at 18) acknowledge that "the disclosure of an SEC investigation [may] qualify as a partial corrective disclosure … when the investigation is coupled with a later finding of fraud or wrongdoing." *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013); *see also Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014) (similar, citing *Meyer*, 710 F.3d at 1201 n.13); *In re Almost Fam., Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) (disclosure of an investigation coupled with a later revelation of fraud may be a corrective disclosure); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 772 (N.D. Ohio 2020) (citing the above cases for the same proposition). *See also In re Take-Two*

14

that the announcement of an SEC investigation, paired with a later admission or corrective disclosure, can amount to a partial corrective disclosure. *Norfolk Cnty.*, 877 F.3d at 696 (finding loss causation adequately alleged) (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209–11 (9th Cir. 2016)). The Ninth Circuit explicitly found in *Lloyd*, 811 F.3d at 1210 that "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure"). *See also Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014). Similarly, in *Halford v. AtriCure, Inc.*, No. 1:08CV867, 2010 WL 8973625, at *18 (S.D. Ohio Mar. 29, 2010), the court found that an announcement of a U.S. Department of Justice ("DOJ") investigation into the very statements that the plaintiffs alleged were false and misleading was sufficient to plead loss causation. In *Take-Two Interactive*, 551 F. Supp. 2d at 288, the facts bore a striking resemblance to those alleged here, and the court found that loss causation may be predicated on announcement of SEC investigation coupled with a 7.5% stock drop. The court also emphasized the added significance that the announced investigation was commenced by the SEC, "a governmental entity charged with ensuring compliance with the federal securities laws." *Id.*

The SEC Order was the product of the SEC's investigation, as first disclosed in March 2019. In the SEC Order, the SEC found that:

> 3.     Fairmount misrepresented that its premium resin-coated sand proppant, PowerProp, had performance characteristics similar to lightweight ceramics. …

---

*Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008) (collecting cases, noting that "various courts have found that the announcement of an SEC investigation into alleged fraudulent conduct may… constitute at least a partial disclosure of such fraudulent conduct."); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. CV169449KSHCLW, 2019 WL 3562134, at *13 (D.N.J. Aug. 6, 2019) (collecting cases, finding numerous courts have "upheld corrective disclosures premised upon announcements of regulatory investigations").

15

4.      Additionally, Fairmount misrepresented that two polymer coated proppant products, Propel SSP and Propel SSP 350, increased oil and gas production in a large number of test wells, when Fairmount's test well results did not support these statements.

5.      Fairmount made materially false and misleading statements about these products … in annual, quarterly and current reports filed with the Commission; presentations to investors and research analysts; and on the company's website.

¶151. The SEC Order also detailed its factual findings, determined that Covia violated the Securities Act and the Exchange Act, and imposed a $17 million penalty. ¶¶152-54. Defendants have completely ignored the SEC Order, which was a corrective disclosure confirming the prior partial corrective disclosures.[8]

The facts here represent precisely the situation the Ninth Circuit warned of in *Lloyd*, where "any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false." *Lloyd*, 811 F.3d at 1210. Here, Plaintiffs allege the market reacted negatively to the announcement of the SEC investigation into the Company's marketing and sales of its "value-added proppants," and that reaction was vindicated by the disclosure of the SEC Order, which revealed Defendants' and the Company's misrepresentations about PowerProp, Propel SSP, and Propel SSP 350. The Court should not let Defendants escape liability simply because the final corrective disclosure came after the Company's bankruptcy had erased any value

---

[8] To the extent Defendants argue that the SEC Order cannot be corrective because it resulted from a settlement with the SEC as opposed to fully-adjudicated findings of liability, that is "inconsequential." *Mauss v. NuVasive, Inc.*, No. 13CV2005 JM (JLB), 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) (finding that a combination of partial corrective disclosures, including the announcement of a government investigation and the CEO's resignation, culminating with the company's settlement with the DOJ requiring the company to pay $13.8 million, were sufficient to plead loss causation). Further, "no stock price drop need accompany the subsequent corrective disclosure." *Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (citing *Lloyd*, 811 F.3d at 1210).

remaining in the stock. Investors already lost out on $16 million of the $17 million in restitution ordered by the SEC due to Covia's bankruptcy. There is no basis to dismiss their claims here.

Second, contrary to Defendants' baseless argument, for which they cite absolutely no authority, the lack of a price drop upon the November 2019 disclosure about the same investigation does not "render implausible" the initial announcement as a loss causation event. MTD at 19. The lack of market reaction to the later disclosure, contained in a quarterly report, noting that the SEC was seeking additional information as to the *same investigation*, more plausibly shows that the market had already internalized the value impact of the SEC's investigation upon the first disclosure, and this later disclosure did not impart new, material information to the market.

