**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WILLIAM PLAGENS, Individually and on Behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:20-cv-02744-JPC |
| v. | |
| JENNIFFER D. DECKARD, MARK E. BARRUS, MICHAEL F. BIEHL, ANDREW D. EICH, RICHARD A. NAVARRE, | **JUDGE J. PHILIP CALABRESE** |
| Defendants. | |

**DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 1

    I.     THE RULE 10B-5 CLAIM SHOULD BE DISMISSED ...................................... 1

          A.     Plaintiffs Fail to Adequately Plead Loss Causation.................................... 1

               1.     Plaintiffs Have Not Plausibly Alleged Any Corrective Disclosures. ...................................................................................... 2

               2.     Plaintiffs' "Materialization Of The Risk" Theory Is Implausible. ..................................................................................... 10

          B.     Plaintiffs Fail to Adequately Plead Materiality. ...................................... 16

          C.     Plaintiffs Fail to Adequately Plead Scienter. ........................................... 18

          D.     Plaintiffs Have Not Adequately Plead False or Misleading Statements. ............................................................................................... 22

    II.     THE 20(A) CLAIM SHOULD BE DISMISSED ................................................ 23

CONCLUSION............................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Almost Fam., Inc. Sec. Litig.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ...................................................................3

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................................16

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013)...........................................................................................24

*Bovee v. Coopers & Lybrand C.P.A.*,
272 F.3d 356 (6th Cir. 2001) .........................................................................................13

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ...........................................................................21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)............................................................................................9

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................................8, 13, 18

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ...............................................................10

*In re Covia Holdings Corp.*,
Case No. 4:20-cv-33295 (Bankr. S.D. Tex).............................................................11, 13

*D.E.&J Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003)
*aff'd*, 133 F. App'x 994 (6th Cir. 2005)..........................................................................24

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .........................................................................................9

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)..............................................................................6

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................2, 6, 10

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)..........................................................................24

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ...................................................................................23

*Forman v. Meridian Bioscience, Inc.*,
  367 F. Supp. 3d 674 (S.D. Ohio 2019) ..................................................................21

*Halford v. AtriCure, Inc.*,
  2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) .......................................................19

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ..................................................................................10

*King Cty., Wash. v. IKB Deutsche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010)......................................................................10

*In re Lehman Brothers Sec. & Erisa Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)......................................................................15

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)......................................................................2, 11, 13, 15

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...............................................................................4, 5

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
  2017 WL 5635424 (C.D. Cal. Aug. 20, 2017).........................................................18

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) ...........................................................8

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008)..............................................................10, 15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..................................................................................6

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .................................................................................3

*Norfolk County Retirement System v. Community Health Systems, Inc.*,
  877 F.3d 687 (6th Cir. 2018) .................................................................................4, 9

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ......................................................................... *passim*

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ...................................................................................25

iii

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008),
    *aff'd*, 597 F.3d 501 (2d Cir. 2010) .................................................................7, 8

*In re Omnicom*,
    597 F.3d 501 (2d Cir. 2010) ..................................................................................11

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
    --- F. Supp. 3d ---, 2021 WL 3773330 (N.D. Ohio Aug. 25, 2021) .......................18, 23, 24, 25

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009) .....................................................................7

*PR Diamonds Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..............................................................................21, 24

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)...................................................................25

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ...............................................................................5

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .........................................................21

*Sinay v. Lamson & Sessions Co.*,
    948 F.2d 1037 (6th Cir. 1991) .............................................................................22

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) .........................................................21

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020)................................................................3, 6, 24

*In re United Am. Healthcare Corp. Sec. Litig.*,
    2007 WL 313491 (E.D. Mich. Jan. 30, 2007)........................................................23, 24

*Weiner v. Tivity Health, Inc.*,
    528 F. Supp. 3d 795 (M.D. Tenn. 2021)...................................................................16

**Statutes**

15 U.S.C.A. § 78u–4(b)(2)(A) .................................................................................25

15 U.S.C. § 78u–5(c)(1)............................................................................................22

**Rules**

Fed. R. Evid. 201(b)(1) ..............................................................................................14

**INTRODUCTION**

The arguments in Plaintiffs' opposition cannot salvage their claims.  Plaintiffs wisely have abandoned their Section 14(a) claim against Defendant Deckard.  Plaintiffs' remaining claims concern public statements about three minor specialty products that the company abandoned, but Plaintiffs have not plausibly alleged that these statements caused them a loss or were material to investors.  They cannot identify any allegedly "corrective disclosure" that suggests the company made misstatements about those three specialty products and was accompanied by a stock-price drop.  Indeed, the only purportedly curative disclosure Plaintiffs identified (in their original complaint) that mentions any of the three products came in November 2019, when the company announced it was discontinuing one of the products, and Covia's stock price then went *up*.  Plaintiffs' alternative loss-causation theory—that the failure to commercialize these products (not the widely reported, industry-wide contraction) caused Covia's 2020 bankruptcy—is even less plausible and utterly unsupported by any pleaded facts.  And although Plaintiffs must plead scienter with particularity as to each defendant, their opposition brief's scienter discussion does not even mention three of the five Defendants—and does not identify any allegation that *any* Defendant received information impeaching his or her statements about these products.  Nor can Plaintiffs show that the only statements made by Defendants Navarre and Eich were even arguably false.  Plaintiffs' Rule 10b-5 claim therefore fails.  And in the absence of an underlying securities violation, or culpable participation in a violation by Covia, their Section 20(a) claim fails, too.

**ARGUMENT**

## I.  THE RULE 10B-5 CLAIM SHOULD BE DISMISSED

### A.  Plaintiffs Fail to Adequately Plead Loss Causation.

Loss causation remains an insurmountable problem for Plaintiffs' lawsuit.  Plaintiffs must plead that "the *subject* of the fraudulent statement or omission was the cause of the actual loss

suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted) (emphasis in original); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Here, Plaintiffs say that Defendants concealed bad news about the prospects of three specialty products Fairmount tried and failed to develop before its merger with Unimin. But their complaint identifies no corrective disclosure about these products (or any other) that led to a stock drop and pleads no facts plausibly suggesting a connection between those products and Covia's bankruptcy filing.

