# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM PLAGENS, *et al.*, | ) | Case No. 1:20-cv-2744 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| JENNIFER D. DECKARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Lead Plaintiff Dr. Thomas Phelps seeks to recover on behalf of a putative class for alleged violations of federal securities laws.  Defendants Jennifer Deckard, Mark Barrus, Michael Biehl, Andrew Eich, and Richard Navarre, all of whom served as officers of Covia Holdings Corporation or its predecessors, principally Fairmount Santrol Holdings Inc., move to dismiss the consolidated amended complaint.  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

## STATEMENT OF FACTS

Taking the facts alleged in the consolidated amended complaint as true and construing them in favor of the non-moving party, as the Court must in the present procedural posture, Plaintiff bases his claims in this putative class action on the following facts and defines the class period as running from March 10, 2016 through June 29, 2020.  (ECF No. 50, ¶ 1, PageID #1066.)

### A.    The Company's Products

When it became a publicly traded company in October 2014, Fairmount Santrol's shares traded on the New York Stock Exchange.  (*Id.*, ¶ 28, PageID #1073.) Effective June 1, 2018, Fairmount Santrol merged with Unimin Corporation to form Covia Holdings Corporation.  (*Id.*, ¶¶ 28–29, PageID #1073.)  In the merger, shareholders received $0.73 in cash consideration and 0.2 shares of Covia stock for each Fairmount Santrol share held at the time of the merger.  (*Id.*)  For the sake of convenience in this ruling, when the Court refers to the Company or Covia, it includes Covia, Fairmount Santrol, and Unimin.

Plaintiff's allegations arise in the context of the hydraulic fracturing space, commonly known as fracking.  (*Id.*, ¶ 2, PageID #1066; *see also id.*, ¶ 39, PageID #1075.)  Hydraulic fracturing injects large quantities of water, chemicals, and sand at high pressure into a wellbore to create cracks in rock formations, allowing oil and gas trapped within to flow more freely.  (*Id.*, ¶¶ 39 & 40, PageID #1075–76.) Specifically, Fairmount Santrol sold sand and sand-based products to oil and gas companies, which used these materials in fracking operations.  (*Id.*, ¶ 2, PageID #1066.) The Company's chief product was Northern White sand, which is not at issue in this case.  (*Id.*, ¶ 43, PageID #1076.)  Instead, this case involves value-added products known as proppants, which prop open fractures in rock formations promoting the flow of hydrocarbons (oil and gas) through wells, that the Company marketed as having higher conductivity than traditional sand.  (*Id.*, ¶¶ 40, 42 & 44, PageID #1076.)  Conductivity provides a key measure of proppant performance, and

higher conductivity means that more oil and gas can be extracted from a well.  (*Id.*, ¶¶ 2 & 42, PageID #1066 & #1076.)

In the early 2010s, hydraulic fracturing expanded in the United States, creating a booming oil and gas industry and significant demand for sand for use as a proppant.  (*Id.*, ¶ 41, PageID #1076.)  According to the consolidated amended complaint, Fairmount Santrol and later Covia attempted to differentiate itself in the market with high-quality and value-added proppants.  (*Id.*, ¶ 3, PageID #1066–67; *see also id.*, ¶¶ 43–45, PageID #1076–77.)  It invested heavily in developing these products and sought to sell them at a premium.  (*Id.*, ¶¶ 44 & 49, PageID #1067 & #1078.)  Plaintiff focuses on three of the Company's value-added proppant products in particular:

(1)     PowerProp, a premium resin-coated sand;

(2)     Propel SSP, a gel-coated sand compatible with freshwater that the Company touted as delivering proppants further into the ground to increase oil and gas production; and

(3)     Propel SSP 350, a version of Propel SSP compatible with almost any type of water.

(*Id.*, ¶ 4, PageID #1067; *id.*, ¶¶ 46–51, PageID #1077–78.)  But these were not the Company's only value-added proppants.  (*See* ECF No. 51-3, PageID #1320.)

## B.    The Company's Business Strategy

Generally, the Company told investors that its long-term strategy included developing and commercializing value-added proppant products.  (ECF No. 50, ¶ 3, PageID #1066–67; *id.*, ¶ 45, PageID #1077.)  As one example of the market

advantages for the Company of these premium products, a confidential witness—a former employee who served as a senior district sales manager from 2017 through March 2020 and whom the consolidated amended complaint references as FE2 (*id.*, ¶ 35, PageID #1075)—reports that PowerProp sold for approximately $250 per ton, compared to the $100 per ton base commodity price for Northern White Sand, or prices as low as $8 per ton for local sand (*id.*, ¶ 44, PageID #1076). The Company first introduced PowerProp in 2010. (*Id.*, ¶ 47, PageID #1077; ECF No. 51-3, PageID #1320.)

According to the consolidated amended complaint, the Company acquired the right to use Propel SSP in 2013 for approximately $55 million and spent more than $58 million toward its development. (ECF No. 50, ¶ 49, PageID #1078; ECF No. 50-1, ¶ 32, PageID #1132.) Further, it avers that PowerProp and Propel SSP accounted for 6.6% of the Company's revenue for its proppant segment in 2014, dropping to 4% in 2017. (ECF No. 50, ¶ 52, PageID #1078; ECF No. 50-1, ¶ 12, PageID #1130.) In 2016, these products accounted for 7.8% of the Company's total profit margin, and they accounted for 4.75% of that margin in 2017. (*Id.*)

Internally, the Company tracked the tons sold and average selling price of these products, and considered them a key component in its profit and loss metrics. (ECF No. 50, ¶ 53, PageID #1078; ECF No. 50-1, ¶ 12, PageID #1130; *see also* ECF No. 50, ¶¶ 187 & 191, PageID #1113–14 & #1115.) Externally, market analysts who covered the Company followed and discussed these proppant products and their commercial prospects. (ECF No. 50, ¶ 54, PageID #1078; ECF No. 50-1, ¶ 13, PageID

4

#1130.)  To illustrate the market's focus on the Company's statements and reports about these productions, the consolidated amended complaint outlines four examples:

- On May 19, 2016, the Company held an event for investors and analysts at which it made statements about Propel SSP.  (ECF No. 50, ¶ 55, PageID #1078–79.)  The next day, an analyst from Wells Fargo credited Fairmount Santrol's claims:  "we see potential upside from the Company's self-suspending proppant 'Propel SSP,' which has been successful in increasing production (30%) compared to offset wells in trials with nearly 20 E&Ps and over 90 wells."  (*Id.*)  A few days later, an analyst from Jefferies noted the potential upside of Propel SSP as well.  (*Id.*, ¶ 56, PageID #1079.)

- Two analysts in March 2017 provided favorable reports on the Company.  On March 9, 2017, an analyst report from Wells Fargo noted increasing demand for resin-coated products that prompted the Company to reopen a facility.  (*Id.*, ¶ 59, PageID #1079–80.)  On March 27, 2017, a report from Guggenheim Securities pointed to the Company's value-added products and unique proppant technology "that could take off and provide an additional avenue of growth."  (*Id.*, ¶ 60, PageID #1080.)  That report also relied on statements from the Company about Propel SSP, including that the Company "believes the production uplift [from Propel SSP] is usually at least 30%."  (*Id.*, ¶ 61, PageID #1080.)

- On November 5, 2017, an analyst report from the energy specialists of Piper Jaffray noted that the Company's management touted Fairmount

Santrol's products:  "value-added proppant, especially Propel SSP, has been a component of the company's product suite that management has long touted," leading the analyst to "believe the increased commercialization of Propel SSP influenced quarterly results.  Modeling sales of the product is difficult but we are increasing our estimates and price target largely under the assumption that value added proppant volumes and revenues continue to improve in the [future]."  (*Id.*, ¶ 57, PageID #1079.)  In that same report, the analyst increased its price target "due largely to increased value added proppant volume."  (*Id.*)

- Between May 2017 and May 2019, analyst reports from Morningstar Equity Research included favorable projections for the Company based on sales of Propel SSP, which the reports said "could be a blockbuster seller, as it holds promise of dramatically reducing well costs while increasing well productivity."  (*Id.*, ¶ 58, PageID #1079.)

## C.    Allegedly False Statements

The consolidated amended complaint points to "numerous false and misleading claims" about PowerProp, Propel SSP, and Propel SSP 350 before and during the class period, which covers the time from March 10, 2016 through June 29, 2020.  (*Id.*, ¶¶ 1 & 62, PageID #1066 & #1080.)

### C.1.    Before the Class Period (March 10, 2016)

Fairmount Santrol did not sell ceramic products for hydraulic fracturing.  (ECF No. 50-1, ¶ 3, PageID #1128.)  Plaintiff maintains that the Company misrepresented that the performance of PowerProp was comparable to lightweight ceramics, which "are higher-performing, more expensive proppant products" compared to sand.  (ECF

6

No. 50, ¶ 63, PageID #1080.)  Plaintiff points to representations to this effect that Fairmount Santrol made to analysts in an August 2014 presentation, a road-show presentation from September 2014, and Fairmount Santrol's registration statement with the Securities and Exchange Commission in connection with its initial public offering.  (*Id.*, ¶¶ 64–66, PageID #1080–81; *see also* ECF No. 50-1, ¶¶ 16–18, PageID #1130.)  Beginning in 2014, Fairmount Santrol posted data purportedly supporting this claim on its website.  (ECF No. 50, ¶ 68, PageID #1081; ECF No. 50-1, ¶ 20, PageID #1130.)  Moreover, internal documents of Fairmount Santrol confirmed that the Company's statements regarding competitiveness with ceramics referred to conductivity.  (ECF No. 50, ¶ 67, PageID #1081; ECF No. 50-1, ¶ 19, PageID #1130.)

Notwithstanding these public representations, employees internally acknowledged that PowerProp's conductivity fell short of Fairmount Santrol's published performance results, which appeared comparable to lightweight ceramics.  (ECF No. 50-1, ¶¶ 19–21, PageID #1130–31; *see also* ECF No. 50, ¶ 68, PageID #1081.)  Beginning in 2011, the Company convened a product performance team and a conductivity improvement team to address the performance of its resin-coated products.  (ECF No. 50, ¶ 156, PageID #1106–07; ECF No. 50-1, ¶ 21, PageID #1130–31.)  These teams included employees from the research and development, sales and marketing, and investor relations departments, as well as product experts and executives, and met for several years.  (*Id.*)  Minutes from their meetings describe unsuccessful efforts to increase the conductivity of PowerProp.  (ECF No. 50, ¶ 156, PageID #1107; ECF No. 50-1, ¶ 21, PageID #1131.)  Moreover, according to an

7

unidentified former employee, whom the consolidated amended complaint references as FE3, the Company received many complaints from customers that PowerProp did not work well or increase productivity and that it actually plugged some wells.  (ECF No. 50, ¶ 184, PageID #1113.)

Minutes from these internal team meetings reflect concern about continuing to market PowerProp as comparable to ceramics.  (ECF No. 50, ¶ 156, PageID #1107; ECF No. 50-1, ¶ 21, PageID #1131.)  Two managers internally acknowledged in 2014 that PowerProp could not compete with ceramics.  (ECF No. 50, ¶ 158, PageID #1107; ECF No. 50-1, ¶ 23, PageID #1131.)  Internal documents show that, in the first quarter of 2014, PowerProp's conductivity was as much as 49% below what the Company said on its website.  (ECF No. 50, ¶ 157, PageID #1107; ECF No. 50-1, ¶ 22, PageID #1131.)  In 2015, Fairmount Santrol employees learned that a former employee forged the conductivity numbers published on its website.  (ECF No. 50, ¶ 159, PageID #1107; ECF No. 50-1, ¶ 26, PageID #1131.)  Nonetheless, the Company left the results on the website until mid-2017.  (ECF No. 50, ¶ 162, PageID #1108.)

Additionally, Plaintiff alleges that the Company oversold the success of Propel SSP in increasing production from test wells, including in filings with the SEC.  (ECF No. 50, ¶ 69, PageID #1081.)  For example, in a presentation in 2015 for investors and analysts, the Company stated that the use of Propel SSP in more than ninety wells typically resulted in production increases of more than 30%.  (ECF No. 50-1, ¶ 36, PageID #1132.)  According to the consolidated amended complaint, this statement was false because the Company had data for only twenty-nine wells, less

8

than half of which showed increased production of more than 30%.  (ECF No. 50, ¶ 163–64, PageID #1108; ECF No. 50-1, ¶ 36, PageID #1132.)  Although Propel SSP performed adequately in the lab, an unidentified former employee, FE4, avers that those tests were not performed in conditions that adequately predicted real-world performance.  (ECF No. 50, ¶ 186, PageID #1113.)  Further, FE4 reports that the Company received feedback from customers about problems with Propel SSP in the field, including that the product gummed up equipment and created a lot of dust, an occupational hazard.  (*Id.*)  Another unidentified former employee, FE1, joined the Company in 2014 and spoke regularly with a chemist at the Company from whom FE1 learned that the Company was unable to get the results it expected for PowerProp's conductivity and performance.  (*Id.*, ¶¶ 177 & 178, PageID #1111.)