### 2. The Announcement of Deckard's Termination Satisfies Loss Causation

Plaintiffs also adequately allege that the announcement of Deckard's termination was a partial corrective disclosure. Paired with the prior announcement of a governmental investigation, an announcement of "the resignation of [a Company]'s CEO, resulting in a further decline in [the Company]'s share price … can qualify as a partial disclosure, even if the announcement did not connect [the CEO]'s resignation to the investigation." *Mauss*, 2016 WL 3681831, at *11 (citing *Amedisys*, 769 F.3d at 323 (holding that the announcement of the resignations of two executive officers to "pursue other interests" constituted a "partial [corrective] disclosure")). In *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 717–18 (E.D. Mich. 2010), the court found that the announcement of a DOJ investigation and the announcement of a senior executive's suspension *six months later* were sufficient to constitute partial corrective disclosures and allege loss causation. "That this announcement followed on the heels of the March 5, 2008 announcement of the DOJ investigation … cannot be ignored. The market would not consider these statements in a vacuum and neither does the Court." *Id.*

17

The out-of-circuit cases Defendants cite hold no different. MTD at 20-21. In *In re Omnicom Grp., Inc. Sec. Litig.*, the court held that "a director's resignation cannot constitute a corrective disclosure *when the resignation is not connected to the alleged fraud*." 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (emphasis added).[9] In contrast, Plaintiffs allege facts plausibly connecting Deckard's termination to the fraud. Plaintiffs allege that (1) Covia stated that it would "treat [Deckard's] resignation as a termination," based on "the Board's decision," ¶¶130-31; (2) the termination occurred just weeks after the SEC investigation was announced, ¶130, even closer "on the heels" than in *Chamberlain*, 757 F. Supp. 2d at 717–718; and (3) the termination was announced abruptly, "effective immediately," and no substantive reason for the termination was provided, ¶131. Plaintiffs' allegations are much more akin to the facts presented in *Mauss* and *Chamberlain*, where announcements of government investigations, abrupt executive departures, and an eventual settlement with the investigating regulator, combined to satisfy the basic pleading requirements for loss causation.

Finally, Defendants argue that the announcement of Deckard's termination cannot support loss causation because Plaintiffs do not disaggregate two other contemporaneous filings which Defendants claim contain potential confounding factors that may have impacted the Company's stock price. MTD at 21-22. Defendants' argument is premature and inappropriate for the pleading stage. As the Sixth Circuit has held, allegations of corrective disclosures followed by swift stock

---

[9] S*ee also Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) (citing *Omnicom* for the same proposition); *United States v. Hatfield*, No. 06-CR-0550 JS AKT, 2014 WL 7271616, at *11 (E.D.N.Y. Dec. 18, 2014) (same). In *Omnicom*, the outside director's resignation (not the CEO's) was attributed explicitly to non-fraud-related reasons, 541 F. Supp. 2d at 553, whereas here, no such reasons were given. *See also SafeNet*, 645 F. Supp. 2d at 229 (finding the CFO's resignation was "wholly unrelated to the fraud"). In *Hatfield*, the court was considering an expert report provided in the context of sentencing in a criminal case, and it found that the executive's resignation was not tied to any prior indication of fraud. 2014 WL 7271616, at *11.

price drops "make it at least plausible that the disclosures had something to do with the [] losses," and "whether the [] losses flowed from the [corrective] disclosures… or anything else is for the parties to dispute at the summary-judgment stage or at trial, rather than for us to decide on the pleadings." *Norfolk Cnty.*, 877 F.3d at 696; *see also Louisiana Mun. Police Emps. Ret. Sys. v. KPMG LLP*, 822 F. Supp. 2d 711, 725 (N.D. Ohio 2011), *modified on reconsideration,* No. 1:10CV01461, 2012 WL 3903335 (N.D. Ohio Aug. 31, 2012) (finding loss causation adequately alleged, as "[w]hat ultimately caused Plaintiff's loss is not ripe for the Court to decide").

The Sixth Circuit has joined courts around the country in rejecting Defendants' "confounding factors" argument. In *Ohio Pub. Emps.*, the Sixth Circuit rejected the defendant's argument that the plaintiff failed to "plead[] facts sufficient to exclude more likely explanations for its alleged losses," holding that the plaintiff "need only allege sufficient facts to support a plausible claim—not the most likely—at this stage." 830 F.3d at 388 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[10] As the Ninth Circuit clearly explained, "[a] plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation. As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (quoting *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)).

---

[10] *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price") (emphasis in original); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 111 (D.C. Cir. 2015) (same); *Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 CIV. 0917 (LGS), 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) ("a complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes") (quoting *Carpenters*, 750 F.3d at 233).; *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) ("[N]either *Lentell* nor *Dura* burden plaintiffs with pleading that no other possible event could have caused plaintiffs' losses").

19

Plaintiffs' allegations that the announcement of Deckard's abrupt termination just weeks after the SEC investigation was revealed caused Covia's stock price to decline sharply the next trading day (¶¶130-134) are plausible and satisfy the basic pleading requirement at the motion to dismiss stage. The Court cannot rule on Defendants' fact-intensive disaggregation arguments at this stage of the proceedings, without the benefit of expert reports and testimony.[11]

### 3. Covia's Bankruptcy Was a Materialization of Undisclosed Risks

Defendants briefly remark that they "do not understand Plaintiffs … to attempt to plead that Covia's bankruptcy was caused by the failure of resin-coated proppant product lines." MTD at 22, n.4. Defendants' understanding is incorrect. Plaintiffs allege that Covia's bankruptcy was partly caused by, and represented a materialization of, the undisclosed risks that the Company's much-hyped "value-added" proppants were actually technical and commercial failures. ¶¶138-146. As the Complaint alleges, "the sales of the expensive 'value-added' proppants never materialized because the real-life data did not support the Company's public claims about the products. Without this supposedly promising revenue stream, and weighed down by the large, fixed costs associated with these products, Covia was unable to withstand the downturn in oil prices, was unable to refinance its substantial debts as it had previously been able to during the Class Period and had to declare bankruptcy." ¶146. Deckard herself recognized how important these products were in determining the Company's fate, "emphasizing the critical role they would play in driving Covia into profitability" in a meeting focused solely on selling these products. ¶191.