### 1. Plaintiffs Have Not Plausibly Alleged Any Corrective Disclosures.

Plaintiffs have not identified any corrective disclosure that would establish loss causation. Plaintiffs say the Defendants made misleading statements overstating the benefits and commercial prospects of three specific Fairmount products: PowerProp, Propel SSP, and Propel SSP 350. Am. Compl. ¶¶ 4–6. Plaintiffs then contend they were injured when the truth about these products was revealed to the market through three corrective disclosures: two announcements by Covia that the SEC was investigating its value-added proppant business, and the announcement of Jenniffer Deckard's resignation as CEO. *Id.* ¶ 7. But none of these proposed corrective disclosures plausibly connects Defendants' alleged misstatements to Plaintiffs' purported losses.

***SEC Investigation Announcements***. On two occasions, Covia told the market about an SEC investigation into unnamed "value-added proppants." *Id.* ¶¶ 127, 135. First, a March 22, 2019 10-K disclosed that Covia received a subpoena "seeking information relating to certain value-added proppants marketed and sold by Fairmount Santrol or Covia … since January 1, 2014." *Id.* ¶ 127. Second, a November 6, 2019 10-Q revealed that the SEC "requested additional information and subpoenaed multiple current and former employees to testify regarding" the unnamed value-added proppants. *Id.* ¶ 135. The first announcement coincided with a decrease in Covia's stock price, *id.* ¶ 129; but Plaintiffs now admit the second, which revealed both the expanded scope of the SEC's investigation and that Covia had discontinued Propel SSP, led to a stock-price *increase*,

MTD 19; ECF No. 49.  Plaintiffs understandably now contend that only the first of these disclosures was purportedly "curative."

A mere announcement of an SEC investigation, however, "is insufficient to constitute a corrective disclosure for purposes of § 10(b)."  *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 772 (N.D. Ohio 2020).  As another court in this Circuit put it, the "disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."  *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012).  Plaintiffs plead no facts from which one could plausibly conclude that investors gleaned from these general announcements that the company had made misstatements about its PowerProp, Propel SSP, and Propel SSP 350 products.

The investigation announcements do not reveal any facts contradicting any of the company's prior statements, or even that the SEC's investigation concerned those three products.  Indeed, Fairmount and Covia's securities filings make clear the companies marketed other value-added proppants, too.  *See, e.g.*, 2017 10-K (MTD Ex. 2) at 13; 2018 10-K (MTD Ex. 4) at 8–9.  And it is undisputed that Covia had already stopped selling PowerProp and Propel SSP 350 prior to this announcement.  *See* Am. Compl. ¶ 169 ("by December 2018 the Company had decided to stop selling Propel SSP 350"); SEC Order ¶ 31 (the company "stopped selling PowerProp by the time of the merger in mid-2018").  Notably, although Plaintiffs have assembled and cited in the complaint to various analyst reports and public statements, Am. Compl. ¶¶ 54–61, 144–145, 147, 170–175, they cannot point to a single report or contemporaneous public statement that interpreted Covia's announcements of the SEC investigation as relating to PowerProp, Propel SSP, and Propel SSP 350, much less to the company's prior public statements about them.

Plaintiffs argue that the investigation announcement was accompanied by something "more" that, in combination with the announcement, led the market to perceive a corrective disclosure. *E.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Plaintiffs say this something "more" consists of December 8, 2020 SEC Order concluding the agency's investigation and announcing a settlement, Opp. 14–16. But Plaintiffs do not and could not allege that the SEC Order caused them any losses, *see* Am. Compl. ¶ 7; the Order came too late for that. The Order issued only after Covia had declared bankruptcy, after its stock stopped trading, and after Plaintiffs themselves say all their losses had already been realized. *See id.* ¶ 1.

The sheer contrast between this case and *Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687 (6th Cir. 2018), illustrates why Plaintiffs' reliance on that case is misplaced. In *Norfolk County*, a securities plaintiff survived a motion to dismiss on loss causation by pointing to two actual, in-class-period corrective disclosures. *Id.* at 691–92. The first was a civil complaint alleging that the defendant made false statements about the integrity of an operational system called the "Blue Book," *id.* at 690–91; the second was the defendant's admission that phasing out this "Blue Book" caused substantial losses, leading market analysts to conclude *during the class period* that the civil complaint's allegations "might have more validity than originally thought," *id.* at 692. The first disclosure provoked a 35% stock decline, and the second an 11% decline. *Id.* at 695–96. The Sixth Circuit concluded that that two things about the civil complaint "set it apart from most": first, the defendant "promptly admitted the truth of one of the complaint's core allegations"; and, second, the complaint "included expert analyses [describing] the extent to which the Blue Book inflated revenues" and "revealed new information" that was "beyond the ken of most investors." *Id.* at 696–97. By contrast to those detailed allegations, which the company "promptly admitted," *id.* at 696, here the SEC investigation

4

announcement does not allege that the Defendants made any misstatements about the products at issue, nor has Covia ever "admitted" to having made false statements.

Plaintiffs' other investigation-announcement cases are similarly inapposite.  In *Lloyd*, "the market and various analysts perceived [an SEC] subpoena to be related to [defendant's] alleged misstatements about [a customer's] ability to repay" particular loans, and the defendant confirmed that suspicion weeks later, when it wrote off millions of those loans and classified the remainder as "non-performing."  *Lloyd*, 811 F.3d at 1210–11.  Plaintiffs here allege no such confirmation by the company during the class period (or at any other time).  And in the Fifth Circuit's *Amedisys* case, a series of five partial disclosures during the class period revealed that the company's prior statements were in fact misleading.  *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323–24 (5th Cir. 2014).  Those disclosures included reports by analysts and the *Wall Street Journal* questioning particular practices; announcements of government investigations into the same issue; and the company's release of disappointing financial results that the defendant "attribute[d] to behavioral responses from [customers] in light of the pending governmental investigations."  *Id.* Simply put, the point of *Amedysis* is that if the truth leaks out gradually across the class period rather than all at once, that supports loss causation so long as the pleaded facts make it "plausible that the market … had become aware of the fraud" due to the disclosures.  *Id.* at 325.  Plaintiffs have alleged nothing like that here.  To the contrary, Plaintiffs allege no facts showing the alleged "truth" leaked out during the class period; rather, they say it was revealed by an SEC Order after Covia had declared bankruptcy.