Throughout this period, and continuing through 2018, the Company allegedly received negative feedback from customers that its data did not support claims about Propel SSP's effectiveness.  (ECF No. 50, ¶ 165, PageID #1108; ECF No. 50-1, ¶ 40, PageID #1133.)  Only one customer that used Propel SSP on a trial basis became a commercial customer.  (ECF No. 50, ¶ 166, PageID #1109; ECF No. 50-1, ¶ 40, PageID #1133; *see also* ECF No. 50, ¶ 189, PageID #1114.)  An unidentified former employee, whom the consolidated amended complaint references as FE5, avers that, while employed at the Company, he cross referenced publicly available data about well productivity with internal, non-public data regarding sales of the Company's proppants and determined that its proppants yielded "no discernible difference" in well productivity.  (ECF No. 50, ¶ 190, PageID #1114–15.)  Another former employee,

FE2, avers that he struggled to sell PowerProp because of its cost.  (ECF No. 50, ¶ 182, PageID #1112.)  The same price issues limited FE2's ability to sell Propel SSP and Propel SSP 350.  (*Id.*)

### C.2. During the Class Period (March 10, 2016 through June 29, 2020)

In the consolidated amended complaint, Plaintiff identifies several statements that he contends are false and misleading.  The Court groups them into four categories and attempts to lay out chronologically the allegations of the consolidated amended complaint by going beyond those specific statements in the first category— the Company's annual reports.

### C.2.a. Annual Reports

Plaintiff identifies specific statements in the Company's annual reports that he alleges are false and misleading.  Additionally, Plaintiff claims that the Company's annual reports made misleading risk disclosures.

### C.2.a.i. 2015

When the Company filed its annual Form 10-K for 2015, it represented that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics."  (*Id.*, ¶ 73, PageID #1082.)  Defendant Jennifer D. Deckard, Fairmount Santrol's president and chief executive officer (*id.*, ¶ 22, PageID #1071) and Defendant Mark E. Barrus, who served as the interim chief financial officer and interim principal accounting officer of Fairmount Santrol from October 20, 2015 to May 2016 (*id.*, ¶ 23, PageID #1072), signed Fairmount Santrol's 2015 Form 10-K and made certifications under the Sarbanes-Oxley Act of 2002 (*id.*, ¶ 72, PageID #1082;

10

*id.*, ¶¶ 77–78, PageID #1083–84). The certification under the Sarbanes-Oxley Act provides the filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]" (*Id.*, ¶ 77, PageID #1083.)

Plaintiff alleges that this statement is false and misleading because Ms. Deckard and Mr. Barrus knew but failed to disclose that PowerProp's conductivity "was as much as 49% lower than the Company's published performance results and much lower than that of lightweight ceramics." (*Id.*, ¶ 74, PageID #1082–83.) Plaintiff claims that the Company based its published performance results for PowerProp on forged test results. (*Id.*)

Also in its 2015 10-K, Fairmount Santrol touted that "Propel SSP continues to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs)." (*Id.*, ¶ 75, PageID #1083.) Plaintiff alleges that this statement is false and misleading because Defendants knew but failed to disclose that "only a small subset of all Propel SSP test wells actually had production increases of 30% or more." (*Id.*, ¶ 76, PageID #1083.) Of the twenty-nine production wells for which Fairmount Santrol had production data, Plaintiff alleges that less than half showed increased production of more than 30%. (*Id.*) "The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production." (*Id.*)

11

These reasons for the alleged falsity of the statements at issue also apply to the risk disclosures Plaintiff places at issue in the consolidated amended complaint. (*Id.*, ¶ 117, PageID #1097.) The Company's 2015 Form 10-K disclosed that Fairmount Santrol was conducting field trials of Propel SSP that might "demonstrate that the product is ineffective or not commercially viable":

> The development and marketing of Propel SSP may prove to be unsuccessful.
>
> In April 2013, we acquired intellectual property rights to self-suspending proppant technology which led to the development of Propel SSP. We are currently conducting field trials on Propel SSP. The technology supporting Propel SSP is still unproven. Although the results of field trials have been encouraging, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 116, PageID #1096.)  Plaintiff alleges that this risk disclosure was not sufficient to inform investors of the limited positive field trial results and lack of commercial demand.  (*Id.*, ¶ 117, PageID #1097.)  Also, Plaintiff alleges that Defendants already knew that Propel SSP was not commercially viable because it had only signed a single contract with a repeat customer to purchase Propel SSP. (*Id.*)

### C.2.a.ii. 2016

When the Company filed its Form 10-K for 2016 with the SEC, Ms. Deckard and Defendant Michael F. Biehl, Fairmount Santrol's chief financial officer and its principal accounting officer and executive vice president from May 2016 to May 2018 (*id.*, ¶ 24, PageID #1072), signed the annual report and made certifications under the Sarbanes-Oxley Act (*id.*, ¶ 93, PageID #1090; *see also id.*, ¶¶ 100 & 101, PageID

#1092).  Again, the Company touted PowerProp as having "strength and performance characteristics similar to lightweight ceramics."  (*Id.*, ¶ 94, PageID #1090.)

Like the 2015 Form 10-K, the annual report for 2016 again reported successful field trials for Propel SSP.  (*Id.*, ¶ 96, PageID #1091.)  Specifically, the 2016 annual report claimed that Propel SSP allowed more extraction of oil and gas from wells and other benefits that lowered production costs:

> Test results indicate that the lower specific gravity allows greater volumes of proppant and/or coarser mesh sizes coated with the Propel SSP® product to be carried deep into the fracture, which in turn allow more hydrocarbons to escape into the wellbore.  As a result, field trials have shown a variety of benefits, including increased production, decreased use of fluids, and reduced pumping time.

(*Id.*)  Additionally, the annual report reinforced these statements:

> Propel SSP® products continue to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs). . . . Extensive field tests have shown the benefits of Propel SSP® products, including increased initial production, reduced fluid usage, and reduced pumping time. Propel SSP® 350 products can now accomplish the same results in hard water.

(*Id.*, ¶ 98, PageID #1091.)  Regarding the risk disclosure, the 2016 Form 10-K contained a similar generic disclaimer regarding Propel SSP as the prior year's annual report:

> *The development and marketing of Propel SSP® products may prove to be unsuccessful.*
>
> The technology supporting Propel SSP® products is still being proven through field trials.  Although the results of field trials have been encouraging, and one customer in particular is using Propel SSP® products on a commercial basis in all of its wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 118, PageID #1097.)

13

Plaintiff alleges that all these statements and the risk disclosure are false and misleading for the same reasons as the similar statements in the 2015 Form 10-K and, in particular, because of the production data and field test results the Company had at the time.  (*Id.*, ¶¶ 95, 97, 99 & 119, PageID #1090–92 & #1097–98.)  In short, Plaintiff claims that field trials for Propel SSP did not show increased production or productivity and that, at the time, the Company had not yet done field testing for Propel SSP 350 and the product was not commercially available.  (*Id.*, ¶ 99, PageID 1092; *id.*, ¶ 167, PageID #1109.)  In fact, the Company could not manufacture Propel SSP 350 in sufficient quantities or at competitive prices.  (*Id.*; ECF No. 50-1, ¶ 42, PageID #1133.)  By this time, Plaintiff claims that the risks of which the Company warned had already materialized because of its inability to convert trial customers of Propel SSP into commercial customers and because of the continued testing results.  (ECF No. 50, ¶ 119, PageID #1097–98.)  Plaintiff alleges that Defendants knew, or were severely reckless in not knowing, that these risks had already materialized.  (*Id.*)

In May 2017, according to an article that Bloomberg Businessweek published in 2020, four employees of Fairmount Santrol told their bosses at meetings that they believed the Company was committing fraud.  (*Id.*, ¶ 170, PageID #1110.)  They allegedly raised concerns about PowerProp's performance and misrepresentations in marketing materials and public statements.  (*Id.*, ¶¶ 6 & 161, PageID 1067–68 & #1108; ECF No. 50-1, ¶ 29, PageID #1131.)  Specifically, the employees took turns speaking to two unnamed executives who met with each employee for at least an hour

14

and, in some cases, more than two.  (ECF No. 50, ¶ 173, PageID #1110.)  An employee of Fairmount Santrol later described the fraud to the SEC as involving the marketing of "scientific testing to create the illusion of proven performance and reliability."  (*Id.* ¶ 172, PageID #1110.)  In 2018, the same publication quoted another whistleblower who said the Company had "a culture of covering up its lies without regard to who might suffer."  (*Id.*)  The Company never disclosed the actual conductivity of PowerProp and stopped the selling product in 2018 when Fairmount Santrol merged with Unimin to form Covia.  (ECF No. 50, ¶ 162, PageID #1108; ECF No. 50-1, ¶ 31, PageID #1132.)

Another unnamed employee, whom the consolidated amended complaint references as FE3, described Propel SSP as a "scam" and "snake oil that they were trying to sell for profit."  (ECF No. 50, ¶ 184, PageID #1113.)  Like FE2, FE3 avers that the Company was unable to sell Propel SSP because of its cost.  (*Id.*)

### C.2.a.iii. 2017

On March 3, 2018, the Company filed its 2017 Form 10-K with the SEC.  Again, Ms. Deckard and Mr. Biehl signed the annual report and its accompanying certifications.  (*Id.*, ¶ 106, PageID #1094; *id.*, ¶¶ 113 & 114, PageID #1095–96.)  Like the 2015 and 2016 annual reports, the 2017 Form 10-K touted PowerProp (*id.*, ¶ 107, PageID #1094), the successful results for Propel SSP in extensive field tests (*id.*, ¶ 109, PageID #1095), and the benefits of Propel SSP 350 (*id.*, ¶ 111, PageID #1095.)  Plaintiff alleges that these statements were false and misleading for the same reasons as those in the earlier annual reports.  (*Id.*, ¶¶ 108, 110 & 112, PageID #1094 & #1095.)

15

Also, the 2017 annual report contained a similar generic risk disclosure regarding Propel SSP and its allegedly unproven technology:

> *The development and marketing of Propel SSP® products may prove to be unsuccessful.*
>
> The technology supporting Propel SSP® products is unproven through field trials.  Although the results of field trials have been encouraging, and some customers are using Propel SSP® products on a commercial basis in all of their wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 120, PageID #1098.)  Plaintiff alleges that this disclosure was misleading and inadequate for the same reasons as the earlier disclosures in the previous annual reports.  (*Id.*, ¶ 121, PageID #1098.)  Only one customer, not "some," had adopted Propel SSP.  (*Id.*)  By this time, the Company still did not have field test results for Propel SSP 350.  (*Id.*, ¶ 168, PageID #1109.)

By 2018, an unidentified former employee, whom the consolidated amended complaint references as FE1, avers that executives at the Company discussed PowerProp less frequently "because it was not gaining any sales traction or commercial adoption." (*Id.*, ¶ 181, PageID #1112.)  As a result, the Company shifted its efforts to Propel SSP.  (*Id.*)

### C.2.a.iv. 2018

On March 22, 2019, the Company filed its 2018 Form 10-K with the SEC.  (*Id.*, ¶ 122, PageID #1098.)  Ms. Deckard signed the report, as did Defendant Andrew D. Eich, Covia's executive vice president and chief financial officer from June 2018 through the end of the class period (*id.*, ¶ 25, PageID #1072) and Defendant Richard A. Navarre, who served as Covia's chief executive officer from September 2019

through the end of the class period and as chair of the board of directors and the chair of its executive and audit committee beginning in June 2018 (*id.*, ¶ 26, PageID #1072; *id.*, ¶¶ 122 & 125–26, PageID #1098 & 1100). Plaintiff alleges that the 2018 annual report contained a generic and misleading risk disclosure warning that the Company's products might prove unsuccessful:

> *The initial and sustained commercialization of our products may prove to be unsuccessful.*
>
> The products we develop may or may not be technically viable, and those that are technically viable may not be or remain commercially viable. . . . A failure to capitalize on Propel SSP® products in commercial application would result in a significant unrecouped investment and the failure to realize certain anticipated benefits, each of which may have a material adverse effect on our business, financial condition, and results of operations.

(*Id.*, ¶ 123, PageID #1099–1100.) Plaintiff contends that this disclosure was misleading for the same reasons as the other statements and disclosures at issue. (*Id.*, ¶ 124, PageID #1099.) By this time, Plaintiff claims that Propel SSP products "were already a significant unrecouped investment resulting in material adverse effects on the Company's business and financial condition." (*Id.*, ¶ 124, PageID #1100.) By the end of 2018, the Company stopped selling Propel SSP 350. (*Id.*, ¶ 169, PageID #1109.)

### C.2.b. Earnings Calls

In the consolidated amended complaint, Plaintiff identifies six earnings calls in which Ms. Deckard allegedly made false or misleading statements or omissions.

### C.2.b.i. 4Q15 Earnings

On March 10, 2016, the Company held a conference call with analysts and investors to discuss fourth quarter earnings from 2015.  (*Id.*, ¶ 70, PageID #1082.)  During the call, Ms. Deckard touted Propel SSP's performance and superior recovery of oil and gas from wells:

> We continue to see very positive productivity trends from our Propel SSP trial wells.  To date, documented third-party field performance data demonstrates an average of 30% cumulative enhanced hydrocarbon recovery over non-SSP offset wells after only 90 days of production, with the differentials continuing to increase over producing time.