---

[11] The two out-of-circuit district court cases Defendants cite involve facts inapplicable here, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (holding that plaintiff could not untangle his losses from the contemporaneous collapse of the Internet sector because he failed to explain the issuer's stock price decline in the months prior to the alleged materialization of the risk), or relate to proceedings at the summary judgment stage on a fully developed record, not on a motion to dismiss, *Omnicom*, 541 F. Supp. 2d at 553.

Under the materialization of the risk theory, "a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *Ohio Pub. Emps.*, 830 F.3d at 384. Plaintiffs need only show that Defendants' misrepresentations concealed risks which were "a significant contributing cause" of their loss. *Robbins*, 116 F.3d at 1447. "In other words, plaintiff must show that 'the misrepresentation touches upon the reasons for the investment's decline in value." *Id.* (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981)).

Courts have found that similar facts, where Defendants' misrepresentations concealed a risk that contributed to the Company's spiral into bankruptcy, were adequate to plead loss causation. *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020) ("The Fund has adequately alleged that Defendants' false and misleading statements concealed risks that materialized … in the form of weak financial performance by PSG that eventually led PSG to enter a downward spiral toward bankruptcy."); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011) (defendants' misrepresentations concealed "risks that ultimately culminated in the ratings downgrades and liquidity crisis that followed and led to Lehman's bankruptcy."). In *Lehman Bros.*, the court rejected the very same argument proffered by Defendants here, *see* MTD at 14, that "[the company's] stock steadily declined through the class period and the company ultimately failed in consequence of a market-wide phenomenon, … that affected [the company's] industry generally." 799 F. Supp. 2d at 305. As the *Lehman Bros.* court reasoned, plaintiffs need only allege that they "would have been spared all *or an ascertainable portion* of the [] loss absent the fraud." *Id.* (emphasis in original) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). Even crediting, *arguendo,* that the market-wide circumstances defendants asserted did contribute

21

to the bankruptcy, that "would not of itself exclude a sufficient causal connection between the alleged misstatements and omissions and a portion of the losses plaintiffs sustained." *Id.*

Just as in *Lehman Bros.*, Plaintiffs allege that Defendants' misrepresentations touting the Company's high-margin "value-added" proppants, which were critical to driving the Company's profitability, concealed from investors the known risk that the Company was unable to successfully develop and commercialize these products. That undisclosed risk was a contributing causative factor leading to the Company's bankruptcy. Plaintiffs have thus alleged a plausible connection between the misrepresentations and the loss suffered upon the bankruptcy announcement.

### B.     The Complaint Adequately Alleges Falsity

Statements of material fact are actionable in the securities fraud context if they are either false or misleading. *See Matrixx*, 563 U.S. at 36. "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Defendants contend that only two sets of the alleged statements are not actionable: the Company's misleading risk disclosures, and certain statements about PowerProp and Propel SSP that Defendants claim are mere puffery. MTD at 34-37.[12]

### 1.     The Alleged Risk Disclosure Statements are Misleading and Actionable

Risk warnings may be actionable when they "speak[] entirely of as-yet-unrealized risks" and fail to "alert[] the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *Wilkof v. Caraco Pharm.*

---

[12] Defendants vaguely indicate that they may later attempt to challenge falsity with respect to other alleged statements. MTD at 34. The Court may hear no such arguments to the extent they are raised for the first time on reply. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; … As a matter of litigation fairness and procedure, then, we must treat such issues as waived.").

*Lab'ys, Ltd.*, No. 09-12830, 2010 WL 4184465, at *8 (E.D. Mich. Oct. 21, 2010) ("cautionary language can never be meaningful if it warns of risks that have already materialized"). "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996). Even "warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).

The Complaint alleges that Defendants and the Company omitted hard facts which would have revealed that the warned-of risks were of significantly greater magnitude than the statements implied, and in fact the risks had already come to fruition. In the Company's 2015-2017 annual reports, Defendants and the Company told investors that the "development and marketing of Propel SSP *may* prove to be unsuccessful," and claimed that "the results of field trials have been encouraging." ¶¶116, 118, 120 (emphasis added). At the time these statements were made the Company had failed *for years* to find commercial customers for its Propel SSP products. ¶166; *see also* ¶182 (the Company' sales team "was simply unable to sell much of [Propel SSP]", ¶184 (the Company received numerous complaints from customers that productivity was not increasing with Propel SSP, and "nobody wanted to buy it"), ¶186 (multiple customers complained of a lack of field results), ¶189 (the post-merger Company had only one commercialized customer for Propel SSP). Moreover, it was misleading to say that "the results of field trials have been encouraging"— a clear statement of historical fact, not a warning of a potential future risk—because the Company did not have data for many of its test wells and its only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production, and multiple

23

customers complained they were unable to produce comparable results in the field. *See id.*; ¶¶163-65, 190 (public data showed "no discernable difference" in production for wells using Propel SSP).