Plaintiffs say that the Court should ignore these problems so that Defendants do not "escape liability simply because the final corrective disclosure came after the Company's bankruptcy had erased any value remaining in the stock."  Opp. 16–17.  That argument confuses two things.  Loss

causation may be proved either through corrective disclosures or through a "materialization of the risk theory." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.* ("*OPERS*"), 830 F.3d 376, 382 (6th Cir. 2016).  Plaintiffs cannot mix and match.  The fact that the SEC Order postdates Covia's insolvency means it has no relevance to their corrective-disclosure theory.  If Plaintiffs wish to recover damages because "the Company's bankruptcy had erased any value in the stock" *before* any corrective disclosure revealed alleged fraud to the market, Opp. 16–17, they must plead facts plausibly showing the materialization of undisclosed risks about the three Fairmount products caused Covia's insolvency.  As explained in § I.B, *infra*, they have not come close to doing so.

Next, Plaintiffs suggest it counts as something "more" that the first investigation disclosure was accompanied by a stock drop.  Opp. 15.  That would effectively read out *Dura*'s loss-causation pleading requirement.  After all, "a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling [such] a plaintiff to proceed … would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).  Thus, courts regularly hold that investigation announcements are *insufficient* to plead loss causation, notwithstanding accompanying stock drops.  *See, e.g., In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d at 755–57; *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 908 (W.D. Tex. 2008).

Here, pointing to stock-price movements accompanying the investigation announcements is particularly unpersuasive.  As explained in the motion to dismiss, Plaintiffs *mistakenly* alleged that these announcements provoked a consistent downturn in Covia's share price.  ECF No. 46 ¶¶ 135–138.  But as Plaintiffs now concede, ECF No. 49, that didn't happen.  The second

6

disclosure about the SEC's intensified investigation was accompanied by an immediate *increase* in Covia's stock price.  MTD 12–13, 18–19.

Plaintiffs assert in response that Defendants have not cited a case in which a court rejected loss causation because a curative disclosure actually led to an increase in stock price.  Opp. 17. No doubt that is because securities plaintiffs do not often sue about stock-price increases.  But here, no prior case is needed to establish that Plaintiffs' loss-causation theory is implausible as pleaded.  Plaintiffs contend the market must have interpreted the first SEC announcement as a disclosure of serious fraud concerning the three products, Opp. 14–15, and, to boot, that those specialty products allegedly *caused the company's bankruptcy*, *see* Opp. 20–22.  Those theories are belied by the fact that after Covia revealed that the SEC's investigation was more serious than previously announced, the market had no negative reaction at all.

***Deckard's Resignation.***  The only other purportedly corrective disclosure Plaintiffs allege is the announcement of Jenniffer Deckard's resignation as Covia's CEO.  But the resignation or departure of an officer does not normally constitute a corrective disclosure unless the announcement *connects* the resignation to the alleged fraud.  MTD 20–21; *see In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (a "resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud"), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *see also Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation."). The announcement of Deckard's resignation said nothing about fraud.  It suggested no misconduct by Deckard; and it did not tie her departure to any of the statements about any of the products Plaintiffs are suing about here.  Rather, it said only that Deckard resigned "following the Board's

decision to pursue a different direction with [its] leadership," that it was being treated as a termination "without cause," and that Deckard would continue to serve as a consultant and receive enhanced severance benefits including a prorated bonus. Am. Compl. ¶¶ 130–32.

Nor is Deckard's resignation is akin to the corrective disclosures in *Mauss v. NuVasive, Inc.*, 2016 WL 3681831 (S.D. Cal. July 12, 2016), and *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010). Two more distinguishable cases would be hard to find. In *Mauss*, the court treated as a corrective disclosure a company's announcement of a CEO's "forced resignation" "for failure to comply with certain of the company's expense-reimbursement and personnel policies" amidst an investigation involving "kickbacks." 2016 WL 3681831, at *1, *10. In *Chamberlain*, the company "announced the suspension of [the CEO] for 'likely violating' company policy and being associated with matters under investigation by … the DOJ." 757 F. Supp. 2d at 717–18. Thus, in both cases, something about the resignations affirmatively connected them to previously concealed wrongdoing—making them corrective disclosures. The ordinary announcement of Deckard's resignation does not bear even a passing resemblance to *Mauss* and *Chamberlain*. Rather, it falls in the heartland of routine resignation announcements that cannot plausibly be taken as a revelation of fraud. *In re Omnicom*, 541 F. Supp. 2d at 553.

In any case, Plaintiffs have not pleaded facts plausibly connecting Deckard's May 9, 2019 resignation either with past misstatements concerning the three specialty products or with Covia's stock drop the next day. Plaintiffs' complaint avoids mentioning that Covia filed two SEC disclosures that same evening reporting grim financial news. MTD 21–22. The company's filings revealed that "supply for proppants exceeded demand in the second half of 2018 and early 2019, resulting in significantly lower proppant pricing and some facilities idling or reducing production," May 9, 2019 10-Q (MTD Ex. 7) at 33; that energy revenues had decreased *47 percent* from the

8

same period in 2018, *id.* at 36; and that in the first quarter of 2019, gross profit in the relevant segment had dropped $16.2 million, to $15.1 million, 'driven primarily by lower local sand prices.'"  Covia May 9, 2019 8-K (MTD Ex. 14) re Items 2.02, 7.01, and 9.01 at Ex. 99.1.[1] Although Plaintiffs say that the mere fact that Covia's stock declined the next day suggests the market *must have viewed* Deckard's resignation as a correction of fraud, these simultaneous filings render that hypothesis implausible.

In response, Plaintiffs' opposition muddies the waters about the law of "confounding factors," Opp. 19, but their arguments make no difference. They first misread two Sixth Circuit cases where plaintiffs identified corrective disclosures that plausibly *did* cause subsequent stock drops.  In *OPERS,* 830 F.3d at 398, and *Norfolk County*, 877 F.3d at 696, the court of appeals held that plaintiffs need not exclude all *other* possible causes of those stock drops.   By contrast, the bland announcement of Deckard's resignation could not plausibly be called a corrective disclosure, or a plausible cause of Covia's stock decline, in the first place.

Plaintiffs also quote Ninth Circuit language stating that plaintiffs need not show that "a misrepresentation was the sole reason for the investment's decline" so long as "the misrepresentation is one substantial cause" of that decline.  Opp. 19 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)) (quotation marks omitted).  Here, it is implausible that some bankshot inference from Deckard's resignation to purported fraud about PowerProp, Propel SSP, and Propel SSP 350 is what led to the stock drop.  The resignation announcement says nothing connecting it to those products.  Nor does the mere fact of the stock drop plausibly suggest investors must somehow have drawn such a connection.[2]  In any case, none of Plaintiffs' cases

---

[1]    This exhibit replaces Exhibit 8 to the motion to dismiss, which inadvertently attached the wrong SEC filing.