(*Id.*, ¶ 70, PageID #1082.)  Plaintiff alleges that this statement is false and misleading because Ms. Deckard knew but failed to disclose that "only a small subset of all Propel SSP test wells actually had production increases of 30% or more."  (*Id.*, ¶ 71, PageID #1082.)  Of the twenty-nine production wells for which Fairmount Santrol had production data, Plaintiff alleges that less than half showed increased production of more than 30%.  (*Id.*)  "The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production."  (*Id.*)

### C.2.b.ii. 1Q16 Earnings

In a conference call with investors and analysts on May 10, 2016 to discuss results from the first quarter of the year, Ms. Deckard reaffirmed the performance data of Propel SSP and reported the commercial success of the product:

> To date, trials have included placement of Propel SSP in 87 wells with 19 different operators across all major U.S. basins.  And we continue to work with our customers to document their improved operational efficiency and their enhanced production rate.

18

> Third-party field performance data continues to demonstrate an average of 30% cumulative enhanced hydrocarbon recovery over non-SSP offset wells after 90 days of production, with differentials continuing to increase over producing time.  After seeing successful results during field trials, multiple customers have committed to ongoing commercial use of Propel SSP.

(*Id.*, ¶ 79, PageID #1084.)  During the call, an analyst asked a question about Propel

SSP, prompting Ms. Deckard to say that the product enjoyed widespread success:

> ANALYST:  On this SSP, could you tell us which regions is it more successful or is it pretty widespread?
>
> MS. DECKARD:  It's pretty widespread.  And the productivity gains are across most of the basins that we've tested the product.  So we're feeling pretty confident and we don't, at this point, have a targeted market with a difference in productivity gains.

(*Id.*, ¶ 81, PageID #1084–85.)  Plaintiff alleges that these statements were false and

misleading for the same reasons the statements on the March 10, 2016 call allegedly

were.  (*Id.*, ¶¶ 80 & 82, PageID #1084 & #1085.)

### C.2.b.iii. 2Q16 Earnings

On August 4, 2016, Fairmount Santrol held a conference call with investors

and analysts to discuss results from the second quarter of the year.  (*Id.*, ¶ 85, PageID

#1086–87.)  Ms. Deckard stated that a recent study confirmed her prior statements

regarding Propel SSP:

> Our recent reservoir engineering study of Propel SSP trial well[s], as validated by an external petroleum engineering firm, confirms our previous communications regarding 30% to 50% production enhancement with an optimized completion design using Propel SSP[.]
>
> We remain very excited about the prospects for Propel SSP.  Moving forward and as operators once again become more focused on maximizing well productivity, the company is well-positioned to provide the most advanced proppant technology solution from base resin to

resin-coated proppants, to Propel SSP and to many other value added solutions.

(*Id.*, ¶ 85, PageID #1087.)  Again, Plaintiff alleges that this statement is false and misleading for the same reasons as the others.  (*Id.*, ¶ 86, PageID #1087.) Additionally, Plaintiff contends that Ms. Deckard knew that PowerProp and Propel SSP were not able to maximize well productivity.  (*Id.*)

### C.2.b.iv. 3Q16 Earnings

On November 3, 2016, the Company held a conference call with analysts and investors to discuss financial results from the third quarter.  (*Id.*, ¶ 89, PageID #1088.)  During the call, Ms. Deckard advised of additional successful field test results for Propel SSP:

> [W]e're pleased to provide an update on Propel SSP, our Self-Suspending Proppant solution, which optimizes frac geometry to superior subsurface transport and placement of proppant, while also providing key operational benefits at the wellhead.
>
> The operational benefits and the significant production uplift that have been experienced by our customers continue to be both convincing and repeatable. During the third quarter, the successful completion of additional trial wells with new customers and the commercial adoption of Propel SSP by repeat customers, added to our successful track record and we believe further differentiated Propel SSP from other products. We remain truly energized by the value of the Propel SSP provides the customers, as well as a prospects for broader market adoption.

(*Id.*, ¶ 89, PageID #1089.)  Plaintiff alleges that these statements were false and misleading for the same reasons as those from the earlier earnings calls.  (*Id.*, ¶ 90, PageID #1089.)

Further, the consolidated amended complaint alleges that the production increases customers of Fairmount Santrol experienced with Propel SSP were not

significant, convincing, or repeatable. (*Id.*) Moreover, it claims that Ms. Deckard knew that the Company consistently failed to convert Propel SSP trial customers into commercial customers. (*Id.*) Indeed, according to the consolidated amended complaint, the Company only signed one contract for Propel SSP with a repeat commercial customer. (*Id.*)

### C.2.b.v. 4Q16 Earnings

When the Company held a conference call on March 9, 2017 to discuss results form the fourth quarter of 2016, Ms. Deckard touted the "meaningful productivity gains" from use of Propel SSP:

> Before we get to Q&A, I'd also like to provide an update on Propel SSP. In addition to ongoing commercial activity driven by wells which continue to yield meaningful productivity gains, we're also building a compelling case on operational efficiencies that produce benefits for both E&Ps and for service companies. . . .

> We continue to invest in the commercialization of Propel SSP, including the recently launched product line extension, Propel SSP 350. . . . We remain optimistic on Propel SSP's future.

(*Id.*, ¶ 102, PageID 1092–93.) Plaintiff alleges that these statements were false and misleading for the same reasons as the other statements at issue. (*Id.*, ¶ 103, PageID #1093.)

Additionally, the consolidated amended complaint alleges that field tests for Propel SSP did not yield meaningful productivity gains and that Ms. Deckard knew there was no reason for optimism regarding Propel SSP or Propel SSP 350. (*Id.*) As bases for the latter allegation, the consolidated amended complaint avers that the Company consistently failed to convert Propel SSP trial customers into commercial customers—only signing one contract for Propel SSP with a repeat commercial

customer—and was unable to manufacture Propel SSP 350 in sufficient quantities to achieve economies of scale.  (*Id.*)  Further, the Company could not consistently manufacture Propel SSP 350 to specification and had only one plant where it could manufacture the product in limited quantities.  (*Id.*)

### C.2.b.vi. 1Q17 Earnings

In a conference call with investors and analysts on May 4, 2017, Ms. Deckard reported growth in demand for Propel SSP based on results in trial wells for the past two years:

> Another key value-add on which I'd like to provide an update is Propel SSP.  We saw good growth in demand in quarter 1, as users were able to leverage Propel SSP to both gain productivity and operational efficiencies, which are valuable to both E&P and service companies.  The productivity enhancements that Propel SSP provide have been well demonstrated through many trial wells in different basins over the past 2 years.

(*Id.*, ¶ 104, PageID #1093–94.)  For the same reasons Plaintiff claims the earlier statements during earnings calls were false and misleading, he alleges that these were too.  (*Id.*, ¶ 105, PageID #1094.)  Namely, the Company had limited production data, which did not show any meaningful increase in production.  (*Id.*)

### C.2.c. Presentations

On May 18, 2016, the Company attached a presentation to a Form 8-K filing with the SEC and used that presentation at an event on May 19, 2016 for investors and analysts.  (*Id.*, ¶ 83, PageID #1085.)  This presentation touted results based on field activity showing that use of Propel SSP in over ninety wells typically resulted in production increases greater than 30%.  (*Id.*, ¶ 83, PageID #1085–86.)

22

On September 16, 2016, the Company filed another investor presentation on Form 8-K.  (*Id.*, ¶ 87, PageID #1087.)  Like the earlier presentation, this one claimed that use of Propel SSP in over ninety wells typically resulted in production increases greater than 30%.  (*Id.*, ¶ 87, PageID #1087–88.)

Again, Plaintiff alleges that the statements in both presentations are false and misleading because, of the twenty-nine production wells for which Fairmount Santrol had production data, less than half showed increased production of more than 30%.  (*Id.*, ¶¶ 84 & 88, PageID #1086 & PageID #1088.)  "The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production."  (*Id.*)

### C.2.d. Press Release

On January 18, 2017, the Company issued a press release, which stated that Propel SSP 350 "leverages the field-proven characteristics of Propel SSP technology into the realm of high salinity water sources."  (*Id.*, ¶ 91, PageID #1090.)  For the same reasons Plaintiff alleges the other statements at issue are false and misleading, the consolidated amended complaint claims this one is too.  (*Id.*, ¶ 92, PageID #1090.)  Additionally, Plaintiff alleges that at this time the Company had not done field testing for Propel SSP 350.  (*Id.*)

### D.    The SEC Investigation & Ms. Deckard's Separation from Covia

In its 2018 annual report filed on March 22, 2019, the Company disclosed that it had received a subpoena from the Securities and Exchange Commission:  "On March 18, 2019, we received a subpoena from the SEC seeking information relating to certain value-added proppants marketed and sold by Fairmount Santrol or Covia

within the Energy segment since January 1, 2014." (*Id.*, ¶ 127, PageID #1100.)  Four employees brought whistleblower claims to the Securities and Exchange Commission, which opened an investigation.  (*Id.*, ¶ 7, PageID #1068.)  According to the consolidated amended complaint, disclosure of this investigation "partially revealed to the market that the Company faced the previously undisclosed risk of governmental penalties" relating to its proppant products.  (*Id.*, ¶ 128, PageID #1100–01.)  This news prompted Covia's share price to drop 6.9% during the next trading day.  (*Id.*, ¶ 129, PageID #1101.)

After markets closed on May 9, 2019, two weeks after reporting the SEC subpoena, Covia announced the termination of Ms. Deckard at the direction of the board effective immediately.  (*Id.*, ¶¶ 130–31, PageID #1101; *see also id.*, ¶ 7, PageID #1068.)  Although announced as a termination without cause, entitling Ms. Deckard to retain her severance amounting to some $5.5 million, Plaintiff alleges that the termination amounted to a for-cause separation.  (*Id.*, ¶¶ 131 & 132, PageID #1101.)  This announcement did not reference the SEC's investigation.  (*Id.*)  On the same day the Company announced Ms. Deckard's separation, it also filed its Form 10-Q for the first quarter of 2019, which reported excess proppant supply in the market and a decrease of 47% in revenues for the Company's energy business.  (ECF No. 51-8, PageID #1857 & #1860.)

Defendant Richard A. Navarre, who served as chair of the board of directors of the Company after the merger and chair of its executive and audit committee, took over as the interim chief executive officer.  (ECF No. 50, ¶ 26, PageID #1072; *see*

*also* ECF No. 51-1, PageID #1154 n.1.)  In September 2019, Mr. Navarre served as the Company's chief executive officer without the "interim" title.  (ECF No. 50, ¶ 26, PageID #1072.)  In its report for the third quarter filed with the SEC on November 6, 2019, Covia disclosed that the SEC requested additional information and served subpoenas on multiple current and former employees regarding "certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014."  (*Id.*, ¶ 135, PageID #1102.)  Further, Covia's Form 10-Q for the third quarter reported that the Company discontinued sales and marketing of Propel SSP and took a related charge of $7.8 million.  (*Id.*, ¶ 136, PageID #1102.)

### E.    Bankruptcy

On June 29, 2020, after markets closed, Covia announced that it had reached a comprehensive restructuring agreement with lenders and voluntarily filed petitions under Chapter 11 of the Bankruptcy Code to implement that agreement.  (*Id.*, ¶ 138, PageID #1102.)  Previously, the Company had been able to renegotiate its debt obligations on several occasions due in part to the statements about PowerProp, Propel SSP, and Propel SSP 350 that Plaintiff alleges were false and misleading.  (*Id.*, ¶ 140–43, PageID #1103.)  Analyst reports noted the Company's large debt load relative to peers due to its investments in and infrastructure to support resin-coating and proppant operations.  (*Id.*, ¶ 144, PageID #1104.)

When Covia filed for bankruptcy protection, the New York Stock Exchange delisted its shares.  (*Id.*, ¶ 13, PageID #1070; *id.*, ¶ 32, PageID #1074; *id.*, ¶ 147, PageID #1104.)  When its shares resumed over-the-counter trading, their value

25

declined, leaving shareholders with nothing. (*Id.*, ¶ 148, PageID #1104–05; *see also id.*, ¶ 31, PageID #1074.) Specifically, Covia's share price fell from $0.48 at closing on June 29, 2020 to $0.04 on July 1, 2020. (*Id.*, ¶ 148, PageID #1104–05.)

At its peak, the Company's stock traded at a high of $30.00 per share in June 2018. (ECF No. 51-7, PageID #1823.) By December 31, 2018, it had fallen to $3.49 per share. (*Id.*, PageID #1818.)

Throughout the class period, Dr. Phelps purchased 1,338,925 shares of the Company's stock, both pre- and post-merger. (ECF No. 42, PageID #883.) Accounting for sales in which Dr. Phelps engaged pursuant to his investment strategy, his net purchases of the Company's stock exceeded 700,000 shares during the class period. (*Id.*) At the end of the putative class period, Dr. Phelps retained approximately 724,400 Covia shares (*id.*, PageID #896) and suffered hundreds of thousands of dollars in losses (*id.*, PageID #885 & #888).