Similarly, in Covia's 2018 annual report, it stated that "[a] failure to capitalize on Propel SSP® products in commercial application *would* result in a significant unrecouped investment and the failure to realize certain anticipated benefits." ¶123 (emphasis added). At the time these statements were made, the Company had already invested years of development and millions of dollars into Propel SSP, yet it still had consistently failed to commercialize the Propel SSP products. ¶¶166, 182, 184, 186, 189. Thus, Defendants "fail[ed] to disclose hard facts critical to appreciating the magnitude of the risks described." *Am. Int'l Group*, 741 F. Supp. 2d at 531. Defendants' omission of these material facts rendered its statements misleading.

### 2.       The Alleged False and Misleading Statements are not Puffery

A statement is not puffery when it is capable of verification, meaning an "assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence." *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005). The "context in which a statement is made is essential in determining whether a statement is puffery." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1007 (S.D. Ohio 2008); *see also City of Monroe*, 399 F.3d at 672 (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)). Moreover, as the Sixth Circuit has recognized, "puffery ... in particular contexts when it is both factual and material ... may be actionable." *Id.* at 674. In contrast, the type of statements courts dismiss are those "so vague, [and] so lacking in specificity, ... that no reasonable investor could find them important to the total mix of information available.'" *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570–71 (6th Cir. 2004). The statements challenged by Defendants are objective and verifiable, and thus actionable under the securities laws.

24

First, Defendants challenge the statements in the Company's 2015-2017 annual reports, claiming that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics." ¶¶73, 94, 107. These are statements of objective, verifiable fact. The Complaint alleges that "internal documents from Fairmount employees confirmed that PowerProp's performance and purported competitiveness with lightweight ceramics referred specifically to its conductivity metrics." ¶67. Conductivity is not only measurable, the Company did in fact measure it, and the Company's own data on PowerProp contradicted the Company's statements. ¶¶155-61. That is an "assertion of a relationship between [conductivity] data and a conclusion [PowerProp's competitiveness on conductivity with ceramics]" that the Court "could test against record evidence." *City of Monroe*, 399 F.3d at 674.[13]

Second, Defendants contend that Deckard's statements that "the significant production uplift that have been experienced by our customers continue to be both convincing and repeatable," ¶89, and that wells using Propel SSP "continue to yield meaningful productivity gains," ¶102, are also puffery. Once again, Defendants improperly attempt to divorce individual words from the context of the statements in which they were made and ignore the reasons Plaintiffs claim these statements were false and misleading. The claims of continuing "significant production uplift," must be read in the context of the Company's and Deckard's myriad claims of achieving 30% production increases from over 90 test wells. *See, e.g.,* ¶¶70, 75, 79, 81, 83, 85, 87. The same is true as to the claims in the 2015 annual report of Propel SSP's "successful results (increased

---

[13] A cursory read of the full context of the statements at issue in Defendants' cases (MTD at 36) reveals they are not analogous to the statements Plaintiffs allege here. In *Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014), *aff'd sub nom. Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015), "competitiveness" referred to the company's "strong financial performance," not to a specific metric like conductivity. *See also TransDigm*, 440 F. Supp. 3d at 764 (statements regarding "the terms 'value,' 'value-based,' 'value-added,' 'strength,' and 'quality'… are not tethered to any kind of objective standard").

productivity…)" from "extensive field trials," ¶75, and Deckard's claim that Propel SSP's "successful" field results—referring to "productivity gains"—were "widespread." ¶81. Deckard's statement "confirm[ing] our previous communications regarding 30% to 50% production enhancement … using Propel SSP," ¶85, could not more clearly reference those same, prior specific claims. In truth, the Company's own data contradicted all of these claims. ¶¶163-64. The Company had also received multiple complaints from its customers that they were unable to produce comparable results in the field, and the public data showed that the purported "production uplift" was not "repeatable" and wells using Propel SSP did not "continue to yield meaningful productivity gains." ¶¶163-65, 182, 184, 190.[14]

Finally, Deckard's statement of optimism as to the Propel SSP products (¶102) was actionable, contrary to Defendants' arguments (MTD at 36), because it omitted material facts about the basis (or lack thereof) for Deckard's purported optimism and "those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Deckard's statement was not merely a "rosy affirmation," MTD at 36, but a specific reference to the commercial success of specific products, while omitting known material facts about the inadequate data, customer complaints, and years of failure to successfully develop the Propel SSP products or convert trial customers into commercial users. ¶¶163-65, 182, 184, 190. The Company also did not have *any* field results showing that Propel SSP 350 increased production and was not capable of manufacturing Propel SSP 350 in commercially viable quantities. ¶¶168-69, 184.

---

[14] These statements are unlike those in *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 404, 419 (5th Cir. 2001), cited by Defendants (MTD at 36), where the plaintiffs merely alleged "general statements that the Phase III results were 'positive,'" without reference to any quantifiable claims.

## C.       The Complaint Adequately Alleges Materiality

Plaintiffs have adequately alleged that Defendants' misrepresentations were material to investors. A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *see also Matrixx*, 563 U.S. at 38; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) (same).

The SEC has also issued guidance on assessing materiality. *See* SEC Staff Accounting Bulletin No. 99, ("SAB No. 99"), 1999 WL 1123073 (Aug. 12, 1999).  The Supreme Court has declared that "the SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability is entitled to consideration."  *TSC*, 426 U.S. at 449 n.10. Here, the SEC explicitly found in its Order that with respect to PowerProp, Propel SSP, and Propel SSP 350, "[t]hese products were material to investors." Complaint, Ex. 1 (SEC Order) ¶ 12.

SAB No. 99 provides the following guidance with respect to assessing materiality:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. … ***But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations***.