[2]    Because Deckard's resignation is not a corrective disclosure, cases holding that plaintiffs need not demonstrate that a corrective disclosure was the *only* cause of a loss, Opp. 19 n.10, are beside the point.  *See Carpenters*

9

disputes that a plaintiff pleading loss causation must "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura Pharms.*, 544 U.S. at 343).  This complaint does not try to do that; it carefully avoids mentioning the more plausible explanations for the stock decline.

### 2.  Plaintiffs' "Materialization Of The Risk" Theory Is Implausible.

Lacking any coherent loss-causation theory based on corrective disclosures, Plaintiffs' opposition brief tries another tack.  Plaintiffs contend that Covia's 2020 bankruptcy was a "materialization of the risks" related to PowerProp, Propel SSP, and Propel SSP 350 that Defendants purportedly concealed.  Opp. 20–21.  Plaintiffs argue that "[w]ithout this supposedly promising revenue stream, and weighed down by the large fixed costs associated with these products, Covia was unable to withstand the downturn in oil prices, was unable to refinance its debts … and had to declare bankruptcy."  Opp. 20 (quoting Am. Compl. ¶ 146).  In other words, Plaintiffs assert that the failure of *these products* is what led Covia to file for bankruptcy protection. That theory is not just unsupported by allegations of fact; it makes no sense at all.

It is true that the materialization of a fraudulently concealed risk may support loss causation in a securities case, *OPERS*, 830 F.3d at 384–85, but under dramatically different circumstances. As the Sixth Circuit has observed, loss causation is a species of proximate cause.  *Id.*  "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the

---

*Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("defendants conceded at oral argument that [a settlement agreement] was the (first) occasion that Barclays disclosed its false 2007–2009 submission rates"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 110–11 (D.C. Cir. 2015) (disclosure consisted of revised earnings guidance and financial results); *Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *7 (S.D.N.Y. Mar. 20, 2018) (disclosure was reporting on government investigation which had concluded defendant made false statements in filings); *see also King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) (risks materialized when bonds were downgraded to junk ratings).

10

loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 172–73 (emphasis in original).  Thus, in a materialization of the risk case, the securities plaintiff's proximate-cause theory is that "'negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *OPERS*, 830 F.3d at 384–85 (quoting *In re Omnicom*, 597 F.3d at 511).  But the plaintiff must allege facts plausibly showing "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered….  Otherwise, the loss in question was not foreseeable." *Lentell*, 396 F.3d at 173 (quotation marks omitted) (emphasis in original).

Plaintiffs' complaint utterly fails to plead facts showing that the failure of the three products here is what caused Covia's insolvency.  Indeed, the complaint says almost nothing about Covia's Chapter 11 proceedings.  Plaintiffs allege only that "[o]n June 29, 2020, after market hours, Covia announced that it had entered into a comprehensive restructuring agreement with lenders and voluntarily filed petitions under Chapter 11 of the United States Bankruptcy Code to implement the agreement." Am. Compl. ¶ 138.  That is it.  Plaintiffs allege *nothing* about the substance of the petition, the first day declaration before the bankruptcy court, or any of the public filings or proceedings in that case that would shed light on the cause of Covia's insolvency.  As the bankruptcy docket shows, those proceedings included a *trial*, whose publicly stated purpose was to resolve a dispute between the debtor in bankruptcy and its unsecured creditors about what precipitated the insolvency. *In re Covia Holdings Corp.*, Case No. 4:20-cv-33295 (Bankr. S.D. Tex.), ECF No. 602 at 6–8 (creditors briefing describing the collapse of the NWS market); ECF No. 999 at 154:16–25, 177:5–204:24 (expert analyst testimony on Fairmount and Covia's solvency); ECF. No. 1005 at 129:2–136:7 (testimony describing energy-market dynamics and

11

causes of bankruptcy).  Yet Plaintiffs do not say whether those proceedings suggested in any way that the three products somehow caused Covia's insolvency.  (They do not.)

Nor do Plaintiffs identify any analyst coverage or market commentary of Covia's bankruptcy.  The last analyst they quote is a Morningstar report about Covia from 2019, repeating verbatim language that first appeared in Morningstar reports about Fairmount in *2017*.  *Id.* ¶ 144. It opines that the company was "weighed down by its large yet very unprofitable resin-coated sand operations" and for that reason had "nearly twice as much property, plant, and equipment per 2014 ton sold as peers."  *Id.*  It is telling that, notwithstanding extensive market discussion of the causes of Covia's insolvency,[3] Plaintiffs cite none at all.  Nor do they plead any facts showing the market interpreted the failure of the three products as the cause of the company's bankruptcy filing.

What few facts Plaintiffs do plead about Covia's bankruptcy do not plausibly suggest any connection to these value-added proppants.  Whatever a Morningstar analyst may have said in about Fairmount's *overall* resin-coated business expenses years earlier, Plaintiffs cannot argue that, in 2020, Covia maintained massive amounts of financially debilitating capital equipment for *the three Fairmount products at issue here*.  That would make no sense in light of Plaintiffs' allegations about the comparatively small size and waning importance of those three products: Between 2014 and 2017, those products' contribution to the proppant segment's revenue decreased from 6.6 to 4 percent, and Plaintiffs make no allegation of the products' post-2017 significance. Am. Compl. ¶ 52; SEC Order ¶ 12.  Plaintiffs' opposition remains conspicuously silent as to the supposed impact of these products from 2017 onward.  Besides, Plaintiffs allege, and the SEC Order confirms, that over the course of 2018 and 2019 Covia stopped development of the three

---

[3]  *E.g.*, Jodi Shafto, "Fracking slowdown pushes Covia into bankruptcy as demand for sand dries up," S&P GLOBAL, July 1, 2020, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/fracking-slowdown-pushes-covia-into-bankruptcy-as-demand-for-sand-dries-up-59260907.

products altogether.  Am. Compl. ¶¶ 137, 169, 181.  Plaintiffs plead no facts suggesting Covia continued to maintain devastating capital expenditures for these jettisoned product lines.