## F.    The SEC's Cease-and-Desist Order

On August 10, 2020, Covia filed its quarterly report for the second quarter and disclosed that the SEC's staff recommended that the Commission file an action against the Company based on its investigation. (ECF No. 50, ¶ 149, PageID #1105.) By November 2020, the SEC interviewed the four Company employees who filed whistleblower complaints with the Commission. (*Id.*, ¶ 175, PageID #1111.) On December 8, 2020, the SEC commenced cease-and-desist proceedings in an order which Plaintiff attaches and incorporates into the consolidated amended complaint. (*Id.*, ¶ 8, PageID #1068; ECF No. 50-1.) In that order, the SEC accepted a settlement

offer from the Company and imposed a cease-and-desist order. (ECF No. 50-1, PageID #1127.)

The SEC's order made numerous factual findings. (*Id.*, ¶¶ 10–45, PageID #1129–34.) In short, the SEC's order finds that the Company made materially false and misleading statements about PowerProp, Propel SSP, and Propel SSP 350 in its SEC filings, presentations to investors and analysts, and on the Company's website. (ECF No. 50, ¶ 8, PageID #1068; *id.*, ¶ 151, PageID 1105.) These findings also detail internal Company documents, correspondence, and meetings before and during the class period that informed the Company and its officers that their statements about the proppants at issue were false and misleading. (*Id.*, ¶ 9, PageID #1069.) For example, a former employee forged test results that the Company touted, and the Company relied on laboratory tests for Propel SSP that did not correlate with real-world conditions. (*Id.*; *see also id.*, ¶ 154, PageID #1106.) Nonetheless, the Company continued to make public statements that were allegedly false and misleading. (*Id.*, ¶ 9, PageID #1069; *see also id.*, ¶ 154, PageID #1106.)

Notably, the SEC made its factual findings to settle the violations of federal securities laws the agency pursued and made clear that its findings "are not binding on any other person or entity in this or any other proceeding." (ECF No. 50-1, PageID #1128 n.2.) The SEC determined that the Company violated provisions of the Securities Act of 1933, the Exchange Act, and SEC Rules. (ECF No. 50-1, ¶¶ 46 & 47, PageID #1134; ECF No. 50, ¶ 10, PageID #1069; *id.*, ¶ 152, PageID #1106.) The Commission ordered the Company to cease and desist from committing further

violations and imposed a $17 million civil penalty. (*Id.*, ¶ 153, PageID #1106.) Because of Covia's bankruptcy, the SEC deemed the monetary penalty satisfied with a $1 million payment. (*Id.*)

## STATEMENT OF THE CASE

Based on these alleged facts, plaintiffs filed various lawsuits against Defendants, but not against Covia. After a hearing, the Court consolidated those cases, appointed Dr. Phelps as the lead Plaintiff (ECF No. 42), then appointed lead counsel (ECF No. 43). Plaintiff amended the complaint (ECF No. 46), then the parties stipulated to the filing of a corrected consolidated amended complaint (ECF No. 48), which remains the operative pleading and which the Court references as the consolidated amended complaint (ECF No. 50).

Plaintiff asserts three causes of action. In Count I, Plaintiff alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. (*Id.*, ¶¶ 204–13, PageID #1119–21.) Count II alleges violations of Section 20(a) of the Exchange Act. (*Id.*, ¶¶ 214–19, PageID #1121–22.) In Count III, Plaintiff alleges violation of Section 14(a) of the Exchange Act and Rule 14a-9 against Ms. Deckard. (*Id.*, ¶¶ 220–25, PageID #1122–23.) He also seeks to maintain these claims on behalf of a class. (*Id.*, ¶¶ 1 & 194–203, PageID #1066 & #1116–19.) Plaintiff defines the class period as running from March 10, 2016 through June 29, 2020. (*Id.*, ¶ 1, PageID #1066.) Plaintiff seeks compensatory damages. (*Id.*, PageID #1124.) Because Plaintiff's class allegations do not otherwise bear on analysis of the present motion to dismiss, the Court does not summarize them here.

## GOVERNING LEGAL STANDARDS

The Court evaluates Defendants' motion to dismiss Plaintiff's consolidated amended complaint for securities fraud under three different standards.

## I. Rule 8

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading

as factual allegations[.]"  *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be.  *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'").  Rule 8, to say nothing of the Private Securities Litigation Reform Act, "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.

On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint.  *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  Accordingly, the Court considers the public filings and statements, reported stock prices, and the bankruptcy court docket.  *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("*Omnicare III*").  Further, the Court considers the SEC order dated December 8, 2020, which Plaintiff attaches to the consolidated amended complaint and incorporates by reference.  (ECF No. 50-1; ECF No. 50, ¶ 8, PageID #1068.)

30

## II.     Rule 9(b)

In addition, fraud claims must meet Rule 9(b)'s heightened pleading standard. That Rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To satisfy this Rule, 'the plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 760 (N.D. Ohio 2020) (cleaned up) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012)).  But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

## III.    Private Securities Litigation Reform Act

Under the Private Securities Litigation Reform Act of 1995, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016).  Also, the Reform Act requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *In re TransDigm Grp.*, 440 F. Supp. 3d. at 760.

31

Where a plaintiff fails to meet these standards, "the court shall, on the motion of any defendant, dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).  In determining whether to dismiss, courts consider not only the complaint, but also "plausible opposing inferences" that favor the defendant.  *Doshi*, 823 F.3d at 1039 (citation and quotation omitted).  The Reform Act's requirements are intended to be an "elephant-sized boulder" in the way of private securities fraud cases.  *Omnicare III*, 769 F.3d at 461.

## ANALYSIS

In briefing on Defendants' motion, Plaintiff concedes that his claims in Count III fail to state a claim.  (ECF No. 52, PageID #1956 n.2.)  Therefore, the Court **GRANTS** the motion to dismiss this count and proceeds to analyze the motion with respect to Counts I and II.

## I.  Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for anyone to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors."  15 U.S.C. § 78j(b).  To enforce this statute, the SEC promulgated Rule 10b-5, which makes it "unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

"The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)).  To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37–38 (quotation and citation omitted); *see Omnicare III*, 769 F.3d at 469.  Based on the "text and purpose of § 10(b)," Supreme Court precedent permits an implied "private cause of action" under this statute.  *See Matrixx*, 563 U.S. at 37.  But what Section 10(b) and Rule 10b-5 do not create is "an affirmative duty to disclose any and all material information." *Id.* at 44.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

### I.A.   Alleged Material Misrepresentations and Omissions

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things:  (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Omnicare III*, 769 F.3d at 470.  What is required of a plaintiff changes based on whether they allege an "affirmative misrepresentation[], as opposed to omissions," and whether the misrepresentation or omission "concerns hard, as opposed to soft, information." *Id.*

"The [Reform Act] mandates that," to survive a motion to dismiss, Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all the facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 568 (6th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(1)); *see Omnicare III*, 769 F.3d at 480 n.6.

Generally, a misrepresentation or omission is attributable only to the person who made it, and only that person or entity is potentially liable for the misrepresentation or omission under Rule 10-b5(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–43 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement," not one who merely "prepares or publishes a statement on behalf of another." *Id.* at 142.  Under the Supreme Court's reasoning in *Janus*, corporate officers who sign documents filed with the SEC make the statements contained in those documents. *Louisiana Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, No. 1:10-cv-01461, 2012 WL 3903335, at *5 (N.D. Ohio Aug. 31, 2012) (holding that under Rule 10b-5 corporate officers made allegedly misleading statements contained in annual and quarterly reports they signed and filed with the SEC).

*Misrepresentations.*  "A misrepresentation is an affirmative statement that is misleading or false." *Omnicare III*, 769 F.3d at 470.  Misrepresentations may contain

34

either hard or soft information.  Hard information usually concerns "historical information or other factual information that is objectively verifiable." *Id.* (quotation omitted).  That type of statement may be actionable where "a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading."  *Id.*  Misrepresentations containing soft information "add[] a subjective inquiry to an otherwise objective element" and "include predictions and matters of opinion."  *Id.*  At this first step, the Court determines whether statements are in fact actionable misstatements and, if so, whether they were material, nothing more.  *Id.*  Whether the defendants made those statements with knowledge of their falsity is reserved for the scienter analysis.  *Id.* at 471.

*Omissions.*  Omissions may be actionable in two circumstances:  where a company has an affirmative duty to disclose (for example, when an insider trades or a statute requires disclosure) or where a company makes "an inaccurate, incomplete, or misleading prior disclosure" that it must then correct.  *Id.* at 471 (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).  In the latter circumstance, a person has a duty to disclose hard information it may receive "if it renders a prior disclosure objectively inaccurate, incomplete, or misleading."  *Id.* (citing *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008)).  If "new information is soft, then a person or corporation has a duty to disclose it only if it is virtually as certain as hard facts and contradicts the prior statement."  *Id.* (cleaned up).  At bottom, where a person chooses to speak, federal securities laws "require an actor to 'provide complete and non-misleading

35

information with respect to the subjects on which he undertakes to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)).

*Materiality.*  A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic*, 485 U.S. at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Because materiality is an element of a Rule 10b-5 claim, *Matrixx*, 563 U.S. at 37–38, a misstatement or omission is only actionable if a reasonable investor would have viewed the information as "alter[ing] the total mix of information available" to the market.  *Basic*, 485 U.S. at 232; *see also Omnicare III*, 769 F.3d at 472.  But courts have a "limited understanding of investor behavior and the actual economic consequences of certain statements," which means they run the "risk [of] prematurely dismissing suits on the basis of [judicial] intuition."  *Omnicare III*, 769 F.3d at 472.

"[V]ague, soft, puffing statements or obvious hyperbole" of "corporate optimism[,]" which can be either "forward looking" or generalized to the point they are "not capable of objective verification," cannot form the basis of a Section 10(b) claim.  *In re Ford Motor Co.*, 381 F.3d at 570.

> [F]ederal courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, [and] so lacking in specificity, . . . that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570–71 (quotations omitted).

Similarly, where sufficient forward-looking cautionary language accompanies affirmative statements, the "bespeaks caution" doctrine renders predictions of business results immaterial as a matter of law.  *See In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371–73 (3d Cir. 1993).  That is, "forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors."  *Id.* at 371.  This doctrine, "as an analytical matter, equally appli[es]" to both "affirmative misrepresentations and omissions concerning soft information."  *Id.* Applying the doctrine depends on the specific communication at issue and requires a case-by-case analysis.  *Id.*  Materiality is a question of fact.  *Matrixx*, 563 U.S. at 43 (quoting *Basic*, 485 U.S. at 236).

Plaintiff's allegations concerning Defendants' alleged misrepresentations and omissions are subject to the heightened pleading standards of the PSLRA and Rule 9(b) that the Court set forth above.  *Omnicare III*, 769 F.3d at 470.  The Court determines whether a statement was false or misleading at the time it was made in light of all the evidence in Plaintiff's pleadings.  In this case, that includes the SEC order dated December 8, 2020 (ECF No. 50-1) and the confidential witness statements set forth in the consolidated amended complaint.  "[P]laintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged."  *Doshi*, 823 F.3d at 1037 n.2.

37

The alleged misrepresentations and omissions Plaintiff maintains are actionable fall into three general categories: (1) statements comparing PowerProp's performance to that of lightweight ceramics; (2) overstatements or misstatements of testing performance results for Propel SSP; and (3) inadequate, misleading risk disclosures concerning the commercial prospects for PowerProp, Propel SSP, and Propel SSP 350. The Court will analyze each in turn. *See Bondali v. TumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (directing district courts to engage in "a statement-by-statement analysis"). Throughout its analysis, the Court identifies whether the statement is attributable to any particular Defendant or solely to the Company or certain non-parties.

### I.A.1. Comparison to Lightweight Ceramics

Both before and during the class period, Defendants and the Company made statements in presentations and SEC filings asserting that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics," a higher-performing and more expensive product on the market. (ECF No. 50, ¶¶ 63–66, PageID #1080–81; *see also id.*, ¶¶ 73, 94 & 107, PageID #1082, #1090 & #1094.) Ms. Deckard, Mr. Barrus, and Mr. Biehl each signed at least one of the Company's annual reports that contained these statements. (*Id.*, ¶¶ 72, 93 & 106, PageID #1082, #1090 & #1094.) Plaintiff alleges that these statements were false and misleading because PowerProp's conductivity—a key measure of proppant performance (*id.*, ¶¶ 2 & 42, PageID #1066 & #1076)—was not in fact comparable to lightweight ceramics. (*Id.*, ¶¶ 68, 74, 95 & 108, PageID #1081, #1082–83, #1090 & #1094; ECF No. 50-1, ¶¶ 15, 19, 21–23 & 25–29, PageID #1130–31.) Notably, Defendants do not argue that

these statements were false.  Instead, they argue that the comparisons are puffery, which is not actionable.