1999 WL 1123073, at *2. SAB No. 99 provides further that "exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law." *Id*. Additionally, SAB No. 99 states that "there are numerous circumstances in which misstatements

27

below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material….” *Id*. at *3.[15]

### 1. Materiality Typically Cannot Be Resolved at the Pleading Stage

Assessing materiality is a fact-specific inquiry and “these assessments are peculiarly ones for the trier of fact.” *TSC*, 426 U.S. at 450 (1976); *Matrixx*, 563 U.S. at 43. As the Sixth Circuit has recognized, this is because “the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements.” *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014). As a result, “a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material *unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.*” *Helwig*, 251 F.3d at 563 (emphasis in original).

### 2. Plaintiffs Allege Qualitative Factors that Demonstrate Materiality

Plaintiffs have adequately alleged that the Company’s “value-added” proppants were material to investors. ¶¶46-61. Multiple former employees reported that PowerProp, Propel SSP, and Propel SSP 350 were highly important products to the Company. ¶180 (“the Company emphasized selling these resin-coated products”); ¶187 (“the Company considered sales of resin-coated sands and the Propel SSP products to be critical”). The Company touted PowerProp as its premium resin-coated sand proppant, with supposedly “higher crush resistance and conductivity than any other sand-based proppant available on the market.” ¶¶47-48. The Company spent $55

---

[15] One of “the considerations that may well render material a quantitatively small misstatement of a financial statement item” is “whether the misstatement concerns a segment or other portion of the registrant’s business that has been identified as playing a significant role in the registrant’s operations or profitability.” SAB No. 99, 1999 WL 1123073 at *3-4. Here, Deckard “emphasiz[ed] the critical role [PowerProp, Propel SSP, and Propel SSP 350] would play in driving Covia into profitability” in a meeting focused solely on selling these products. ¶191.

million for the rights to Propel SSP and invested at least another $58 million toward developing Propel SSP for commercial production and sales. ¶49. In its 2016 and 2017 annual reports, the Company referred to Propel SSP 350 as one of its "most significant product innovations." ¶50. The Company also tracked sales data for these products in its internal "Key P&L Metrics." ¶53. Additionally, research analysts from various investment banks discussed the Company's proppant products and their commercial potential in their published reports about the Company. ¶¶54-61. As the SEC recognized in SAB No. 99, such qualitative factors may cause misstatements of quantitatively small amounts to be material. 1999 WL 1123073, at *3-4.

Defendants contend that after Covia announced it had discontinued its sales and marketing efforts of Propel SSP and had recorded an impairment charge, the Company's stock price rose the next day. MTD at 23. Without any authority, Defendants suggest that the $0.06 stock price movement following this announcement, and the lack of price movement after the *unannounced* discontinuation of Propel SSP 350, undermine Plaintiffs' allegations regarding materiality. *Id.*

Defendants' unsupported argument is misplaced. "Materiality in securities fraud does not depend on demonstration of a market reaction to the misstatements." *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011); *United States v. Clark*, 717 F.3d 790, 807 n.9 (10th Cir. 2013). "There is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material." *S.E.C. v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 353 (S.D.N.Y. 2005); *see also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (refusing to dismiss complaint based on factual argument that stock price did not drop); *Palazzolo v. Fiat Chrysler Automobiles N.V.*, No. CV 16-12803, 2017 WL 6389573, at *8 (E.D. Mich. Dec. 14, 2017) (rejecting defendants' argument that statements were immaterial because the company's stock price increased after the statements). Importantly, a "per se rule" that "if there has been no

immediate change in the stock price, the alleged misrepresentations or omissions must have been immaterial" would "contravene the Supreme Court's holdings" in *Basic* and *TSC*. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003); *see also United States v. Nichols*, No. SACR 08-00139CJC, 2008 WL 5233199, at *2 (C.D. Cal. Dec. 15, 2008) (rejecting defendants' argument that "because the price of [the company's] stock increased when [the company] announced its restatement, the alleged false statements and alleged acts of concealment are immaterial as a matter of law").

Second, Defendants suggest that analysts assigned little or no weight to Fairmount's statements about the products at issue because the analyst reports were purportedly "replete with caveats." MTD at 23-25. Defendants' argument, however, is pure conjecture based upon factual determinations that are inappropriate for resolution on a motion to dismiss. The weight that investors and analysts assigned to Defendants' statements requires a factual assessment which the Court is ill-equipped to make at the pleading stage. *Omnicare*, 769 F.3d at 472; *see also TSC*, 426 U.S. at 450 (1976); *Matrixx*, 563 U.S. at 43.[16]

### 3. Plaintiffs Allege Quantitative Factors that Demonstrate Materiality

In addition to the qualitative factors, Plaintiffs also allege quantitative factors that further illustrate materiality. For example, PowerProp and Propel SSP accounted for 4-6.6% of Fairmount's Proppant Solutions segment revenue from 2014-2017 and 4.8-7.8% of Fairmount's total profit margin on products in 2016-2017. ¶52. Courts have found quantitative impacts of far less magnitude to be material. *See, e.g.*, *In re Sipex Corp. Sec. Litig.*, No. 05-392, 2005 WL

---

[16] Defendants contend that the analyst reports cited in the Complaint do not mention PowerProp or Propel SSP 350, MTD at 23, but the March 27, 2017 analyst report from Guggenheim Securities discussed "the company's value-added products." ¶¶60-61. The Company's "value-added" proppant products were PowerProp, Propel SSP, and Propel SSP 350. ¶46.