Nor do Plaintiffs plead facts supporting a purported link between these products' commercial failure and Covia's debt.  *See id.* ¶ 146.  Plaintiffs do discuss Fairmount and Covia's total debt—ultimately, "a $1.65 billion term loan and a $200 million revolving credit facility," *id.* ¶ 143.  But they plead no facts attributing any meaningful portion of that indebtedness to the development of the three products at issue here, or even to the resin-coated proppant business generally.  *See id.* ¶¶ 141–43.  Nor do they plead any facts remotely suggesting that, absent the company's spending on the three products, Covia would somehow have avoided insolvency.  Because it is Plaintiffs' burden to plead facts plausibly suggesting the truth of their risk-materialization theory, *Lentell*, 396 F.3d at 176, Plaintiffs' silence requires dismissal.

Plaintiffs are mute on these facts for good reason.  Even a cursory inspection of the bankruptcy court's docket, or of judicially noticeable facts about the energy sector and the fracking industry circa 2018–2020, renders Plaintiffs' theory totally implausible.  Plaintiffs' complaint acknowledges that Fairmount and Covia's "chief product" was raw "Northern White sand, mined primarily from the Great Lakes region."  Am. Compl. ¶ 43.  The basic reason Covia gave for its insolvency was the near collapse of the market for its "core energy product, northern white sand" ("NWS").  *In re Covia Holdings Corp.*, Case No. 4:20-cv-33295, ECF. No. 15 (First Day Declaration) ¶ 9.[4]  The declaration recounts these industry-wide events, including (1) the significant decline in investment in oil and gas companies leading to falling demand for proppant,

---

[4]  Because Plaintiffs have made Covia's bankruptcy an integral part of their Complaint, this Court can take judicial notice of the publicly available documents pertaining to that proceeding cited herein.  *Chamberlain*, 757 F.Supp.2d at 698 ("A court may also take judicial notice at the pleadings stage of certain public documents, including filings in other courts of record and publicly filed disclosure documents.") (citing *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001)).

13

(2) the near doubling of proppant supply, as cheap local sand flooded the market as a substitute for NWS, and (3) the fact that "lower oil prices and capital restraints led to an unforeseen, increased shift in demand *from NWS to lower-cost in-basin sand*."  *Id.* ¶ 10 (emphasis added).  The collapse of the NWS market was no secret:  The Court can take judicial notice of matters "generally known within the trial court's territorial jurisdiction," Fed. R. Evid. 201(b)(1), and the energy and fracking market's severe downturn hardly escaped public notice in Ohio or across the country.[5]

In truth, publicly knowable facts about the market conclusively refute their theory. Plaintiffs claim Covia "had to declare bankruptcy" because "[w]ithout this supposedly promising revenue stream" from PowerProp, Propel SSP, and Propel SSP 350, "and weighed down by the large fixed costs associated with these products, Covia was unable to withstand the downturn in oil prices." Am. Compl. ¶ 146.  They also claim that what distinguished Covia from its competitors was the outsize commitment to overhead associated with these resin-coated products.  *Id.* ¶ 144. But that evidently made no difference:  By 2020, several of Covia's frac sand competitors *also* declared bankruptcy in a sector-wide downturn.  *See Hi-Crush Permian Sand, LLC,* Case No. 4:20-bk-33505 (Bankr. S.D. Tex.); *Vista Proppants & Logistics, LLC*, Case No. 4:20-bk-42002 (Bankr. N.D. Tex.); *CARBO Ceramics Inc. & Off. Comm. of Unsecured Creditors of CARBO*, Case No. 4:20-bk-31973 (Bankr. S.D. Tex.).  Plaintiffs ignore these industry-wide stresses that have nothing to do with Covia's three specialty products at issue here.

---

[5]  *E.g.*, Clifford Krauss, "'I'm just living a nightmare': Oil industry braces for devastation," CINCINNATI BUSINESS COURIER, April 22, 2020, https://www.bizjournals.com/cincinnati/news/2020/04/22/i-m-just-living-a-nightmare-oil-industry-braces.html; Mike Hughlett, "Minnesota, Wisconsin frac sand mines crushed by oil industry shifts," STAR TRIBUNE, Mar. 28, 2020, https://www.startribune.com/minnesota-wisconsin-frac-sand-mines-crushed-by-oil-industry-shifts/569168022/; Alexander Osipovich and Ryan Dezember, "There's No Oil in Wisconsin.  The Fracking Bust Hit It Anyway," WALL STREET JOURNAL, Oct. 8, 2020, https://www.wsj.com/articles/wisconsin-fracking-sand-jobs-11602104015.

14

The result is that Plaintiffs' backup loss-causation theory fails.  In a materialization of the risk case, "when the plaintiffs' loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiffs' loss was caused by the fraud decreases." *Lentell*, 396 F.3d at 174 (quotation marks omitted).  And in such cases, the claim should be dismissed at the pleading stage if the plaintiff "has not adequately pl[e]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Id.* (quotation marks omitted).  Here, Plaintiffs have no such facts.

Plaintiffs misplace their reliance on distinguishable cases involving Freddie Mac, *OPERS*, 830 F.3d at 386–88, and Lehman Brothers, *In re Lehman Brothers Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 306 (S.D.N.Y. 2011).  In those cases, the defendants misrepresented the businesses' exposure to high-risk financial instruments and then suffered a massive loss attributable to those very assets.  *OPERS*, 830 F.3d at 386–88; *see also In re Lehman Brothers Sec. & Erisa Litig.*, 799 F. Supp. 2d at 306 (same).  Here, by contrast, Plaintiffs have pleaded no facts attributing Covia's bankruptcy to the risk that PowerProp, Propel SSP, and Propel SSP 350 would not prove successful lines of research and development.  As in *In re Merrill Lynch*, 568 F. Supp. 2d at 363, Plaintiffs here cannot "untangle [their] losses from the contemporaneous collapse" of the frac sand market.  Opp. 20 n.11.  And as the motion to dismiss pointed out, Plaintiffs have no explanation for why Covia's stock price declined by 87% between June and December 2018, well before any of the alleged corrective disclosures on which Plaintiffs' case relies, and well before the bankruptcy.  MTD 14; *see* Covia Stock Table (MTD Ex. 6).  Plaintiffs do not attempt to plead any facts showing that a failure to commercialize these particular value-added proppants somehow caused this decline or Covia's eventual insolvency.

15

For all those reasons, Plaintiffs have not carried their burden to plead materialization of the risk.  Without a plausible theory of loss causation, Plaintiffs' complaint should be dismissed.