Plaintiff's allegations satisfy the heightened pleading standard under the Reform Act.  Defendants' assertions that PowerProp's conductivity is comparable to or competes with that of lightweight ceramics constitutes hard information because it is "objectively verifiable."  *Omnicare III*, 769 F.3d at 470.  According to the consolidated amended complaint, conductivity presents a reasonably quantitative metric that can be verified—presumably by comparing the volume of oil and gas extracted from a well using each product as a proppant.  (ECF No. 50, ¶¶ 42 & 156–57, PageID #1076 & #1106–07.)

Further, in the consolidated amended complaint Plaintiff specifies each time that Defendants or the Company stated PowerProp was comparable to lightweight ceramics, followed immediately by an allegation concerning why that statement was false.  (*See, e.g.*, *id.*, ¶¶ 74 & 75, PageID #1082–83.)  Plaintiff identifies each misleading statements including its time, place, and content, as Rule 9(b) and the Reform Act require.  (*See, e.g.*, *id.*)  And the SEC order Plaintiff incorporates into the consolidated amended complaint, while not conclusive, finds that PowerProp's conductivity was in fact not as high as lightweight ceramics.  (ECF No. 50-1, ¶ 21, PageID #1130–31.)  Confidential witness statements confirm the same as early as 2011.  (*Id.*; *see also* ECF No. 50, ¶ 156, PageID #1106–07.)  Further, the consolidated amended complaint alleges that Fairmount Santrol employees learned in 2015 that a former employee forged some PowerProp rest results on which the Company

39

continued to rely in public statements.  (*Id.*, ¶ 159, PageID #1107.)  Therefore, these statements by Ms. Deckard, Mr. Barrus, and Mr. Biehl are misleading representations under Rule 10b-5 if they are material.  *Omnicare III*, 769 F.3d at 470.

Defendants argue that these statements amount to mere puffery.  (ECF No. 51-1, PageID #1186–87.)  Specifically, they argue that statements to the effect that PowerProp could compete with lightweight ceramics are vague and incapable of being proven or disproven.  Therefore, they are immaterial as a matter of law.  (*Id.*)  Generalized, vague statements of corporate optimism are often unverifiable and are too general to cause a reasonable investor to rely on them.  *In re TransDigm*, 440 F. Supp. 3d at 763–64.  Therefore, such statements are immaterial puffery and cannot support a securities fraud claim.  *Id.*  As the Sixth Circuit explained:  "All public companies praise their products and their objectives . . . as a matter of law a certain kind of rosy affirmation . . . so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker" does not alter the total mix of information and is  immaterial.  *In re Ford Motor Co.*, 381 F.3d at 570 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

Without question, vague propositions of "competitiveness" in a market will not always be verifiable.  *See Norfolk Cnty. Ret. Sys. v. Tempur-Pedic, Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014), *aff'd, Pension Fund Grp. v. Tempur-Pedic, Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015).  But Plaintiff alleges that the statements at issue comparing PowerProp to lightweight ceramics reference a particular metric important in the proppant industry—conductivity.  As explained above, that metric

40

appears reasonably capable of being proven or disproven, unlike a vague assertion that the Company "strengthened [its] competitiveness." *Id.* For these reasons, Plaintiff sufficiently alleges that the statements comparing PowerProp's performance to lightweight ceramics were material misstatements.

### I.A.2. Propel SSP Test Results

Before and during the class period, Defendants and the Company made statements in presentations, press releases, and SEC filings that Plaintiff alleges oversold the success of Propel SSP in increasing production from test wells. (ECF No. 50, ¶ 69, PageID #1081; *see also id.*, ¶¶ 75, 83, 87, 96, 98, 109, PageID #1083, #1085, #1087–88, #1091 & #1095.) Ms. Deckard made similar statements on earnings calls. (*Id.*, ¶¶ 70, 79, 85, 89, 102, 104, PageID #1082, #1084, #1086–87, #1088–89, #1092–93 & #1093–94.) Also, the Company issued a press release on January 18, 2017 concerning Propel SSP 350, stating that "it leverages the field-proven characteristics of Propel SSP's technology" in saltwater. (ECF No. 50, ¶ 91, PageID #1090.)

Some of these statements included specific figures for enhanced productivity in test wells. For example, during a March 10, 2016 earnings call, Ms. Deckard reported that Propel SSP's performance data "demonstrate[d] an average of 30% cumulative enhanced" production compared to non-SSP wells after 90 days. (*Id.*, ¶ 70, PageID #1082; *see also* ¶¶ 79, 83, 85 & 87, PageID #1084, #1085 & #1086–87.) Other statements do not include specific data. During a March 9, 2017 earnings call Ms. Deckard stated that the Company "remaine[d] optimistic about Propel SSP's future" (*id.*, ¶ 102, PageID #1093) and that the Company's 2015 10-K stated that "key

41

customers" showed "successful results (increased productivity and reduced operating costs)" using Propel SSP (*id.*, ¶ 75, PageID #1083).  Ms. Deckard and the Company—in the form of 8-Ks filed with the SEC and signed by a non-defendant corporate officer—made statements that included numerical testing data.  (*Id.*, ¶¶ 70, 79, 83 & 85, PageID #1082, #1084, #1085 & #1087.)  Mr. Biehl and Mr. Barrus signed 10-Ks that touted Propel SSPs "successful" trials and results, including increased production, but did not include specific numbers.  (*Id.*, ¶¶ 75, 96, 98 & 109, PageID #1083, #1091 & #1095.)

Plaintiff alleges that these statements were false or misleading because, contrary to these representations, Propel SSP in fact performed poorly in test wells.  (ECF No. 50, ¶¶ 71, 76, 80, 84, 86, 97, 99, 110 & 186, PageID #1082, #1083, #1084, #1086, #1087, #1091, #1091–92, #1095 & #1113; ECF No. 50-1, ¶¶ 33, 36 & 38, PageID #1132 & #1133; *see also* ECF No. 52, PageID #1960–62.)  According to Plaintiff, the Company only had test data for 29 wells, and less than half of those wells showed increased production rates greater than thirty percent.  (*Id.*)  Taking the allegations in the consolidated amended complaint as true, the Company had this test data as early as March 2016.  (ECF No. 50, ¶ 71, PageID #1082.)  Further, when Defendants stated that Propel SSP 350 brought the success of Propel SSP to saltwater, they had no test data for Propel SSP 350.  (*Id.*, ¶ 99, PageID #1092.)

For much the same reasons that the Court concludes that Defendants' and the Company's statements about PowerProp are actionable misstatements, the Court concludes that Plaintiff adequately alleges Defendants' and the Company's

statements concerning Propel SSP's test results were false or misleading.  Defendants take pains not to cite the portions of Plaintiff's allegations that include numerical test data in their brief (ECF No. 51-1, PageID #1187), but Defendants' statements that Propel SSP increased productivity by 30% are "objectively verifiable" by comparing the statement to the actual test results.  *Omnicare III*, 769 F.3d at 470.  As alleged, Propel SSP's actual test results—showing increased production of 30% in less than half of the only 29 test wells (ECF No. 50, ¶ 71, PageID #1082)—verify the falsity of the statements.  And Plaintiff specifies each time that Defendants or the Company touted Propel SSP's test results, followed immediately by an allegation concerning why that statement was false.  (*See, e.g.*, ECF No. 50, ¶ 70 & 71, PageID #1082.) Plaintiff identifies each misleading statement, including its time, place, and content, as Rule 9(b) and the Reform Act require.  (*See, e.g.*, *id.*)

Again, Defendants argue that these statements amount to mere puffery that is unactionable.  (ECF No. 51-1, PageID #1187.)  A "rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace" is unactionable optimistic puffing.  *In re Ford Motor Co.*, 381 F.3d at 570; *see also In re TransDigm*, 440 F. Supp. 3d at 764.  But as the Court notes above, Defendants ignore the portions of Defendants' statements that include hard numbers.  Like the comparison between PowerProp's conductivity and that of lightweight ceramics, Propel SSP's test results are objective, verifiable numbers.

Defendants identify certain statements that merely say the Company was "optimistic" about Propel SSP.  (ECF No. 51-1, PageID #1187; ECF No. 50, ¶ 102,

PageID #1092–93.)  This statement, and the others like it, are vague puffery.  For example, in one statement Ms. Deckard said that Propel SSP "continue[d] to yield meaningful productivity gains" (*id*.), but meaningful is far from an objective measure. In contrast, Ms. Deckard and the Company made statements on at least four occasions that referenced the number of test wells and percentage increase in productivity.  Unlike the alleged misstatements concerning "statistically significant" test results in *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 417 n.15 (5th Cir. 2001), which did not include hard numbers and on which Defendants rely, these statements contain concrete data, not vague "rosy affirmations."  Plaintiff sufficiently alleges misleading statements with respect to those allegations, even if Defendants made them at the same time as other vague, puffing statements.

### I.A.3. Commercial Prospects and Risk Disclosures

During the class period, Defendants made statements about Propel SSP and Propel SSP 350's commercial prospects that Plaintiff alleges were false or misleading. Defendants represented that repeat customers adopted Propel SSP after testing and that the Company was "optimistic" and "excited" about the commercial prospects for both Propel SSP and Propel SSP 350.  (ECF No. 50, ¶¶ 79, 85, 89 & 120, PageID #1084, #1086–87, #1089 & #1098.)  To the extent these statements appeared in the Company's SEC filings, they were accompanied by certain risk disclosures that Plaintiff alleges were misleading.  These risk disclosures warned that the technology supporting Propel SSP products may fail and that the products may not be commercially viable.  (*Id.*, ¶¶ 116, 118 & 123, PageID #1096, #1097 & #1099.)

Plaintiff relies on information from confidential witnesses to allege that these statements were false or misleading for a few reasons.  First, the Company only signed one contract with a repeat customer for Propel SSP, and the Company failed to convert trial customers into commercial customers as represented.  (*Id.*, ¶ 90, PageID #1089.)  Second, confidential witnesses reported that the Company received negative feedback about Propel SSP from customers.  (*Id.*, ¶ 165, PageID #1108.) Third, the Company did not have the capability to produce Propel SSP 350 in marketable quantities or at competitive prices.  (*Id.*, ¶ 167, PageID #1109.)  And fourth, former sales employees report that Propel SSP was not gaining sales traction because it was too expensive.  (*Id.*, ¶¶ 181 & 184, PageID #1112–13.)  For these reasons, Plaintiff alleges that the risk disclosures were misleading because the risks of which they warned had already occurred.  (*Id.*, ¶¶ 117, 119 & 124, PageID #1097, #1098 & #1099–1100.)

Defendants argue that these statements were not false or misleading because, when they made the statements, the Company was still working to commercialize Propel SSP and Propel SSP 350.  (ECF No. 53, PageID #2023.)  Also, Defendants point to the 2016 10-K, which accurately stated that one customer adopted Propel SSP.  (ECF No. 51-1, PageID #1186 n.5.)  Further, Defendants argue that Plaintiff cannot base a securities fraud claim on statements disclosing the possibility of the precise risk Plaintiff alleges forms the basis for this lawsuit—that PowerProp, Propel SSP, and/or Propel SSP 350 would fail.  (ECF No. 51-1, PageID #1185–86.)  In fact, Defendants argue, the Company's risk disclosures were accurate and prescient

45

because the Company did discontinue PowerProp, Propel SSP, and Propel SSP 350. (ECF No. 51-1, PageID #1185.)  To the extent Plaintiff alleges actionable omissions, Defendants argue that the Company had no obligation to disclose the latest Propel SSP test results.  (*Id.*, PageID #1185–86.)

These alleged misrepresentations include a mix of hard and soft, subjective information such as "predictions and matters of opinion."  *Omnicare III*, 769 F.3d at 470.  Defendants' statements concerning customers who adopted Propel SSP are concrete and were objectively verifiable when Defendants made them, and Plaintiff alleges that at no point had more than one commercial customer adopted Propel SSP for regular use in its wells.  (ECF No. 50, ¶¶ 80, 90 & 121, PageID #1084, #1089 & #1098.)  Therefore, statements that customers (plural) adopted the product in the Company's 2017 10-K (signed by Mr. Biehl and Ms. Deckard) (*id.*, ¶ 120, PageID #1098) and Ms. Deckard's statement during two 2016 earnings calls (*id.*, ¶¶ 79 & 89, PageID #1084 & 1089) were false.

### I.A.3.i. Safe Harbor

The remaining statements of optimism about Propel SSP's prospects and risk disclosures call for further analysis.  The Reform Act contains a limited safe-harbor for forward-looking statements, including "a statement of the plans and objectives . . . for future operations, including . . . relating to the products or services of" the Company and "any statement of the assumptions underlying or relating" to a forward-looking statement.  15 U.S.C. § 78u-5(i)(1)(B) & (D).  Subject to other limitations that are not relevant here, a forward-looking statement is actionable as securities fraud only where (1) it is material, (2) the defendant failed to identify the

statement as forward-looking or provide "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (3) the defendant made the statement "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u–5(c)(1).