3096178, at \*2 (N.D. Cal. Nov. 17, 2005) (a "$350,000 revenue item" for a company "with reported quarterly revenues of about $17 million" "cannot be said to be immaterial as a matter of law at the pleading stage"); *In re Home Health Corp. of Am. Sec. Litig.*, No. CIV.A. 98-834, 1999 WL 79057, at \*6-7 (E.D. Pa. Jan. 28, 1999) (impact on net revenues of less than 2.8% was not immaterial as a matter of law); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410-11 (S.D.N.Y. 1998), *abrogated on other grounds by In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (misstatements that impacted company's profits by no more than 2.54% and most by less than 1% were not immaterial as a matter of law). *See also Constr. Indus. and Laborers Joint Pension Trust v. Carbonite Inc.*, 22 F.4th 1, 6 (1st Cir. 2021) ("a company certainly can consider a product important long before it contributes substantial revenue.").

Courts have also found misrepresentations were material despite much smaller quantitative impacts where a company's deceptive actions affected the company's reputation and/or exposed the company to significant regulatory penalties, as was the case here. *See, e.g., Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme that "was worth a fraction of SAIC's yearly revenues" was material given company's "possible exposure to significant civil and even criminal liability"); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at \*12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing 0.5% of income, but which caused a decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (statements regarding trading platform that accounted for 0.1% of total revenue, but which "call into question the integrity of the company as a whole" were material to investors).

31

Defendants' argument that Plaintiffs' quantitative allegations are insufficient standing alone (MTD at 25) directly conflicts with the Supreme Court's rulings that courts cannot impose a bright-line, quantitative test to determine materiality. *Basic*, 485 U.S. at 236 & n.14; *Matrixx*, 563 U.S. at 39. Thus, Plaintiffs have adequately alleged materiality.

### D. The Complaint Adequately Alleges a Strong Inference of Scienter as to Defendants and the Company

The PSLRA requires a securities fraud complaint to state with particularity facts that give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). However, the PSLRA "was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002) (noting that PSLRA "was not enacted to raise the pleading burdens ... to such a level that facially valid claims … must be routinely dismissed")).

On a motion to dismiss, the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). In *Tellabs*, the Supreme Court held that scienter is adequately pled where the inference of fraud is cogent and at least equally as likely as any non-culpable explanation of the alleged conduct. *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324; *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004) ("The PSLRA does not change the Rule 12(b)(6) maxim that when an allegation is capable of more than one inference, it must be construed in the plaintiff's favor").

Under *Tellabs*, courts are charged with addressing "the allegations collectively," and must refrain from "pars[ing] out the allegations for individual analysis." *Frank v. Dana Corp.*, 646 F.3d

32

954, 961 (6th Cir. 2011). Courts in the Sixth Circuit "employ[] a totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness." *PR Diamonds*, 364 F.3d at 683. Recklessness means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Frank*, 646 F.3d at 959.

The Complaint adequately alleges scienter because Defendants and the Company knew, or recklessly disregarded, that their statements were false and misleading when made. "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). First, the Complaint alleges that the Company's own data contradicted its public statements about the conductivity of PowerProp and the field results for the Propel SSP products. ¶¶157, 159, 178 (regarding PowerProp); ¶¶163-64, 184, 190 (Propel SSP); ¶¶167, 184 (Propel SSP 350). Second, the Complaint alleges that the Company's own employees observed and reported these discrepancies internally. ¶¶155-56, 158, 160-61. Third, the Complaint alleges that the Company received complaints from its customers who were unable to replicate the results touted by the Company. ¶¶165, 168, 184, 186. Fourth, the Complaint alleges that Company consistently struggled to find repeat customers and commercialize these products, despite implementing major initiatives to push their sales. ¶¶166, 169, 180, 182-85, 187-89, 191-92.

On top of these facts, the Complaint alleges that four whistleblowers brought these issues, including "why they thought the company was committing fraud," ¶170, directly to the attention of the Company's executives. ¶¶170-175. These four whistleblowers met directly with a pair of Company executives and spoke with them for hours about how the Company was misrepresenting its "value-added" proppants, PowerProp and Propel SSP. ¶173. One whistleblower described the Company's executives as having "wholly adopted and reinforced a culture of covering up its lies."

¶172. Despite confronting these whistleblowers in person, the Company's executives tried to sweep the matter under the rug, and the whistleblowers turned to the SEC. ¶¶174-75.

These facts are sufficient to support a strong inference of scienter at least as compelling as any competing inference. Scienter may be inferred from "indirect and circumstantial evidence." *Helwig*, 251 F.3d at 551 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir. 1999)). Facts such as those alleged here, showing "divergence between internal reports and external statements on the same subject," and/or "disregard of the most current factual information before making statements," may be probative of scienter. *Id.* at 552. "'In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.'" *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 272–73 (3d Cir. 2009) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)). Defendants argue that the SEC Order itself contained no individual findings of scienter (MTD at 28)—a fact more likely indicating the result of a negotiated settlement—but that argument ignores the totality of Plaintiffs' allegations and common-sense inferences. In light of the Company's own data contradicting its claims, internal discussions within the Company about those contradictions, complaints from customers, executives meeting directly with the whistleblowers concerning "why they thought the company was committing fraud," and the SEC's findings that the Company's public statements were, in fact, false and misleading just as the whistleblowers had warned, it is *at least* as compelling of an inference that Defendants and the Company knew, or were reckless in not knowing, that their claims about their "value-added" proppants were false and misleading.