### B.        Plaintiffs Fail to Adequately Plead Materiality.

Plaintiffs have not adequately pleaded that the alleged misstatements were material to investors buying stock in Fairmount or Covia.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  Plaintiffs do not deny that, based on their own allegations, these three products accounted for a miniscule percentage of the company's overall revenue. Am. Compl. ¶ 52.  The Court should treat statements about these products as at least "presumptively immaterial."  *Weiner v. Tivity Health, Inc.*, 528 F. Supp. 3d 795, 808 (M.D. Tenn. 2021).  Indeed, even Plaintiffs' opposition quotes SEC guidance suggesting a "preliminary assumption" of immateriality when a product is below a low financial-performance threshold.  Opp. 27 (quoting SAB No. 99).  To be sure, a comparatively minor product can *sometimes* be material to investors, but no facts support that here. The SEC Order indicates that the products' role was waning by 2017, and the Complaint is notably quiet about their significance for the majority of the class period.  *See* MTD 25–26.

Knowing that, Plaintiffs next contend that these products were *qualitatively* material to investors because they were vital to the company's future. Opp. 28.  But it is telling that the first factual allegation Plaintiffs cite to support this claim is that "[m]ultiple former employees reported that PowerProp, Propel SSP, and Propel SSP 350 were highly important products to the company." Opp. 28 (citing Am. Compl. ¶¶ 180, 187).  The cited paragraphs of the complaint, however, relate what Plaintiffs allege *confidential witnesses* purportedly *told Plaintiffs' counsel in secret* in preparation for this lawsuit.  That of course, has no bearing on what investors without access to informants may have thought.  Similarly irrelevant are the complaint's allegations that the SEC Order revealed, *after the class period*, what Fairmount spent on research and development for these products and that the company included them on internal tracker for key metrics.  Opp. 28–

16

29 (citing Am. Compl. ¶¶ 49, 50, 53).  None of that was plausibly in the mind of investors when they bought the company's stock.

Plaintiffs cite only two other allegations to support qualitative materiality: the statements of research analysts about value-added products generally, and the company's own statements about PowerProp in particular.  Opp. 28–29 (citing Am. Compl. ¶¶ 47–48, 54–61).  But these analyst reports cautioned *against* reliance on value-added proppants; declined to raise forecasts based on Propel SSP; and did not state that their projections of the company's future financial results were in any way based on the field trial results Plaintiffs claim were misstated.  MTD 23–25.  Plaintiffs have *zero* response to that argument in their opposition brief other than to label it "conjecture."  Opp. 30.  But Defendants were not conjecturing; they were quoting.  *See, e.g.*, May 17, 2017 Morningstar Equity Research Report (MTD Ex. 11) at 3 (analyst reporting they "do not ascribe meaningful value creation" to Propel SSP); Nov. 5, 2017 Simmons & Co. Int'l Report (Ex. 13) at 1 ("volumes have been depressed for so long that most (ourselves very much included) have paid little attention" to value-added proppants); March 27, 2017 Guggenheim Securities Report (Ex. 10) at 10 ("[It is] unclear if [value added] sand will regain lost market share if and when oil prices climb higher.").  Plaintiffs cannot incorporate documents into a securities complaint and then object if Defendants and the Court read them in full.[6]

---

[6]  Underscoring the immateriality of these products to investors, *none* of the analyst reports Plaintiffs cite even mention PowerProp or Propel SSP 350, demonstrating the market had no material interest in at least two of the products whose cumulative importance Plaintiffs claim was so vital.  MTD 23.  All Plaintiffs can muster in response to that problem is a single March 2017 report from Guggenheim Securities that used the general phrase "the company's value-added products."  Opp. 30 n.16 (citing Am. Compl. ¶¶ 60–61).  Plaintiffs claim this phrase must refer to the three specific products in this case, citing only their own complaint's conclusory assertion that "[t]hree of the Company's main 'value-added' proppant products were PowerProp, Propel SSP, and Propel SSP 350," Am. Compl. ¶ 46—not any facts showing that *the market* viewed those three products as material.

17

### C.    Plaintiffs Fail to Adequately Plead Scienter.

"Scienter is the lynchpin of most Section 10(b) claims," and is "difficult to plead." *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, --- F. Supp. 3d ---, 2021 WL 3773330 at *12, *13 (N.D. Ohio Aug. 25, 2021) (quotation marks omitted), *appeal filed sub nom.*, *Corwin v. ViewRay, Inc.*, No. 21-3863 (6th Cir. 2022).  Plaintiffs' opposition brief confirms they have not adequately alleged the Defendants' scienter.  Indeed, it tacitly concedes that Plaintiffs have not tried to "allege scienter with respect to each individual defendant," *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017).  The scienter section of Plaintiffs' brief does not mention Defendants Navarre, Barrus, or Biehl *at all*.  Opp. 32–37.  It mentions Defendant Eich only once, and says only that he and Defendant Deckard attended meetings where PowerProp and Propel SSP were discussed.  Opp. 36.  Plaintiffs briefly attempt to defend their scienter case against Defendant Deckard, Opp. 36–37, but as explained below, they do not do so persuasively.

The bottom-line problem with Plaintiffs' scienter case is this:  Nowhere does the complaint allege that anyone, including Plaintiffs' five confidential witnesses, ever *told one of the Defendants* about the problems with these three of Fairmount's value-added products.  There is no allegation, for example, of anyone telling any Defendant that Fairmount's estimates of PowerProp's conductivity were "based on test results forged by a former employee," *id.* ¶ 95, or that the company's assessment of Propel SSP's performance in test wells was inaccurate, *id.* ¶ 80.  That is no oversight:  In the course of discussing *Covia's* scienter, Plaintiffs discuss allegations that low-level employees purportedly reported problems with Fairmount's products "internally" to unknown others, and allegedly brought concerns about Propel SSP and Propel SSP 350 to the attention of unnamed "executives," Opp. 33–34—pointedly not to the attention of the Defendants.

That distinguishes this complaint from *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010) (cited at Opp. 17–18).  In that case, scienter was adequately

18

pleaded as to those defendants who (according to confidential witnesses with knowledge) had directly participated in forming an illegal antitrust conspiracy or attending meetings where that agreement was openly discussed, but *not* as to the defendant whom no one could place at those meetings, whose knowledge of wrongdoing was inferred only from his corporate position, *id.* at 712–13, 719 ("None of the confidential witnesses mentions Defendant Booth's knowledge of the alleged … agreement.").  The claim here fails for the same reason.  Plaintiffs argue that as senior executives, Defendants attended meetings, took a "hands on" approach to "overseeing the business," and "were constantly asking questions" about "data" and "low-level detail."  Opp. 36 (quoting Am. Compl. ¶ 193).  That is not the same thing as being told by employees with the relevant knowledge about forged test results, problems with field testing, or the like.  *Halford v. AtriCure, Inc.*, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) (cited in Opp. 36), is similarly distinguishable.  There, plaintiffs alleged that a defendant attended a meeting whose purpose was to discuss the specific business activities defendants had publicly represented did not exist.  *Halford, 2010 WL 8973625* at \*16.  Again, Plaintiffs here allege nothing like that.