This safe harbor does not extend to "a statement of present or historical fact." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003). "The critical inquiry . . . is whether [the statement]'s veracity can be determined at the time the statement is made." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (quoting *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015)). Assumptions underlying forward-looking statements qualify for safe-harbor protection. *Id.* Defendants argue that the safe harbor applies to the Company's risk disclosures and the forward-looking statements those risk disclosures accompany. (ECF No. 51-1, PageID #1186; ECF No. 53, PageID #2023.)

As an initial matter, Ms. Deckard's statements on earnings calls in 2016 and 2017 (ECF No. 50, ¶¶ 79, 81, 89, 102 & 104, PageID #1084, #1085, #1089, #1093 & #1094) were not accompanied by "meaningful cautionary statements" as the safe harbor provision requires. 15 U.S.C. § 78u–5(c)(1). Plaintiff alleges that each of those statements were misleading because no facts supported Propel SSP's prospects for commercialization, and only one customer signed a contract to adopt Propel SSP. (*See, e.g.*, *id.*, ¶ 90, PageID #1089.) These statements were misleading and are actionable if they were material.

Regarding the risk disclosures in the Company's SEC filings, Plaintiff cannot rest on "the fact that something turned out badly" to argue that a "defendant knew earlier that it would turn out badly." *Louisiana Sch. Emps.'s Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir. 2009)), *abrogated on other grounds by Matrixx*, 563 U.S. at 48–50.  Because Propel SSP performed poorly in tests and elicited customer complaints, Plaintiff argues that the Company's disclosures that the product may fail were misleading; the product had already failed.  (ECF No. 50, ¶¶ 116–26, PageID #1096–1100.)  This argument goes too far.  In *Miller*, 346 F.3d at 676–77, the Sixth Circuit rejected an argument that the company's risk disclosure was inadequate because it did not specify the nature of its loans to a struggling home retailer that accounted for a large portion of its business.  In rejecting an argument similar to the one Plaintiff makes here, the Sixth Circuit recognized that the argument "goes too far.  [The company] disclosed the exact risk that occurred in this situation:  excess retailer inventory that could lead to negative economic effects" and companies are "not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk."  *Id.* at 678.

The same logic applies here.  The Company's risk disclosures warned of the risk that occurred here—Propel SSP failed.  As in *Miller*, Plaintiff alleges that the Company did not disclose information showing that the products had already or would likely fail.  (*See, e.g.*, ECF No. 50, ¶ 121, PageID #1098.)  But like the Company here, the defendant in *Miller* had information showing the potential risk was

extremely likely to occur, or already had, and did not have to disclose that information. *Miller*, 346 F.3d at 667–69.  The Company's risk disclosures were vague. However, following *Miller*, they were adequate, and forward-looking statements accompanied by those risk disclosures fall under the safe harbor.

### I.A.3.ii. Materiality

As discussed above, the safe harbor does not protect Ms. Deckard's statements on earnings calls or statements in the Company's SEC filings indicating that more than one commercial customer adopted Propel SSP in its wells.  Defendants argue that even if these statements were misleading, they were immaterial because (1) they were puffery; (2) based on analyst reports, investors did not care about them; and (3) the Company's stock price rose after it discontinued Propel SSP.  (ECF No. 51-1, PageID #1174–76.)

The Company's stock price is of limited use in determining materiality.  "[T]he demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  SAB No. 99, 1999 WL 1123073, at *45,153 (Aug. 12, 1999).  The "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material."  *Id.* at 45,152 (quotations omitted).

Defendants argue that Ms. Deckard's statements of optimism about the future of Propel SSP are puffery.  Ms. Deckard made some of these statements on the same calls as statements concerning Propel SSP's test results.  (*See, e.g.*, ECF No. 50, ¶ 85, PageID #1087) (citing Propel SSP's test results as increasing productivity 30 to 50

percent and representing that the Company was "very excited" about its prospects).
As discussed above, the misleading statements regarding Propel SSP's test results
are actionable.  However, because Defendants focus on these "rosy affirmations" to
argue that their statements were puffery, the Court addresses them here.
Ms. Deckard's statement that the Company "remain[ed] optimistic about Propel
SSP's future" (*id.*, ¶ 102, PageID #1093), was "energized" by its "prospects for broader
market adoption" (*id.*, ¶ 89, PageID #1089), was "feeling pretty confident" about the
product (*id.*, ¶ 81, PageID #1085), and "remain[ed] very excited" about its prospects
(*id.*, ¶ 85, PageID #1087) are all classic "rosy affirmations" of the Company's products.
*In re Ford Motor Co.*, 381 F.3d at 570.  Standing alone, they are not material.
However, for the most part, they did not stand alone.  Typically, they formed part of
statements tied to hard numbers or metrics that Plaintiffs allege are false.

Finally, Defendants argue that any statement about Propel SSP is immaterial
because analyst reports demonstrate that the market did not pay attention to the
product.  (ECF No. 51-1, PageID #1177; ECF No. 53, PageID #2017–18.)  However,
the consolidated amended complaint cites several investor reports that refute that
assertion.  For example, in 2016 Wells Fargo declined to raise its outlook on the
Company but *quoted* the Company's false statements concerning Propel SSP's test
results.  (ECF No. 50, ¶ 55, PageID #1078–79; ECF No. 51-1, PageID #1175.)  And in
2017 Morningstar reported that Propel SSP could be a blockbuster seller, although
the industry was shifting away from value-added proppants.  (ECF No. 50, ¶ 58,
PageID #1079; ECF No. 51-1, PageID #1175–76.)  Materiality is a question of fact,

and the Court cannot conclude at this stage of the proceedings that these reports demonstrate the market did not care about Propel SSP.  To the contrary, the Morningstar report appears to confirm Plaintiff's theory.  The Company's bet on value-added proppants as an industry-differentiator, presented Propel SSP's inaccurate test results to the public to support that strategy, and lost.

### I.A.4. Quantitative Materiality of the Products

Defendant argues that each alleged misstatement and omission Plaintiff identifies is immaterial as a matter of law because the products at issue were such a small portion of the Company's overall business, particularly post-merger.  (ECF No. 51-1, PageID #1176–78.)  Further, the amount of money the Company invested in Propel SSP was not a factor that investors considered because it was not public until after the class period.  (ECF No. 53, PageID #2017–18.)

There is no bright-line rule to determine materiality.  *See Matrixx*, 563 U.S. at 30, 49.  The Supreme Court declined to adopt a bright-line rule in *Basic*, where the defendant argued that a potential merger is immaterial as a matter of law until the parties reach an agreement in principle, 485 U.S. at 249, and again in *Matrixx*, where the defendant argued for a bright-line rule that statements concerning pharmaceutical products are not material absent a "statistically significant" risk associated with the product, 563 U.S. at 39.  Defendants acknowledge this legal rule but point to a "rule of thumb" that if the "financial magnitude" of a misstatement is below five percent, it is "presumptively immaterial."  *Weiner v. Tivity Health, Inc.*, 528 F. Supp. 3d 795, 808–09 (M.D. Tenn. 2021) (citing SAB No. 99, 1999 WL 1123073, at *45,151).

On this point, both parties point to the SEC's Staff Accounting Bulletin No. 99, which states in relevant part: "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage with respect to a particular item" is likely immaterial. SAB No. 99, 1999 WL 1123073, at *45,151. "But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality" and is not a substitute for "a full analysis of all relevant considerations." *Id.* One relevant consideration is whether the misstatement "concerns a segment or other portion [of the business] that has been identified as playing a significant role" in "operations or profitability." *Id.* at *45,152.

Plaintiff alleges that PowerProp and Propel SSP accounted for 6.6 percent of the Company's proppant segment revenue in 2014, dropping to four percent in 2017. (ECF No. 50, ¶ 52, PageID #1078.)  At least one analyst increased its estimate and price target for the Company based on the "increased commercialization of Propel SSP . . . largely under the assumption that value-added proppant volumes and revenues continue to improve." (*Id.*, ¶ 57, PageID #1079.) Further, Ms. Deckard mentioned Propel SSP in nearly every quarterly earnings call between 2015 and 2017. These facts weigh in favor of materiality and against the application of a bright-line rule that makes the representations at issue in this case immaterial.

Defendants cite *Weiner* to support their argument that the Court should apply the five percent rule of thumb. (ECF No. 51-1, PageID #1176.)  However, in *Weiner*, the district court applied the five percent rule of thumb but determined "materiality

is clearly a question for the jury in this case." *Weiner*, 528 F. Supp. 3d at 807–08. There, the defendants made material misstatements about a program that accounted for less than one percent of its estimated revenue. *Id.* at 808. However, the plaintiff's claim survived summary judgment because, considering the entire record, the misstatement altered the total mix of information available to investors. *Id.* at 810–11.

Defendants' argument that the products were immaterial post-merger (ECF No. 51-1, PageID #1177–78) is unavailing. Defendants' and the Company's previous misleading statements remained a part of the total mix of information available to investors. And in 2019, the Company disclosed that it had discontinued commercialization efforts of Propel SSP and recorded an impairment charge of $7.8 million. (ECF No. 50, ¶ 136, PageID #1102.) Even without considering the debt the Company took on to develop Propel SSP, which was not public, a jury could find that Defendants' statements concerning PowerProp, Propel SSP, and Propel SSP 350 were quantitatively material.

*     *     *

For the foregoing reasons, Plaintiff adequately alleges material misrepresentations or omissions attributable to Ms. Deckard, Mr. Biehl, and Mr. Barrus in the following paragraphs of the consolidated amended complaint: ¶ 66, PageID #1081; ¶ 70, PageID #1082; ¶ 73, PageID #1082; ¶¶ 79 & 81, PageID #1084–85; ¶ 85, PageID #1087; ¶ 89, PageID #1089; ¶ 94, PageID #1090; ¶ 107, PageID #1094. Plaintiff may not base his claim on the alleged misrepresentations

53

that the Court determines are not actionable, as detailed above.  Therefore, the Court **GRANTS** Defendants' motion to dismiss as to Mr. Navarre and Mr. Eich and **DISMISSES** all counts against those two Defendants.

### I.B.    Loss Causation

Defendants focus their lead argument in support of dismissal on whether Plaintiff adequately pleads loss causation.  (ECF No. 51-1, PageID #1167–73.)  To state a claim for securities fraud, a plaintiff must prove "that the act or omission of the defendant alleged to violate" Rule 10b-5 "*caused the loss* for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4) (emphasis added).  Plaintiff must allege more than that the Company's stock price was inflated when he purchased it because of Defendants' misrepresentations or omissions.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

The requirement that Plaintiff prove loss causation is "not meant to impose a great burden upon a plaintiff."  *Id.* at 346–47.  Rather, "it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud."  *Norfolk Cnty. Ret. Sys. v. Community Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017).  At the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347.  The element of loss causation is not subject to the heightened pleading standards of Rule 9 or the Reform Act.  *Id.* at 346 (noting that the Rule 8 pleading standard governs loss causation).

The Sixth Circuit recognizes more than one method of pleading loss causation. *Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) ("*OPERS*"). Most commonly, plaintiffs will allege that the market "reacted negatively to a corrective disclosure" of fraud. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see also In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (recognizing that loss causation is "easiest to show when a corrective disclosure reveals the fraud to the public"). Also, the Sixth Circuit has adopted the materialization of the risk theory of loss causation. *OPERS*, 840 F.3d at 385. To plead loss causation under this theory, plaintiffs must plead facts showing that "negative investor inferences" from an event or disclosure caused a decrease in stock price that was a foreseeable result of the risk a defendant concealed by fraud. *Id.* at 384–85. A loss is foreseeable if it is "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011).

Primarily, Defendants argue that Plaintiff fails to state a claim for loss causation because no corrective disclosure occurred. (ECF No. 51-1, PageID #1167–73.) Defendants also argue that Plaintiff "cannot mix and match" theories of loss causation. (ECF No. 53, PageID #2007.) However, Rule 8's pleading standard allows pleading in the alternative. *See* Fed. R. Civ. P. 8(d); *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016). Plaintiff bears the risk that proposing alternative theories of loss causation undermines the plausibility of either theory. But he is entitled to do so at the pleading stage.

Plaintiff alleges that his loss, and those of the class, resulted at least in part from the materialization of the risk that the Company's development of and investment in PowerProp, Propel SSP, and Propel SSP 350 would not be commercially viable.  (ECF No. 50, ¶ 139, PageID #1103.)  In reply, Defendants argue that this theory lacks plausibility and that the actual cause of Covia's bankruptcy and Plaintiff's losses was a general decline of the fracking industry and concomitant collapse in demand for proppants.  (ECF No. 53, PageID #2012–16.)