The Complaint alleges facts showing PowerProp, Propel SSP, and Propel SSP 350 were highly important products to the Company. ¶180 ("the Company emphasized selling these resin-

34

coated products"); ¶187 ("the Company considered sales of resin-coated sands and the Propel SSP products to be critical"). The Company also tracked sales data for these products in its "Key P&L Metrics." ¶53. Analysts following the Company also discussed these "value-added" proppants and their commercial potential in their reports. ¶¶54-61. Courts have found allegations that defendants misrepresented issues within analysts' and investors' "primary area of focus" can be probative of scienter. *See, e.g., Cardinal Health*, 426 F. Supp. 2d at 725-26; *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000).

At minimum, the Complaint alleges facts sufficient to find a strong inference of scienter that may be imputed to the Company. In *Omnicare*, the Sixth Circuit explicitly held that scienter may be imputed to the company from "[a]ny high managerial agent … who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance. 769 F.3d at 476; *see also City of Monroe*, 399 F.3d at 688 ("knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation"). Simply because the SEC Order does not identify which particular Company executives met directly with the whistleblowers, that does not negate the inference of scienter altogether. The whistleblowers discussed the Company's public misrepresentations with executives, the Company's "high managerial agents," who then recklessly disregarded those misrepresentations in taking no corrective action. *Omnicare*, 769 F.3d at 476. In *Tellabs*, addressing a hypothetical from Justice Scalia's concurring opinion where "a jade falcon were stolen from a room to which only A and B had access," and no further direct evidence implicated B, Justice Ginsberg explained that "the inference of guilt as to B [would be] quite strong…. Indeed, an inference at least as likely as competing inferences can, in some cases, warrant recovery." 551 U.S at 324, n.5.

The Complaint also adequately alleges scienter as to the individual Defendants. Defendants, in addition to being high-ranking executive officers of the Company, attended several inter-departmental meetings where the products and their sales were often discussed and their importance to the Company was apparent. ¶181 ("the Company's resin-coated products were discussed among the Company's executives at monthly sales meetings"); ¶182 ("there was a major initiative at the Company to sell Propel SSP"); ¶¶183, 185, 188, 191 (multiple meetings attended by Deckard, Eich, and other senior executives where there was "a considerable amount of conversation as to what was happening with PowerProp and Propel [SSP]," which Deckard led and "was strongly emphasizing sales of the resin-coated products," and "emphasizing the critical role they would play"). *Halford*, 2010 WL 8973625, at *16 ("confidential witness statements [that] cite to specific instances where there were discussions regarding [the products at issue]" supported finding of scienter). A former Company vice president explained that the Company's senior executives "were constantly asking questions about data" and that "you wouldn't believe how much [low-level] detail that they would come down and ask about," describing the senior executives as very "hands on" in overseeing the business. ¶193.

The inference of scienter is particularly strong with respect to Deckard, who spoke in detail during several earnings calls about the field results and commercial demand for Propel SSP. ¶¶70, 79, 81, 85, 89, 102, 104. Allegations that "the company thought [a product] important enough to warrant two specific plugs from top management, … create a very strong inference that the senior executives who gave those apparently prepared remarks touting the product would have paid at least some attention to the product's status." *Carbonite*, 22 F.4th at 9 ("[t]his inference is cogent because a company certainly can consider a product important long before it contributes substantial revenue… Similarly, the absence of express market 'clamor' about a new product does not

36

preclude the inference that management thought the product important; direct allegations in the form of their own words can do the trick just as well"). That Deckard spoke in detail about the field results and commercial prospects of Propel SSP on several occasions supports a strong inference that she paid attention to the Company's own contradictory data, internal discussions (which she led), customer complaints, and whistleblower reports on those issues. *Id.*

These allegations, viewed collectively, are sufficient to establish a strong inference that Deckard and the other Defendants had access to information that did or should have made them aware that their and the Company's claims about the "value-added" products were false and misleading. *See PR Diamonds*, 364 F.3d at 688 ("high-level executives can be presumed to be aware of matters central to their business's operation").

Finally, Deckard's abrupt termination shortly following the announcement of the SEC's investigation is also probative of scienter. ¶¶130-33. *See Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 695 (S.D. Ohio) (S.D. Ohio 2019) (unexpected departure of CEO connected temporally to regulatory investigation "weighs slightly in favor of a finding of scienter," even though the CEO maintained a role with the company and the regulatory report and penalties occurred much later).

### E.     The Complaint Adequately Alleges Control Person Claims

The Sixth Circuit has held that "Section 20(a) [] establishes *two requirements* for a finding of control person liability": (1) an underlying violation of the securities laws, and (2) the "controlling person" must have directly or indirectly controlled the person liable for the securities law violation. *PR Diamonds*, 364 F.3d at 696 (emphasis added); *see also In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) ("The Sixth Circuit's most recent statement on the elements of a § 20(a) claim makes no

mention of such a [culpable participation] requirement.") (citing *PR Diamonds*, 364 F.3d at 696). This Court has previously found that culpable participation is a third required element of a Section 20(a) claim. *Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*, No. 1:19-CV-2115, 2021 WL 3773330, at *20 (N.D. Ohio Aug. 25, 2021) (Calabrese, J.), *appeal filed Cort Corwin, et al v. ViewRay, Inc.,* Case No. 21-3863 (6th Cir. Sept. 27, 2021). Respectfully, Plaintiffs submit that this decision contradicts controlling precedent. *PR Diamonds*, 364 F.3d at 696.