Plaintiffs' individual scienter allegations suffer from other defects as well:

*Navarre*.  Plaintiffs' scienter argument never mentions Defendant Navarre.  None of Plaintiffs' confidential witnesses mentions Navarre, either.  *See* Am. Compl. ¶¶ 176–93.  The complaint's only allegation against Navarre (an *independent director*, not a corporate officer) is that he signed Covia's 2018 10-K, *id*. ¶ 122, which warned that "[t]he initial and sustained commercialization of our products may prove to be unsuccessful."  *Id*. ¶ 123.  Yet the complaint pleads zero facts describing what Navarre knew about this statement or about Fairmount's legacy products.  That is unsurprising, since Navarre joined Covia's Board only after the merger, *see* Am. Compl. ¶ 26, by which time these products had long since waned in importance, MTD 25–26.

19

Plaintiffs plead no facts to support the groundless assertion that Navarre "had access to information that did or should have made them aware that their and the Company's claims about the 'value-added' products were false and misleading." Opp. 37.

*Eich.* The same is true of Andrew Eich. Like Navarre, Eich joined Covia only upon the June 2018 merger. Am. Compl. ¶ 25. His only connection to this case is that he signed the same 10-K that Navarre did, plus the attached Sarbanes-Oxley certification. *Id.* ¶¶ 122, 125. Plaintiffs' opposition brief has little say about Eich, either. It points out a confidential witness's allegation that Eich attended "multiple meetings" where "there was 'a considerable amount of conversation as to what was happening with PowerProp and Propel [SSP],' which Deckard led and was 'strongly emphasizing sales of the resin-coated products' and 'emphasizing the critical role they would play.'" Opp. 36 (citing Am. Compl. ¶¶ 183, 185, 188, 191). That is plainly inadequate. This unnamed witness evidently knew enough about these meetings to report Deckard's main speaking points, so it is telling that the witness does not say that anyone at these meetings discussed the problems with Fairmount's products that allegedly render Defendants' statements false. Finally, Plaintiffs' opposition simply ignores the complaint's lack of any allegations of "red flags" alerting Eich that his Sarbanes-Oxley certification might be false. *See* MTD 31.

*Barrus and Biehl*. Like Navarre, Plaintiffs' opposition says *nothing* about Fairmount CFOs Barrus and Biehl, and neither do their confidential witnesses. The opposition does not identify any allegation in the complaint that either Barrus or Biehl knew, or had any reason to know, of problems with Fairmount's products. As with Eich, Plaintiffs say nothing about the lack of "red flags" warning either them of problems with Sarbanes-Oxley certifications. MTD 32. And since neither Barrus nor Biehl worked at Covia when Deckard resigned, Am. Compl. ¶¶ 23–24, her resignation could not possibly support their scienter about anything.

20

***Deckard.*** Plaintiffs contend that the inference of scienter is "particularly strong with respect to Deckard," on the ground that she "spoke in detail during several earnings calls about the field results and commercial demand for Propel SSP." Opp. 36. But that assertion has nothing to do with scienter. Plaintiffs' burden is to prove facts showing that Deckard *knew* that what she said was wrong, and they cannot cite any such factual allegation.

Instead, Plaintiffs contend Deckard must have known about the technical details of field testing and commercialization of these products because "high-level executives can be presumed to be aware of matters central to their business's operation." Opp. 37 (quoting *PR Diamonds Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004)). But "courts applying the core operations doctrine generally 'require that the operation in question constitute nearly all of a company's business before finding scienter.'" *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (internal alterations accepted) (quoting *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017)). Plaintiffs cite no precedent calling a single-digit portion of one business segment's revenue a company's "primary area of focus." *Cf. In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 726 (S.D. Ohio 2006). To the contrary, *In re Cardinal Health*, involved an overstatement of the "main driver" of the company's growth. *Id.* at 725–26. And in *In re Telxon Corp. Securities Litigation*, the sheer magnitude of the misstatement permitted an inference of scienter. 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000). Plaintiffs allege nothing like that. They have not carried their burden to plead scienter.[7]

---

[7]   In *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 695 (S.D. Ohio 2019) (cited at Opp. 37), the court said it "weighs slightly" in favor of scienter that a corporate officer resigned the *very same day* an investigation was announced. Here Deckard's resignation did not coincide with any SEC-investigation announcement.

21

D.      **Plaintiffs Have Not Adequately Plead False or Misleading Statements.**

Plaintiffs have also failed to plausibly allege the falsity of certain statements.  For example, Plaintiffs complain about Defendants' affirmative risk disclosures in Covia's 10-K forms.  These disclosures warned that Propel SSP was "unproven," that "testing ultimately may demonstrate that the product is ineffective or not commercially viable" or "may not be technically viable," that "development and marketing of Propel SSP products may prove to be unsuccessful," that "[t]he initial and sustained commercialization of our products may prove to be unsuccessful" and that "failure to capitalize on Propel SSP products in commercial application would result in a significant unrecouped investment and the failure to realize certain anticipated benefits."  Am. Compl. ¶¶ 116, 118, 120, 123.  Such warnings are designed to ensure that other statements to the market "bespeak caution," *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991), and to comply with the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 78u–5(c)(1).  Here, Covia warned about precisely the risks that Plaintiffs say came to pass.

These cautionary statements were not misleading.  Plaintiffs' opposition argues that Covia "omitted hard facts which would have revealed that the warned-of risks were of significantly greater magnitude than the statements implied."  Opp. 23.  But the statements said nothing, and implied nothing, about the *magnitude* of the disclosed risks at all.  Next, Plaintiffs say the statements were misleading because the disclosed risks had "already come to fruition," *id.*, by which Plaintiffs say they mean that Covia had *so far* been unable to commercialize them, Opp. 23–24.  But that does not contradict the risk disclosures.  The disclosures warn that Covia may ultimately fail to successfully bring the products to market.  That warning is not inconsistent with Plaintiffs' point that Covia had *not yet succeeded*.  Plaintiffs have therefore not alleged that the risk disclosures were actionably misleading.  Because those are the only basis for Plaintiffs' claims against Navarre and Eich, the claims against them should be dismissed.