Plaintiff need not allege that the misstatements and omissions in this case caused their entire loss.  *In re Lehman Bros.*, 799 F. Supp. 2d at 305 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005)).  Plaintiff's allegations suffice if he alleges that the risk Defendants' misstatements and omissions concealed caused at least a portion of the loss.  *Id.*  In *Lehman Brothers*, the plaintiffs adequately pled loss causation by alleging that the materialization of the risk of Lehman's overleveraged status and investment in subprime assets, which the company concealed through its misstatements, caused some part of their losses.  *Id.* at 306.  By contrast in *Lentell*, which was a similar case, the plaintiffs failed to make any allegation that the defendant's misstatements caused any part of their loss.  *Lentell*, 396 F.3d at 175–76.  The district court dismissed the claim, at least in part, for that reason.  *Id.*

Unlike the plaintiffs in *Lentell*, Plaintiff here alleges that Defendants' misstatements concealed the risk that PowerProp and Propel SSP would fail and contribute to the Company's financial downfall.  (ECF No. 50, ¶¶ 139–46,

PageID #1103–04.)  That leaves the question whether Plaintiff plausibly alleges that these statements or omissions caused at least part of his losses, given the general decline of the overall market in which the Company operated and a drop in demand for its chief product, Northern White Sand.  (ECF No. 53, PageID #2015.)  Defendants argue that Plaintiff cannot "untangle [his] losses from the contemporaneous collapse of the frac sand market."  (*Id.*, PageID #2016; ECF No. 51-1, PageID #1173.)  In *Lehman Brothers* and *OPERS*, the risks that the defendants concealed were directly related to the cause of the overall decline in the market, which in those cases was "the worst financial crisis since the Great Depression."  *OPERS*, 830 F.3d at 388 (internal citations omitted).  That is not the case here.  But at the pleading stage, Plaintiff need only allege a plausible claim that Defendants' false and misleading statements caused some *portion* of his losses.

Plaintiff specifically alleges that the failure of PowerProp, Propel SSP, and Propel SSP 350 was a "material factor" and referenced the fixed costs and debt load the Company took on to attempt to develop these products.  (ECF No. 50, ¶¶ 139, 144 & 145, PageID #1103 & #1004.)  *See OPERS*, 830 F.3d at 388.  The Company publicly touted the potential upside of these products as a market-differentiator, which analysts noted.  (ECF No. 50, ¶ 55, PageID #1078–79.)  But that upside never materialized because the products did not prove as successful as Defendants represented.  For these reasons, Plaintiff has adequately alleged loss causation, at least at the pleading stage.  Because the Court determines that Plaintiff adequately alleged loss causation under a materialization of the risk theory, it does not evaluate

Plaintiff's allegations under the alternative theory of a series of partial corrective disclosures.

### I.C.    Scienter

Scienter "is the lynchpin of most" Section 10(b) claims.  *Albert Fadem Tr. v. American Elec. Power Co.*, 334 F. Supp. 2d 985, 1006 (S.D. Ohio 2004).  To allege it sufficiently, a plaintiff must demonstrate that each defendant "had a mental state embracing intent to deceive, manipulate or defraud."  *Omnicare III*, 769 F.3d at 472.

"[T]he Supreme Court set forth a three-part test used by lower courts to determine the sufficiency of a plaintiff's scienter allegations."  *Dougherty*, 905 F.3d at 979 (citing *Tellabs*, 551 U.S. at 322).  This inquiry requires lower courts to:  (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a *strong inference of scienter*"; and then (3) "take into account plausible opposing inferences" to decide whether "a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 322–24 (emphasis added).

To aid in this inquiry, and to determine if there is a "strong inference of scienter" that is "cogent and at least as compelling as any opposing inference," *id.*, the Sixth Circuit looks to "a non-exhaustive list of nine factors," *Doshi*, 823 F.3d at 1039–40.  They include whether there are allegations of:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary

> lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dougherty*, 905 F.3d at 979 (quoting *Omnicare III*, 769 F.3d at 473); *see Helwig*, 251 F.3d at 552.  A strong inference of scienter may be inferred from circumstantial evidence.  *Tellabs*, 551 U.S. at 323.

Although the Sixth Circuit's *en banc* decision in "*Helwig* is no longer good law" when it comes to the legal standard for scienter, its framework remains useful for analyzing factual allegations.  *See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman v. Unum Grp.*, 861 F. App'x 51, 57 (6th Cir. 2021) ("Our starting point is *Helwig*."); *Doshi*, 823 F.3d at 1039–43 (applying the factors); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106, 2019 WL 6251435, at *3–7 (N.D. Ohio Nov. 22, 2019) (same).  At the same time, however, courts "evaluate scienter by looking at 'all the allegations holistically.'" *Pittman*, 861 F. App'x at 54 (quoting *Tellabs*, 551 U.S. at 326).  "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted).

In the end, scienter remains difficult to plead and hard to prove.  Compared to a run-of-the-mill civil action, a plaintiff alleging securities fraud must do "more— much more—"to survive a motion to dismiss. *Albert Fadem Trust*, 334 F. Supp. 2d at

1006.  And although Rule 12(b)(6) requires that all inferences be drawn in the plaintiff's favor, "*inferences of scienter do not survive if they are merely reasonable.*" *Id.* (quoting *Campbell v. Lexmark Int'l Inc. (In re Lexmark Int'l Sec. Litig.)*, 234 F. Supp. 2d 680, 683 (E D. Ky. 2002)).  At this stage, a plaintiff's allegations about scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  *See Tellabs*, 551 U.S. at 324.

### I.C.1. Scienter Under the *Helwig* Factors

Recklessness presents one way to demonstrate scienter.  For example, a plaintiff may allege that a company's directors or executives recklessly made statements to the market or recklessly omitted information from those statements. The Supreme Court has not squarely addressed "whether recklessness suffices to fulfill the scienter requirement."  *Matrixx*, 563 U.S. at 48.  Under the law of this Circuit, however, the requisite recklessness requires "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  *Doshi*, 823 F.3d at 1039 (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)).  In this context, recklessness is "akin to conscious disregard."  *Dougherty*, 905 F.3d at 980. "Before drawing an inference of recklessness, courts typically require multiple obvious red flags . . . demonstrating an egregious refusal to see the obvious, or to investigate the doubtful."  *Doshi*, 823 F.3d at 1039 (citations and quotations omitted).

Recklessness will satisfy the scienter requirement for misstatements or omissions of present fact.  With respect to forward-looking statements and soft information, however, recklessness does not suffice.  "Under the [Reform Act], if the alleged misstatement or omission is a 'forward-looking statement,' the required level

of scienter is 'actual knowledge.'" *Matrixx*, 563 U.S. at 48 n.14 (citing 15 U.S.C. § 78u-5(c)(1)(B)); *Omnicare III*, 769 F.3d at 471. Additionally, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017–18 (11th Cir. 2004).

Plaintiff identifies four categories of allegations that he contends support scienter, which touch primarily on two *Helwig* factors, although some do not squarely speak to any of the *Helwig* factors. Plaintiff argues that: (1) there was a divergence between the Company's internal data and Defendants' public statements; (2) when they made their public statements, Defendants ignored the most recent information certain employees reported through internal channels, including customer complaints and reports of difficulty selling Propel SSP; (3) because the Company's value-added proppant sector was a "primary focus," Defendants were likely paying attention to the sector and knew their statements were false; and (4) Ms. Deckard's abrupt departure from the Company following the announcement of the SEC investigation is probative of scienter. (ECF No. 52, PageID #1986–91.)

### I.C.1.a. Divergence from Internal Reports and Disregard for Most Current Information

Plaintiff argues that two *Helwig* factors—divergence between internal reports and external statements on the same subject; and disregard for the most current information—support an inference of scienter. (*Id.*, PageID #1987–88.) Generally, Plaintiff cites the same factual bases in support of an inference of scienter under both factors.

In this context, internal reports and records receive broad construction.  *See Dougherty*, 905 F.3d at 981.  The "contents of meetings at which senior corporate officers were present" count.  *Id.* (citing *City of Monroe*, 399 F.3d at 688).  So too would regulatory agency meeting minutes.  *Id.* (finding FDA End-of-Phase 2 meeting minutes qualify).  However, the mere existence of internal records and reports does not mean an inference of scienter necessarily follows.  To give rise to sufficient indicia of intent, there must be some divergence between those internal reports and the external statements the company makes on the same subject.  *Id.* (citing *Helwig*, 251 F.3d at 552).  What is relevant are not particular details about the reports themselves, but "the role of these reports in perpetuating" the alleged fraud and the "role of these reports in the Defendants' decision-making process."  *Konkol*, 590 F.3d at 398.  "The standard from *Tellabs* requires *specific* facts" that the "reports were known to Defendants" and that they reflect the allegedly fraudulent scheme.  *Id.* Confidential witnesses are one way to meet the *Tellabs* requirement.  *See id.* at 398–99.

Plaintiff avers that Defendants publicly told investors that PowerProp's performance was comparable to lightweight ceramics, Propel SSP showed positive test results, and Propel SSP and Propel SSP 350 had strong indicators of successful commercialization.  At the same time, internal company records showed PowerProp's conductivity—the key indicator of proppant performance—fell far below that of lightweight ceramics, Propel SSP test results were limited and minimally successful, and only one customer adopted either Propel SSP or Propel SSP 350.  To support this

allegation, Plaintiff points to several paragraphs in the consolidated amended complaint. (ECF No. 52, PageID #1987) (citing ECF No. 50, ¶¶ 157, 159 & 178, PageID #1107 & #1111 (regarding Power Prop); *id.*, ¶¶ 163–64, 184 & 190, PageID #1108, #1113 & #1114–15 (regarding Propel SSP); *id.*, ¶¶ 167 & 184, PageID #1109 & #1113 (regarding Propel SSP 350).) According to Plaintiff, Defendants knew, or were reckless in not knowing, that these statements were false because the Company's own data contradicted the statements about PowerProp's performance and Propel SSP's test results and its employees observed these discrepancies and received complaints from customers. (ECF No. 52, PageID #1987.) Further, whistleblowers raised these concerns with four unnamed executives. (*Id.*)

These allegations support an inference of scienter, at least as to Defendants' misleading statements concerning hard information. Ms. Deckard, Mr. Biehl, and Mr. Barrus all signed SEC filings that compared PowerProp's performance to that of lightweight ceramics (ECF No. 50, ¶¶ 73, 94, PageID #1082 & #1090) and that touted Propel SSP's field trials (*id.*). Also, Ms. Deckard made the same or similar statements on earnings calls. (*Id.*, ¶¶ 70, 79 & 85, PageID #1082, #1084 & #1086–87.) Notably, only Ms. Deckard made statements concerning the allege successful results of Propel SSP's field trials using hard numbers. (*See, e.g.*, *id.*) These numbers were not subjective or unverifiable—they were hard facts and internal reports allegedly demonstrate their falsity. Also, Ms. Deckard, Mr. Biehl, and Mr. Barrus served as officers of Fairmount Santrol when it first developed PowerProp and Propel SSP. Therefore, they had access to information about the products and their development

63

before the merger with Unimin, after which, Defendants aver, they became a less important part of the Company's overall business.

Plaintiff's allegations show at least that Defendants had "access to information contradicting their public statements." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711 (E.D. Mich. 2010). Defendants distinguish *Chamberlain* on two grounds. First, most of the defendants in that case were actively involved in an anti-competitive scheme, which they concealed. (ECF No. 53, PageID #2020) (citing *Chamberlain*, 747 F. Supp. 2d at 712–13, 719).) Though true, this factual difference does not negate the rule that access to contradicting information can support an inference of scienter based on recklessness. Each of Defendants' citations supporting a contrary rule—that access to information contradicting public statements is insufficient to show recklessness—are from a single Circuit (and district courts in that Circuit), not the Sixth Circuit. (ECF No. 51-1, PageID #1184.) Second, the district court in *Chamberlain* dismissed one defendant, Booth, because the court could not "infer Booth's fraudulent intent merely from his position in the company." *Id.* at 719. But Defendants do not mention that the plaintiffs in *Chamberlain* did not even allege any false or misleading statements attributable to Booth. *Id.*

### I.C.1.b. Countervailing Explanation

Defendants explain that they and the Company believed PowerProp, Propel SSP, and Propel SSP 350 could be developed and commercialized successfully, such that they reported to the market what they learned about the products from subordinates and did not commit fraud. (ECF No. 51-1, PageID #1184–85.) Further, none of the alleged reports from subordinates who allegedly alerted the Company's

officers to fraud specifically name Defendants.  (ECF No. 53, PageID #2019.)  Plaintiff argues that his theory of scienter is cogent and "at least equally as likely" as Defendants' countervailing explanation because "all the facts alleged, taken collectively" support a strong inference of scienter.  (ECF No. 52, PageID #1986) (quoting *Tellabs*, 551 U.S. at 322–23).)

Defendants' countervailing explanation is equally as likely as Plaintiff's theory of scienter, at least at the pleading stage, for two reasons.  First, Defendants focus on the fact that no confidential witness names them to undermine an inference of scienter rising to the level of actual knowledge.  But that fact does not speak to recklessness.  Plaintiff alleges that Ms. Deckard, Mr. Biehl, and Mr. Barrus made misleading statements concerning hard information.  The standard for scienter with respect to these statements is recklessness, not actual knowledge. *Omnicare III*, 769 F.3d at 471.  Second, Defendants' theory focuses on shortcomings in the allegations based on Plaintiff's confidential witnesses—not on "all of the facts alleged, taken collectively" as the Supreme Court instructs. *Tellabs*, 551 U.S. at 323.  As the Court explained above, the facts taken collectively support an inference of recklessness under the relevant *Helwig* factors.