Alternatively, if the Court does require culpable participation, the Court may find that Defendants were "in some meaningful sense a culpable participant even though they do not meet the scienter requirements." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-CV-2127(AWT), 2021 WL 3675180, at *28–29 (D. Conn. Aug. 19, 2021) ("[i]t is not apparent why a control person cannot be found, based on an individualized determination, to have been in some meaningful sense a culpable participant even when that control person does not have "conscious recklessness...."). In *Alexion*, the court found that the plaintiffs adequately alleged that the company's CFO, who had signed the company's SEC filings which contained the alleged misstatements and resigned amidst an investigation, was a culpable participant in a fraud perpetrated by the company for purposes of Section 20(a) liability, even though the allegations were insufficient to support a strong inference of scienter as to the same defendant. *Id.* Moreover, the Ninth Circuit opinion in *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1442 (9th Cir. 1987), on which the line of "culpable participation" cases cited in *ViewRay* is based, held that culpable participation is satisfied by allegations that Defendants participated in preparing or issuing the false and misleading SEC filings.

Here, although Plaintiffs do not bring Section 10(b) claims against the Company due to the Company's bankruptcy, *see* 11 U.S.C. § 362(a) (imposing automatic bankruptcy stay), the Complaint nonetheless alleges sufficient facts to find a primary violation of Section 10(b) by the

38

Company. ¶218. *C.f. PR Diamonds*, 364 F.3d at 697 (considering allegations against company, controlled by the defendants, that "is not a named party in this case because it is bankrupt"). Unlike in *PR Diamonds*, 364 F.3d at 697, the Complaint here alleges facts sufficient to support a strong inference of the Company's scienter, independent of whether the allegations are sufficient to show Defendants' scienter. *Supra,* Section III(D). Thus, Plaintiffs' Section 20(a) claims against Defendants do not automatically fail if the Court finds Plaintiffs' scienter allegations insufficiently particularized as to the Defendants. *See In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d 287, 304 (S.D. Ohio 2007) ("The Court's decision to allow the Section 20(a) claims to go forward but to dismiss the Section 10(b) claim reflects 'the scheme established by Congress. It has imposed a heightened pleading standard for a Section 10(b) claim but not for a Section 20(a) claim.'") (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003)).

In *Nat'l Century Fin.*, the court noted that the Sixth Circuit has not adopted a test for liability as a controlling person, and adopted the following test: "a Section 20(a) plaintiff must allege only the power to control, and not an actual exercise of control, in order to survive a motion to dismiss." 504 F. Supp. 2d at 303-04; *see also Halford*, 2010 WL 8973625, at *19 (applying the same standard in finding that the plaintiffs adequately alleged that the individual defendants had the "power to control."); *Telxon*, 133 F. Supp. 2d at 1032-33 ("Plaintiffs … need not demonstrate that defendants actually exercised their authority to control"). In addition, the heightened pleading standard for fraud claims does not apply to section 20(a) claims. *Halford*, 2010 WL 8973625, at *19 (explaining that a majority of courts have concluded that the Rule 8(a) notice pleading standard applies to controlling person claims). In *In re FirstEnergy Corp. Sec. Litig.*, the court found that the plaintiffs had sufficiently pled control person claims where, in addition to sufficiently pleading an underlying primary violation, the plaintiffs alleged that the defendants "had direct and

39

supervisory involvement in the day-to-day operations of FirstEnergy" and "were provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged to be misleading." 316 F. Supp. 2d 581, 600-01 (N.D. Ohio 2004). *See also Cardinal Health*, 426 F. Supp. 2d at 762 (allegations that each of the defendants "had direct and supervisory involvement in the day-to-day operations of Cardinal" and "were provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged to be misleading" were sufficient for Section 20(a) claims).

The Complaint adequately alleges that Defendants controlled the Company and were culpable participants in the Company's violation. Defendants were high-level executives and/or directors of the Company, each serving as CEO or CFO at the times they signed SEC filings containing the misrepresentations alleged in the Complaint. ¶¶22-26. Each of the Defendants, among other things: "(a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; [and] (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein." ¶27. As senior executives of the Company, Defendants had the ability to control, and did control, the contents of the public filings and statements the Company made during the Class period which contained the alleged misrepresentations. ¶¶215, 217. Defendants were very "hands on" in overseeing the business. ¶193. Thus, the Complaint adequately alleges Defendants' control of the Company and—to the extent necessary—their culpable participation in the Company's fraudulent conduct.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

Dated: January 31, 2022                               Respectfully submitted,

**KARON LLC**
*/s/ Daniel Karon*
Daniel Karon
700 W. St. Clair Ave., Ste. 200,
Cleveland, Ohio 44113
Telephone: (216) 622-1851
Email: dkaron@karonllc.com

*Liaison Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Joshua Baker
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       lrosen@rosenlegal.com
       jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
       clinehan@glancylaw.com
       esams@glancylaw.com

*Additional Counsel for Plaintiffs*

42

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


Dated: January 31, 2022                    */s/ Daniel Karon*