22

In addition, for the reasons explained in the motion to dismiss (MTD 35–37), many of the alleged misstatements by other Defendants are the kind of "vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (internal quotations omitted); MTD 35–37.  To take the example Plaintiffs focus on in opposition, one of the alleged misstatements in the complaint is Jenniffer Deckard's comment on Propel SSP during a March 2017 earnings call, including her statement that "[w]e remain optimistic on Propel SSP's future."  Am. Compl. ¶ 102.  Plaintiffs complain that Defendants have wrongly disaggregated the word "optimistic" from the rest of Deckard's statement, Opp. 25–26, but the complaint itself *separately alleges* Deckard's statement was misleading because she had "no basis for the professed optimism."  Am. Compl. ¶ 103.  Regardless, the point of the puffery doctrine is that investors do not buy stocks because management describes themselves as "optimistic."

## II.     THE 20(A) CLAIM SHOULD BE DISMISSED

As explained above, Plaintiffs have not pleaded a Rule 10b-5 violation by any individual Defendant.  As a fallback, Plaintiffs claim the Defendants are liable for alleged securities violations by Fairmount and/or Covia, on the theory that the Defendants qualify as "control persons" subject to liability under Section 20(a).  Am. Compl. ¶¶ 214–219.  That fails.

***First***, Plaintiffs must plead facts "demonstrating … that the defendant 'culpably participated in [the] underlying violation."  *ViewRay*, 2021 WL 3773330, at *20 (quoting *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *20 (E.D. Mich. Jan. 30, 2007)).  Courts apply this requirement because "Congress did not intend for controlling persons to be the insurer against the fraudulent activities of another, but rather that what Congress did intend was to impose liability on those who were controlling persons and who were in some meaningful sense

culpable participants in the fraud perpetrated by the controlled persons."  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 n.20 (3d Cir. 2013) (quotation marks omitted).[8]

Plaintiffs cannot show culpable participation here.  As discussed above, Plaintiffs have failed to plead the scienter of any individual Defendant.  *Supra* § I.C.  Plaintiffs argue that "culpable participation" for Section 20(a) purposes may be satisfied even if scienter is not shown. Opp. 38–39.  But Plaintiffs' allegations with respect to the Defendants' states of mind are deficient under any standard.  As discussed, Plaintiffs' scienter discussion does not even *mention* Navarre, Barrus, or Biehl; and as to Eich, it says only that he attended meetings where nothing inculpatory was allegedly said.  *See supra* § I.C.  As for Deckard, Plaintiffs say only that she spoke about the relevant products on several occasion and was CEO of the company.  Opp. 36–37, 40.  That does not plausibly allege personal culpability under any test.

At bottom, Plaintiffs urge the Court to interpret "culpable participation" as an empty requirement, rendering any executive liable for corporate violations purely by virtue of their title. Every factual allegation Plaintiffs cite to support culpable participation reduces to the proposition that the Defendants were officers and directors of the company and performed the general functions of those jobs.  Opp. 40.  That would obliterate *ViewRay*'s holding that "culpable participation" is a separate element of control-person liability under § 20(a).  *ViewRay*, 2021 WL 3773330, at *20.

---

[8]  Plaintiffs say the Sixth Circuit rejected this requirement in *PR Diamonds*, Opp. 37–38, but that is wrong.  *PR Diamonds* briefly mentioned § 20(a)'s requirements and expressly declined to decide the scope of control person liability.  364 F.3d at 698.  After *PR Diamonds*, district courts in this Circuit have continued to require culpable participation.  *See In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d at 773; *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *20; *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 600 (N.D. Ohio 2004); *see also D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 750 (E.D. Mich. 2003), *aff'd*, *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994 (6th Cir. 2005).

***Second***, Section 20(a) liability depends on an underlying violation of the securities laws by the controlled entity (*i.e.*, the company).  *Id.*  For the reasons explained in §§ I.A and I.B, *supra*, Plaintiffs have failed to plead loss causation or materiality with respect to any alleged misstatement.  As a result, they cannot state a § 20(a) claim against anyone.

Nor, to the extent the Court reaches the question, have Plaintiffs alleged the element of scienter with respect to Fairmount or Covia, much less "with particularity." 15 U.S.C.A. § 78u–4(b)(2)(A).  Corporate scienter for a securities violation depends on whether *the person who made, prepared or ratified the statement at issue* knew or was reckless about whether it was false.  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).  But Plaintiffs' complaint says nothing about that.  It points only to allegations, either from the SEC Order or the statements of confidential witnesses, that low level employees learned of discrepancies concerning Fairmount's products and reported them up the chain to unidentified "executives."  Opp. 33–34.  Tellingly, the complaint does not name any of those alleged executives.  That illustrates precisely why courts are skeptical of confidential witnesses' allegations when evaluating a motion to dismiss.  *See, e.g.*, *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 739–740 (E.D. Mich. 2007).  Plaintiffs' informants, if they are indeed reliable, should know whom at Covia they told about irregularities.  Either they did not tell Plaintiffs, or Plaintiffs chose not to tell the rest of us.  Without that missing piece, the complaint does not raise any "cogent inference," or indeed any inference, of corporate scienter.

Without an underlying securities violation, the Section 20(a) claim must be dismissed.

### CONCLUSION

The Complaint should be dismissed with prejudice in its entirety.

DATED: March 2, 2022                    Respectfully submitted,


                                        */s/ Gabor Balassa, P.C.*
                                        Gabor Balassa, P.C. (admitted *pro hac vice*)
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, IL  60654
                                        (202) 862-2000
                                        (202) 862-2200
                                        gbalassa@kirkland.com

                                        Daniel T. Donovan
                                        Matthew S. Owen (admitted *pro hac vice*)
                                        Katharine C. Collins (admitted *pro hac vice*)
                                        KIRKLAND & ELLIS LLP
                                        1301 Pennsylvania Avenue, NW
                                        Washington, DC  20004
                                        (202) 389-5000
                                        (202) 389-5200
                                        daniel.donovan@kirkland.com
                                        matt.owen@kirkland.com
                                        katharine.collins@kirkland.com

                                        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

On March 2, 2022, the foregoing document was submitted to the Court, and thereby served on counsel for the United States, by the CM/ECF system.

 */s/ Gabor Balassa, P.C.*
Gabor Balassa, P.C.