Also, Defendants argue that the SEC order does not find scienter on the part of any individual.  (ECF No. 51-1, PageID #1179.)  But the SEC's order, without more, fails to refute a showing of scienter for at least three reasons.  First, the SEC order is the result of an agreement between the Company and the SEC.  Second, the SEC order names the Company as a whole, not the individual Defendants in this lawsuit.

(ECF No. 50-1, PageID #1127.)  Third, the SEC order does not address scienter on the part of any person.  The words "scienter" or "state of mind" appear nowhere in the SEC order.  For these reasons, the SEC order does not foreclose an inference of scienter in this lawsuit.

*     *     *

Defendants spend the balance of their briefing attacking the insufficiency of Plaintiff's allegations as to each individual Defendant, rather than addressing the *Helwig* factors.  The Court will address scienter holistically as to each Defendant below.  However, the two *Helwig* factors on which Plaintiff relies give rise to a strong inference of scienter at the pleading stage.

### I.C.2. Ms. Deckard's Separation from Employment

Plaintiff argues that Ms. "Deckard's abrupt termination shortly following the announcement of the SEC's investigation is also probative of scienter" as to the Company and the individual Defendants.  (ECF No. 52, PageID #1991; ECF No. 50, ¶ 133, PageID #1101–02.)  Plaintiff argues that the "unexpected departure of a CEO connected temporally to a regulatory investigation 'weighs slightly in favor of a finding of scienter.'"  *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 695 (S.D. Ohio 2019).  Mr. Biehl and Mr. Barrus no longer worked at the Company when Ms. Deckard separated from employment.  Therefore, her departure has little bearing on their scienter.

Citing several out-of-circuit authorities, Defendants maintain that Ms. Deckard's separation from employment does not support an inference of scienter

because nothing in her departure announcement referenced alleged fraud.  (ECF No. 51-1, PageID #1180–81.)  Standing alone, they argue, Ms. Deckard's resignation cannot establish scienter where "no specific evidence indicates the resigning officials, or their replacements, knew of" the alleged fraud.  *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. 2016); *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 251 (S.D.N.Y. 2007) (finding no inference of scienter where majority of the fraud occurred before CEO joined the company and resignation was not explicitly linked to fraud); *M&M Hart Living Tr. v. Global Eagle Ent., Inc.*, No. CV 17-1479, 2017 WL 5635424, at *13 (C.D. Cal. Aug. 20, 2017) (finding no inference of scienter where plaintiff did not allege facts sufficient to distinguish a suspicious change in personnel from a benign one).

Similarly, Defendants cite *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 344–48 (D.N.J. 2007), for the proposition that, where an officer's resignation is not explicitly connected to the allege fraud, it cannot form "even a piece" of the scienter puzzle.  (ECF No. 51-1, PageID #1181.)  There, the district court relied on a line of cases from the Northern District of California.  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 346–47 (citing *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005); *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051290, at *14 n.26 (N.D. Cal. Mar. 25, 2003); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002)).  The Court declines to adopt such a bright line rule where the Sixth Circuit has not done

so and will consider whether Ms. Deckard's departure supports an inference of scienter viewing the facts alleged in the consolidated amended complaint holistically.

Covia attributed Ms. Deckard's departure to the Board's decision "to pursue a different direction with our leadership." (ECF No. 50, ¶ 130, PageID #1101.)  When the Company made that announcement on May 9, 2019, the scope of the SEC investigation was not yet public.  By then, the Company had only disclosed the fact of the investigation and that it had received a subpoena concerning some of its value-added proppant products.  (*Id.*, ¶ 127, PageID #1100.)  Unlike the plaintiffs in *Schott*, *Openwave*, and *M&M Hart*, here Plaintiff alleges that Ms. Deckard knew of the alleged fraud, or was severely reckless in not knowing (*see, e.g.*, ECF No. 50, ¶ 90, PageID #1089) and the SEC order further supports that the fraud occurred while Ms. Deckard was an officer first of Fairmount Santrol and then of Covia.  (ECF No. 50-1, ¶¶ 10–41, PageID #1129–33.)  These allegations support an inference of scienter, even if the inference is not as strong as it would be had the Company's announcement explicitly tied Ms. Deckard's departure to fraud.

Further, relying on *Albert Fadem Trust*, 334 F. Supp. 2d at 1014, Defendants argue that Ms. Deckard's departure occurred too long after the Company announced the SEC subpoenas to be plausibly related to the alleged fraud.  (ECF No. 51-1, PageID #1180–81.)  In that case, Plaintiff proposed no plausible explanation for the significance of the dates of certain officers' resignations, which occurred a year before discovery of the alleged fraud.  *Id.*  One officer resigned a month after the public disclosure of the alleged fraud, but there was a more plausible explanation for that

resignation. Just one month earlier, the company publicly disclosed it was decreasing the size of the officers' entire department. *Id.* An anodyne statement that the Board was going "in a different direction" does not present the same kind of plausible alternative explanation for Ms. Deckard's departure, particularly in light of the SEC investigation that was ongoing at the same time.

Finally, Defendants argue that, if Ms. Deckard's termination were related to the alleged fraud, the Company would not have kept her on as a consultant. (ECF No. 51-1, PageID #1181.) In *Forman*, the departing CEO stayed on pending the naming of his replacement. 367 F. Supp. 3d at 695. Still, the district court determined that his departure weighed slightly in favor of an inference of scienter. *Id.* Similarly, Ms. Deckard's departure a few weeks after the SEC issued a subpoena—which the record reflects concerned PowerProp, Propel SSP, and Propel SSP 350—weighs slightly in favor of a showing of a strong inference of scienter.

### I.C.3. Holistic Analysis of Scienter

As the Supreme Court's decision in *Matrixx* requires, the Court also reviews "all the allegations holistically." *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). Additionally, as courts within this Circuit continue to do following *Matrixx*, the Court also considers the allegations of the second amended complaint under *Helwig*. *See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman*, 861 F. App'x at 57 ("Our starting point is *Helwig*."). "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted).

69

Ms. Deckard signed each of the Company's Form 10-Ks during the class period. Mr. Barrus signed the Company's 2015 Form 10-K, and Mr. Biehl signed the Company's 2016 and 2017 Forms 10-K.  Plaintiff generally alleges that each Defendant:  "directly participated in management of the Company"; "was directly involved in the day-to-day operations of the Company at the highest levels"; "was privy to confidential proprietary information concerning the Company and its business and operations"; "was directly or indirectly involved in . . . disseminating the false and misleading statements and information alleged herein"; "was directly or indirectly involved in . . . the Company's internal controls"; "was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company"; and/or "approved or ratified" the false or misleading statements.  (ECF No. 50, ¶ 27, PageID #1072–73.)

Considering the totality of Plaintiff's allegations against each Defendant under the Reform Act and the law of this Circuit both individually and collectively, Plaintiff adequately alleges scienter only as to Ms. Deckard.

### I.C.3.a. Ms. Deckard

The bulk of the specific allegations in the consolidated amended complaint concern Ms. Deckard.  She spoke during the Company's earnings calls and press conferences, and she signed the Company's Form 10-Ks during the class period.

Plaintiff's biggest hurdle with respect to scienter is that neither the SEC order nor any of Plaintiff's confidential witnesses identify which unnamed executive was affirmatively told about the Company's alleged fraud.  However, other facts support an inference of scienter.  The consolidated amended complaint identifies at least four

70

occasions on which Ms. Deckard repeated in her own words allegedly false metrics concerning Propel SSP's test results.  Plaintiff alleges that Ms. Deckard attended sales meetings where attendees discussed the commercial viability of PowerProp and Propel SSP.  (ECF No. 50, ¶¶ 185 & 191, PageID #1113 & #1115.)  Further, according to the Company's former marketing executive, Ms. Deckard "emphasiz[ed] the critical role" the Company's resin-coated products "would play in driving Covia into profitability."  (*Id.*, ¶ 191, PageID #1115.)

"At the motion-to-dismiss stage, we need not view [the CEO]'s optimism as mere ignorance."  *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F. 4th 802, 813 (6th Cir. 2022).  And Ms. Deckard expressed more than generalized optimism.  She repeatedly touted Propel SSP's allegedly false test results and signed several SEC filings that compared PowerProp's performance to lightweight ceramics, which Plaintiff claim was false.

In particular, Ms. Deckard's emphasis on Propel SSP as an important component of the Company's future profitability supports an inference of scienter.  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 725 (S.D. Ohio 2006).  Certainly, the products at issue represented a small share of the Company's business.  But taking all of Ms. Deckard's statements together, and considering the *Helwig* factors, Plaintiff's allegations establish a strong inference that she at least recklessly, if not knowingly, misled investors when she made the material misstatements of hard information alleged in the consolidated amended complaint.  *Cf. id.* (finding a strong inference of scienter where defendants' misstatements concerned the company's

71

"main driver" of growth). This inference is at least as strong as the competing explanations for Ms. Deckard's statements that she advances.

### I.C.3.b. Mr. Barrus and Mr. Biehl

To determine whether the allegations raise a strong inference of scienter as to each individual defendant, the Court must analyze Plaintiff's allegations holistically. But there are no allegations against Mr. Barrus or Mr. Biehl other than their signatures on the Company's 2015 10-K and 2016 and 2017 10-Ks, respectively. Without more, their failure to verify the veracity of each statement in the filing "indicates negligence at most." *Astec*, 29 F. 4th at 816. Mr. Barrus's name appears in the consolidated amended complaint only five times, three of which are in the case caption and "Parties" section. Mr. Biehl's name appears only six times. These allegations do not satisfy the heightened pleading requirement for scienter or amount to a "cogent and compelling inference of scienter." *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 801 (N.D. Ohio 2021). For these reasons, the Court **GRANTS** Defendants' motion as to Mr. Barrus and Mr. Biehl and **DISMISSES** all counts against those two Defendants.

### I.C.3.c. The Company

Plaintiff does not allege claims against the Company because of its bankruptcy. However, Plaintiff argues that the individual Defendants have control-person liability because the Company itself violated federal securities laws. (ECF No. 50, ¶ 217, PageID #1122.) The Court addresses those claims in more detail below.

Plaintiff argues that he sufficiently alleges scienter as to the Company. Because the Company is not a Defendant in this case, the Court declines to determine

whether Plaintiff alleges a strong inference of scienter—or any other element of a securities fraud claim—against the Company.  However, as a matter of law Ms. Deckard's scienter can be imputed to Company by virtue of her position as its chief executive officer.  *Astec*, 29 F. 4th at 816 (quoting *Omnicare III*, 769 F.3d at 476).

## II.    Section 20(a) Control-Person Liability

As an initial matter, Plaintiff urges the Court to adjust its holding in *Plymouth County Retirement Association v. ViewRay, Inc.* to determine that there is no requirement that a party liable under Section 20(a) be a "culpable participant" in the underlying violation.  (ECF No. 52, PageID #1992.)  The Sixth Circuit affirmed that decision without addressing the control-person claims.  *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, No. 21-3863, 2022 WL 3972478 (6th Cir. Sept. 1, 2022).  For the following reasons, the Court declines to re-examine its holding in *ViewRay* here because Plaintiff's theory of control-person liability fails for another reason.

Plaintiff's theory of control-person liability against Ms. Deckard for her control of the Company is circular.  Although Plaintiff does not seek to recover against the Company because of its bankruptcy, he alleges in the consolidated amended complaint that the Company's conduct constitutes a primary violation for purposes of Section 20(a).  (ECF No. 50, ¶ 218, PageID #1122.)  Because the Company is not properly a Defendant in this case, as a formal matter the Court cannot conclusively determine that it committed an underlying violation of Section 10(b) or Rule 10b-5.

Even if a claim against the Company were properly before the Court, the Company's scienter, at least in part, relies on Ms. Deckard's scienter as its chief executive.  As the Sixth Circuit has noted, without deciding, that "a plaintiff may not

be able to simultaneously assert both Section 10(b) and Rule 10b-5 claims and Section 20(a) claims against the same defendant." *PR Diamonds Inc. v. Chandler*, 91 F. App'x 418, 442 n.4 (6th Cir. 2004).  The Court declines to impute Ms. Deckard's scienter for her alleged primary violation of Section 10(b) and Rule 10b-5 to the Company to support an additional control-person claim against Ms. Deckard herself where, as here, an underlying Section 10(b) violation against the Company is not before the Court.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.  The Court **DISMISSES** Mr. Barrus, Mr. Biehl, Mr. Navarre, and Mr. Eich and **DISMISSES** Counts II and III against all Defendants, including Ms. Deckard.  But Count I will proceed against Ms. Deckard based on the allegations in the following paragraphs of the consolidated amended complaint:  ¶ 66, PageID #1081; ¶ 70, PageID #1082; ¶ 73, PageID #1082; ¶¶ 79 & 81, PageID #1084–85; ¶ 85, PageID #1087; ¶ 89, PageID #1089; ¶ 94, PageID #1090; ¶ 107, PageID #1094.

**SO ORDERED.**

Dated:  March 30, 2023

_____
    J. Philip Calabrese
    United States District Judge
    Northern District of Ohio

74
